FILED

2022 Apr-04  PM 03:55
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| BRITTANY COLEMAN;<br>BRANDON JONES;<br>CHEKEITHIA GRANT; and<br>ALEXIS THOMAS, on behalf of<br>themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>THE TOWN OF BROOKSIDE, ALABAMA;<br>JETT'S TOWING, INC.; and<br><br>MARCUS SELLERS and BROOKSIDE<br>POLICE OFFICERS DOE 1 and DOE 2, in their<br>individual capacities,<br><br>Defendants. | Civil Action No. _____<br><br>**CLASS ACTION<br>COMPLAINT** |

Plaintiffs and putative class representatives Brittany Coleman, Brandon Jones, Chekeithia Grant, and Alexis Thomas, by their undersigned counsel, allege as follows, on behalf of themselves and all others similarly situated:

## INTRODUCTION

1.     This civil rights case challenges the Town of Brookside's (the "Town" or "Brookside") years-long policy, practice, and custom of using its law-enforcement and municipal-court systems to generate revenue for the Town's police department, prosecutor's office, and municipal court. Since March 2018, the Town's

1

policymakers have systematically deployed its police department not to protect the public, but to generate revenue, resulting in a 640% increase in revenue generated from "fines and forfeitures" within two years. That money has gone almost entirely right back to the police department for use on hiring, trainings, conferences, salaries, expensive unmarked SUVs, a new communications center and jail, a K9 unit, and a SWAT tactical operations team, among other purchases—all to patrol a small town of fewer than 1,300 residents that sees essentially no serious crime.

2.      Police officers, prosecutors, and municipal judges are public officials, entrusted with enormous power over the cases they charge, prosecute, and adjudicate.

3.      As recognized by the U.S. Supreme Court, the Due Process Clause of the Fourteenth Amendment mandates that municipal courts cannot have (or appear to have) a financial interest in obtaining convictions.

4.      The U.S. Supreme Court has also made clear that the Due Process Clause prohibits law enforcement (police departments and prosecutor's offices) from having a financial interest or incentive in enforcing the law.

5.      Therefore, a municipality may not use or appear to use its municipal court to fund, or increase the funding of, municipal departments or operations.

6.      Similarly, a municipality may not have a system that incentivizes its police department or prosecutor's office to fund, or increase the funding of,

municipal departments or operations.

7.    For years, Brookside has been systematically violating these principles.

8.    Since at least March 2018, the Town's policymakers have deployed its law-enforcement and municipal-court systems to maximize the Town's revenue streams, to the direct financial benefit of the very municipal departments and operations responsible for ticketing (the police department), prosecution (the prosecutor's office), and adjudication (the municipal court).

9.    Between 2017 and 2020 (the most recent year for which the Town has publicly released its financial data), Brookside's annual revenue from "fines and forfeitures" skyrocketed by nearly 1,100%—from $51,473 to $610,307.

10.    By 2020, fines and forfeitures made up around 49% of the Town's annual revenue. Most of that revenue—often taken from people with no realistic ability to challenge the Town's policing for profit—has directly benefitted the Town's police department, which has used its skyrocketing budget on, among other things, military-style equipment and expensive unmarked black SUVs for its officers.

11.    That 49% figure is a near-fivefold increase from the percentage of the Town's revenue that came from fines and forfeitures in 2017. And it is nearly five times the amount that courts around the nation recognize as raising a presumption of unconstitutionally profit-driven or policing-dependent municipal budgeting.

12.    The experiences of Plaintiffs Brittany Coleman, Brandon Jones, Chekeithia Grant, and Chekeithia's daughter Alexis Thomas (the "Named Plaintiffs") spotlight how Brookside's pursuit of revenue has harmed the Town's residents and people unfortunate enough to drive through (or near) the Town.

13.    In service of the Town's quest for revenue extraction, Brookside police officers have been systematically subjecting the Named Plaintiffs and thousands of others like them to intrusions and indignities, including baseless and unconstitutional traffic stops, car searches, handcuffings, and arrests; fabricated allegations and violations; and unnecessary car tows and roadside strandings for the purpose of extracting vehicle "release" fees.

14.    The Town arranged for each of the Named Plaintiffs' cars to be towed by Defendant Jett's Towing, Inc. ("Jett's Towing"), which has regularly had tow trucks on standby directly next to, behind, or within a block or two of Brookside police cars in order to immediately tow and impound vehicles.

15.    Those towing policies and practices are an immensely lucrative revenue-raising device that Brookside's policymakers and Jett's Towing have, together, turbo-charged since 2018. Between 2018 and 2020, annual tows skyrocketed from 50 to 789.

16.    Jett's Towing refuses to release a car without proof that the owner or driver has paid around $175 to Brookside for a "release receipt." Then, the company

charges an additional $160 (or more), plus daily impound fees.

17.    The Town also charged each Named Plaintiff with offenses in Brookside Municipal Court. The municipal court relies on the Brookside City Council for its funding. The Brookside City Council is responsible for appointing the lone municipal judge, fixing his salary, and financing the municipal court's operations. Between 2019 and 2021, the council more than doubled the salary of the Town's municipal judge.

18.    During that same period, the council also increased the salary of the town attorney (the Town's sole prosecutor) by over $50,000, including more than doubling the part of his salary attributable to prosecuting municipal-court cases.

19.    This state of affairs suffers structural problems that violate the rights of everyone subjected to it. Brookside's policy, practice, and custom of relentlessly towing vehicles to generate ready cash for the Town violates the Due Process Clause of the Fourteenth Amendment. So, too, does the Town's single-minded goal of exploiting its criminal-justice system for profit.

20.    Plaintiffs thus seek to certify two classes.

21.    First, the "Towing Class," defined to cover: "All persons who, since March 1, 2018, have paid fees to either the Town of Brookside or Jett's Towing (or both) to secure the release of a vehicle towed on the orders of the Brookside Police Department following a traffic stop." On behalf of this class, Plaintiffs seek class-

wide declaratory and injunctive relief against Brookside and Jett's Towing, including the disgorgement and cancelation of fees arising from their unconstitutional policies, practices, and customs.

22.     Second, the "Charging Class," defined to cover: "All persons who have been charged with offenses in Brookside Municipal Court following traffic stops by the Brookside Police Department since March 1, 2018." On behalf of this class, Plaintiffs seek to establish Brookside's liability for the systemic due-process violations caused by the Town's profit-fueled enforcement policies, practices, and customs.

## JURISDICTION AND VENUE

23.     Plaintiffs bring this civil rights lawsuit pursuant to 42 U.S.C. § 1983 and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, for violations of rights, privileges, or immunities secured by the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution and the Fourth Amendment to the U.S. Constitution.

24.     This Court has jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343 (civil rights jurisdiction).

25.     Venue is appropriate in this Court under 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2).

## THE PARTIES

26.     Plaintiff Brittany Coleman is an adult citizen of the United States and a resident of Georgia.

27.     Plaintiff Brandon Jones is an adult citizen of the United States and a resident of Alabama.

28.      Plaintiff Chekeithia Grant is an adult citizen of the United States and a resident of Alabama.

29.     Plaintiff Alexis Thomas is an adult citizen of the United States and a resident of Alabama.

30.     Defendant Town of Brookside is a municipal corporation located in Jefferson County, Alabama. Brookside controls, directs, and funds its police department, prosecutor, and municipal court.

31.     At all times relevant to the facts of this case, Brookside, its agents, and its employees have acted under color of law. The actions that give rise to Plaintiffs' claims are, unless otherwise indicated, taken pursuant to the policies, practices, and customs of Brookside, at the direction of, with the knowledge of, and through the actions of: its former and current policymakers (including its former and current mayors, its current municipal court judge, its current prosecutor, and its recently-resigned police chief); its former and current police officers; and a private towing company (Defendant Jett's Towing, Inc.) that performs municipal functions with

and at the direction of those policymakers and officers.

32.     Defendant Jett's Towing, Inc. ("Jett's Towing") is an Alabama corporation with its principal place of business in Adamsville, Alabama. Jett's Towing is sued for its actions taken under color of law that give rise to Plaintiffs' claims. Jett's Towing's actions that give rise to Plaintiffs' claims are government functions because the authority to tow or impound vehicles for the reasons and in the manner described in this case derives from and is directly in conjunction and coordination with Brookside's exercise of municipal and police powers. Jett's Towing's actions that give rise to Plaintiffs' claims are done jointly with Brookside and pursuant to the policies, practices, and customs of Brookside. Jett's Towing perpetuates and profits from Brookside's policy, practice, and custom of towing and impounding vehicles for profit.

33.     Defendant Marcus Sellers was at all times relevant to this case a police officer employed by the Town of Brookside. He is sued in his individual capacity by Plaintiff Brittany Coleman.

34.     Defendant Officers Doe 1 and Doe 2 participated, with Defendant Sellers, in the April 4, 2020 traffic stop of Plaintiff Brittany Coleman and were at that time police officers employed by the Town of Brookside. They are sued in their individual capacities by Plaintiff Brittany Coleman. They will be added as named defendants when their identities are determined.

## STATEMENT OF FACTS

**I.      Brookside's policymakers institute and implement policies, practices, and customs designed to generate revenue from fines, fees, and forfeitures.**

35.     The Town of Brookside is a small city outside of Birmingham, Alabama. It is home to fewer than 1,300 residents. Its police jurisdiction covers six miles of roads and a 1.5-mile stretch of Interstate 22.

36.     From 2011 to 2018, Brookside reported to the State of Alabama a total of 55 serious crimes (defined as assault, burglary, homicide, larceny, motor vehicle theft, rape, or robbery). Of those 55 crimes over an eight-year period, none were rape or homicide.

37.     In 2017 and 2018, Brookside reported no serious crimes at all.

38.     In March 2018, the Brookside City Council named Michael Jones its new chief of police. They made him Brookside's only full-time officer. At that time, the Town's current mayor, Mike Bryan, was a member of the Brookside City Council.

39.     When the city council and mayor made Chief Jones the chief of police, he was already one of a small handful of part-time Brookside officers. So the Town's policymakers knew who he was and what his policing goals and strategies would be upon taking office. They hired him to fulfill and implement particular mandates and directives, starting with building a full-time police department.

40.     Chief Jones fulfilled and exploited his mandate with alacrity. He immediately instituted and began directing, overseeing, and participating in systematic practices designed to generate revenue. By 2021, he had grown Brookside's police force to nine full-time officers and several part-time officers. Counting just the nine full-time officers, that per-capita size is nearly five times larger than the national average.

41.     The hiring spree that Brookside's policymakers (the city council, mayor, and Chief Jones) implemented had its intended effects: By relentlessly policing, ticketing, arresting, towing, prosecuting, and convicting Brookside residents and others, the Town has succeeded in maximizing its revenue, nearly all of which flows right back to the police department, with increased revenue for the town attorney and municipal court as well. All of those budgets are controlled by the city council.

42.     Several statistics from 2018 (when Chief Jones took over and began instituting the mayor's and city council's directives) to 2020 (the latest year for which Brookside has made data publicly available) illustrate, in raw numbers, the effects of the policies, practices, and customs instituted and implemented by Chief Jones and Brookside's other policymakers.

43.     From 2018 to 2020, Brookside police patrol hours grew from 1,735 to 12,372 to 17,375 per year. That is a tenfold increase.

44.    From 2018 to 2020, Brookside police issued 382, then 2,782, then 3,024 traffic citations per year. That is a near-eightfold increase.

45.    From 2018 to 2020, Brookside police, in conjunction with Defendant Jett's Towing, towed 50, then 508, then 789 vehicles per year. That is a near-sixteenfold increase. Put differently, in 2020 Brookside police were averaging more than two vehicle tows per day, every single day. And on information and belief, these efforts persisted throughout 2021, though Brookside has yet to release that year's data.

46.    In 2018, Brookside police made 90 misdemeanor arrests. In 2019, that number increased to 518. In 2020, that number increased to 1,273. That is a fourteenfold increase between 2018 and 2020.

47.    From 2018 to 2021, the mayor and Chief Jones applied for and received grants for their officers to work overtime, maximizing the hours they could devote to policing for profit without spending Brookside revenue.

48.    Brookside has not grown in residency or size nearly commensurate with those explosions of citations, vehicle tows, and misdemeanor arrests. Indeed, its population has stayed about the same since 2017. Nor is there any indication that crime was increasing (and certainly not substantially) in Brookside before or during this period.

49.    Brookside's 2020 towing, citation, and arrest figures, in particular,

illustrate a commitment to aggressive and profit-driven policing, in light of the decreases in road and highway travel caused by the Covid-19 pandemic that year.

50.    In 2020, Brookside made about the same number of arrests for misdemeanor allegations (which are prosecuted in the Town's municipal court) as it had residents. It also collected $487 in fines and forfeitures for every man, woman, and child in the town (to say nothing of the amounts assessed but unpaid).

51.    From 2018 to 2020, Brookside's revenue from "fines and forfeitures" increased from $82,467 to $187,445 to $610,307 per year. (It is unclear whether the $610,307 is the Town's gross revenue or its net revenue after accounting for fines and forfeiture related expenses, so the amount taken in may be greater still.)

52.    The increase is even more stark when measured against 2017, the year before Brookside's policymakers put Chief Jones in charge: that year, Brookside's fines and forfeitures revenue was $51,473. In other words, from 2017 to 2020, Brookside's annual fines and forfeitures revenue grew by nearly 1,100%.

53.    By 2020, fines and forfeitures revenue made up 49% of Brookside's total annual revenue. That is five times the amount that courts across the country deem presumptive evidence of overreliance on fines, fees, and forfeitures to fund municipal operations. Even in 2019, the percentage of Brookside's annual revenue that came from fines and forfeitures was over 20%—double the typical threshold for presumptive unconstitutionality.

54. Of course, those revenue numbers do not account for the significant amounts of fines, fees, and forfeitures that Brookside assessed but was unable to collect from its mostly poor or below-median-income residents.

55. In 2019, over 18% of Brookside residents lived below the poverty line (compared to approximately 16.5% statewide), and Brookside's median household income was under $39,000 (compared to nearly $52,000 statewide).

## II. Brookside's reliance on fines and fees revenue drives its towing and law-enforcement policies, practices, and customs.

56. None of the massive increases in revenue discussed above are coincidental. They are not the result of changes in population size or driver behavior, nor meaningful increases in serious crime, in or around Brookside.

57. Instead, Brookside's massive increases in revenue starting in 2018 are the result of deliberate policies, practices, and customs instituted by Brookside's former and current policymakers to generate as much revenue as possible, almost all of which goes to the police, with additional windfalls to the town prosecutor and municipal court.

58. Chief Jones was one of the policymakers. He made the officer-hiring decisions, and he supervised the dozen or so officers he employed at any given time. He tasked the officers with implementing his towing and ticketing practices, which, as detailed below, follow clear patterns and demonstrate systematic policies, practices, and customs. He also regularly personally carried out and observed other

officers carry out the systematic practices described below.

59.    Brookside's other policymakers knew about, approved, and ratified Chief Jones's abusive revenue-generating policies, practices, and customs. As explained by current Mayor Mike Bryan, the former mayor and city council (which included Mike Bryan at the time) hired Chief Jones with a directive to build a new police force and implement his policies, practices, and customs.

60.    In an interview in late 2021 or early 2022, Chief Jones said (with Mayor Mike Bryan present and agreeing) that Brookside's policing is "a positive story" and that "a 600% increase" in annual revenue within two years is "a failure," because, according to Chief Jones, "with more officers and more productivity you'd have more" revenue generation and increases.

61.    To achieve that "productivity" in revenue generation starting in 2018, Brookside and Chief Jones instituted revenue-fueled policies, practices, and customs for towing vehicles and for law-enforcement activity more broadly.

A.    **"They just want the money": Brookside's vehicle-towing system is a key element of its revenue-generation policies, practices, and customs.**

62.    Since at least March 2018, Brookside's policy, practice, and custom of seizing, towing, and impounding vehicles has been driven by the single-minded goal of maximizing town revenue instead of safeguarding the public interest or respecting constitutional rights.

63.    For every vehicle that Brookside police order seized and towed, the owner must pay Brookside approximately $175 to get a piece of paper authorizing the tow company (Defendant Jett's Towing) to release the vehicle. On information and belief, this fee goes entirely to Brookside, and therefore funds the city council, municipal court, prosecutor's office, and police department.

64.    After Jett's Towing tows and impounds a vehicle, Brookside refuses to tell the vehicle owner where the car is until the owner pays approximately $175 to Brookside for the piece of paper "releasing" the vehicle. Jett's Towing also refuses to release a vehicle without proof of payments already having been made to Brookside. Then, Jett's Towing charges its own fee of at least $160, plus daily impound fees, to release the vehicle.

65.    No neutral adjudicator is involved at any stage of this process. It operates entirely at the direction of Brookside's policymakers and Jett's Towing.

66.    Since March 2018, Brookside's reliance on these tow-release fees has created an incentive for its police officers to order the towing of vehicles with the goal of maximizing revenue for Brookside. They do so by following systematic patterns of behavior, evincing department-wide policies, practices, and customs designed to create pretextual reasons to tow as many cars as possible.

67.    On information and belief, for example, in order to meet the Town's revenue goals Brookside police officers regularly refuse to look at drivers' proof-of-

insurance documentation and then order the drivers' vehicles towed for lack of insurance.

68.    On information and belief, in order to meet the Town's revenue goals Brookside police regularly order vehicles towed even when people are physically present or about to be present who could legally and safely drive those vehicles away from the scene.

69.    On information and belief, a DMV supervisor in a nearby town told one victim of Brookside's towing policies, practices, and customs that Brookside police officers regularly allege that a vehicle's driver is not its owner. On information and belief, that policy, practice, and custom exists to meet the Town's revenue goals by giving the officers the opportunity to order the drivers' vehicles towed (as happened to the woman who spoke to the DMV supervisor).

70.    On information and belief, in order to meet the Town's revenue goals Brookside police officers regularly arrest drivers with the goal of thereby having the opportunity to order the drivers' vehicles towed.

71.    On information and belief, Brookside regularly has a Jett's Towing tow truck on standby directly next to, behind, or within a block or two of Brookside police cars in order to immediately tow vehicles, for the profit of Brookside and Jett's Towing.

72.    For every vehicle that Brookside police order towed, the owner also

must pay Jett's Towing an additional fee of at least $160, plus daily impound fees, to regain the vehicle. Jett's Towing refuses to release a vehicle without proof of prior payment of Brookside's fee.

73.     In short, Brookside's policy, practice, and custom is to use vehicle towing not as a legitimate law-enforcement or public-safety tool, but to maximize revenue for Brookside (and in turn, to maximize revenue for the Brookside Police Department and other municipal departments and functions).

74.     Jett's Towing is a knowing and active participant in and beneficiary of Brookside's towing policies, practices, and customs. It is the "designated and approved Brookside impound lot." The company stands at the ready near police cars to tow vehicles, and it refuses to release them until Brookside collects its own predatory fees. Moreover, Brookside empowers Jett's Towing to not only charge the company's own towing, impound, and storage fees, but also to charge and collect "additional town fees." And Jett's Towing has regularly auctioned off the vehicles of individuals who could not afford to pay the release fees, for yet additional profit to the company.

75.     Brookside's profit-driven towing practices are reflected in figures from recent years. In 2018, Brookside police ordered a total of 50 vehicles towed. In 2019, Brookside police ordered 508 vehicles towed. In 2020, Brookside police ordered 789 vehicles towed—an increase of over 1,400% within two years.

76.     With the approximately $175 fee Brookside charges for each vehicle's release, the vehicles seized in 2020 alone had the potential to add over $130,000 to Brookside's 2020 revenue.

77.     Jett's Towing stood to gain as much too, if not more, given daily impounding fees and profits from auctioning off cars that people could not afford to have released.

78.     Brookside's and Jett's Towing's increases in towing revenue are a direct result of the policies, practices, and customs instituted by Brookside through policymakers Michael Jones, the former and current mayors of the Town, and the City Council. As a representative of Jett's Towing told Plaintiff Brandon Jones's wife when she picked up their vehicle from Jett's Towing's impound: "They just want the money." (That admission did not, of course, stop Jett's Towing from also demanding and collecting its fees from the Jones family.)

> **B.     Brookside's reliance on fines and fees revenue has driven its law-enforcement policies, practices, and customs.**

79.     At all times relevant to this case, Brookside has paired its profit-driven towing practices with profit-driven law-enforcement practices more broadly. At all times relevant to this case, Brookside's reliance on fines, fees, and forfeiture revenues has created an incentive for its law-enforcement officials (including police officers and its town attorney) to maximize revenue. Similarly, that reliance has created the appearance (and the reality) that Brookside's municipal court has a

financial interest in imposing fines, fees, and costs.

80.    The Brookside Municipal Court has jurisdiction over prosecutions of violations of Brookside municipal ordinances only. *See* Ala. Code § 12-14-1(c); *see also* Ala. Const. art. VI, § 145. Municipalities like Brookside are authorized to adopt ordinances and to make violations of state misdemeanor statutes offenses against the municipality itself when the violations occur within the municipality's jurisdiction.

81.    Fines and fees assessed in cases heard in Brookside Municipal Court are paid in part to the Town of Brookside. The mayor of Brookside has the power to remit fines and such costs as are payable to the municipality, and to commute sentences imposed by the municipal court (or the court to which an appeal is taken) for violations of municipal ordinances. Ala. Code § 12-14-15.

82.    Since Brookside's policymakers hired Chief Jones, Brookside has become heavily dependent on revenues derived from law enforcement through its municipal court.

83.    Brookside puts its fines, fees, and forfeiture revenue almost entirely back into its police department. As explained by the current mayor, $544,077 of the $610,307 raised in 2020 went directly to the police, in the form of training, conferences, computer and software purchases, vehicle maintenance and purchases, and salaries. In other words, the police operate under a direct eat-what-you-kill profit-incentive system.

84.     They have used their massive budget increases to acquire, among other things, military-style equipment, expensive unmarked black SUVs, a new communications center and jail, and a K9 unit.

85.     They even made use of a mine-resistant vehicle (known to residents as the town tank), which Chief Jones parked in front of city hall as a show of intimidation.

86.     According to the mayor, after the police got their cut, Brookside "only profited $70,886" in 2020 from what the Town designated its "fines and forfeitures."

87.     At all times relevant to this case, Brookside's reliance on the fines and fees assessed in Brookside Municipal Court has created an ever-present incentive for its law-enforcement officials to maximize revenue through fines and fees. The Brookside Police Department even named one of its drug dogs "K9 Cash."

88.     This incentive for Brookside's law-enforcement officials to maximize revenue through fines and fees is evidenced not just by the financial figures detailed above, but also by the Brookside Police Department's on-the-ground practices. For example:

      a.     Brookside's practice of issuing hundreds of fabricated criminal citations under Alabama Code § 32-5-77, a left-lane driving law that does not provide for or allow the issuance of citations.

      b.     Brookside's practice of issuing citations and towing vehicles for

lack of insurance despite the presence of paperwork or documentation showing that the vehicles were in fact insured.

c.     Brookside's practice of unlawfully issuing hundreds of traffic citations on stretches of Interstate 22 beyond and outside the Town's jurisdiction.

d.     Brookside's practice of stacking charges so that a single occurrence or violation results in a handful of (or even a dozen or more) charged violations, with pecuniary fines, fees, and court costs for each.

e.     Brookside's practice of waiting surreptitiously and targeting the residents of a particular housing project by pulling them over and ticketing them on allegations, sometimes fabricated, of failing to use a turn signal when entering the neighborhood, usually in the evening as people are coming home from work.

f.     Brookside's practice of waiting surreptitiously for people to exit the Dollar General parking lot and pulling them over on pretextual allegations in order to search their cars without any basis, in hopes of finding chargeable offenses and reasons to tow their cars.

g.     Brookside's practice of collecting cash bonds directly from

arrestees in order to buy their freedom, sometimes with no documentation given to the arrestee of the amount paid.

89.     Chief Jones's public statements remove any doubt that using the criminal-justice system to maximize revenue through fines and fees is the central feature of the Brookside Police Department's policies, practices, and customs. As reported in a January 2022 news article, Chief Jones "said he'd like to see even more growth in revenue from fines and forfeitures." Jones also is quoted as saying: "'I see a 600% increase [as] a failure. If you had more officers and more productivity you'd have more. . . . I think it could be more.'"

90.     These statements reportedly were made in the hearing of and with the nodding approval of another Brookside policymaker—the current mayor (who was also on the city council when it put Chief Jones in charge of the Town's profit-driven policing).

91.     Brookside's revenue-maximizing goals (and successes) have created an ever-present incentive for Brookside's law-enforcement officials (including the police department and the prosecutor's office) to enforce the law in a way that maximizes revenues and disregards the public interest, public safety, and constitutional rights.

### C.     Brookside's reliance on fines and fees revenue has driven the operation of its municipal court.

92.     Brookside's revenue is heavily dependent on the fines, fees, and court

costs assessed by its municipal court.

93.    The Brookside town attorney (at all times relevant to this case, Mark Parnell) prosecutes alleged violations charged in Brookside Municipal Court.

94.    The Brookside municipal judge (at all times relevant to this case, Jim Wooten) adjudicates alleged violations charged in Brookside Municipal Court.

95.    The Brookside City Council appoints Brookside's one municipal judge. *See* Ala. Code § 12-14-30.

96.    Brookside's one municipal judge has his salary fixed by the Brookside City Council, Ala. Code § 12-14-33(a), and that salary is paid by the Town of Brookside.

97.    Brookside is also responsible for furnishing the municipal court's facilities and support personnel. Ala. Code § 12-14-2(a).

98.    The Brookside City Council has the power to replace its municipal judge at the end of his term. Ala. Code § 12-14-30(b). The Brookside City Council even has the power to abolish the Brookside Municipal Court altogether. Ala. Code § 12-14-17.

99.    The Brookside town attorney is likewise hired and paid by Brookside.

100.    In short, the more revenue Brookside has, the more is available for its municipal court and its prosecutor.

101.    Between 2019 and 2021, in fact, as Brookside's revenues grew, so did

Municipal Judge Wooten's annual salary, by 127%—from $8,800 to $20,000.

102.   Brookside's dependence on (and zealous, successful efforts to increase) its municipal revenues has led, or has appeared to lead, Brookside's municipal court to perform official duties in a way that maximizes revenues while disregarding the public interest and constitutional rights.

103.   During that same period, the town attorney's annual salary attributable to his prosecutorial duties more than doubled—from $8,200 to $18,000.

104.   Overall, the town attorney's salary grew during that time from $21,132 to $72,115.

105.   When asked by a journalist, the town attorney reportedly said that one of the factors explaining his and the municipal judge's salary increases was Brookside's "increase in the number of cases having to be processed through the municipal court" as a result of Brookside's policing policies, practices, and customs.

106.   Brookside's dependence on municipal-court revenues has thus led, or has appeared to lead, Brookside's municipal-court officials to perform official duties in a way that maximizes revenues while disregarding the public interest and constitutional rights.

**III.    Plaintiffs have been injured by Brookside's profit-fueled towing, ticketing, charging, and fines-and-fees policies, practices, and customs.**

**A.    Plaintiff Brittany Coleman**

107.    On April 4, 2020, Brittany Coleman and her boyfriend were driving in separate cars to a birthday breakfast for Brittany.

108.    Brittany was following three or four car lengths behind her boyfriend. Suddenly, he pulled over to the side of the highway. Brittany was unsure why, and she pulled over too, still several car lengths behind.

109.    The reason Brittany's boyfriend pulled over was that he saw a police car following closely behind Brittany and realized before she did that the police officer was pulling her over.

110.    A lone male Brookside police officer (who, pursuant to Brookside policy, practice, and custom, wore no identifying information) approached Brittany's car. The officer was Defendant Marcus Sellers.

111.    Brittany asked why she was pulled over. Officer Sellers said that she was "tailgating" (following too closely) a car in front of her. She knew that she was not. Brittany was following her boyfriend because they were going to the same place. But she was three to four car lengths behind him.

112.    Brittany asked Officer Sellers which car she was allegedly tailgating. He pointed to her boyfriend's car, which was parked several car lengths ahead.

113.   Officer Sellers then claimed to smell marijuana in Brittany's car.

114.   There was no marijuana in Brittany's car.

115.   Brittany knew of the Brookside Police Department's reputation for escalation and harassment during traffic stops. So, fearful for her boyfriend's safety, she told him over the phone to drive away while she dealt with her traffic stop, and that she would catch up with him. He did as she asked.

116.   On the basis of Officer Sellers's fabrication regarding the smell of marijuana, Officer Sellers told Brittany to get out of the car, and he immediately handcuffed her. Brittany did not understand why she was being handcuffed for no reason.

117.   When she asked Officer Sellers why she was being handcuffed, he told her that it was the Brookside Police Department's "standard procedure" to handcuff drivers upon searching their vehicles.

118.   Except for his fabrication regarding the smell of marijuana, Officer Sellers had no basis to search Brittany's car.

119.   Officer Sellers did not give any other reason for handcuffing Brittany. There was no other reason; she did nothing indicating that she posed a threat or that there was anything dangerous on her person or in her car.

120.   Brittany was afraid, and she tried to call her mother using her phone's voice-activation function (because her hands were cuffed behind her back). Officer

Sellers seized the phone and placed it on the hot trunk of his car, where it stayed for the 45-minute duration of the stop, causing it to overheat and malfunction.

121.  Officer Sellers proceeded to search Brittany's car thoroughly for about half an hour.

122.  Two more officers arrived. Brittany has tried to obtain the names of those two officers through records of her citations and court appearances but has been unable to identify them. She has named them as Defendants Doe 1 and Doe 2.

123.  The three officers kept Brittany handcuffed and standing directly in the hot sun for nearly 45 minutes. She could not even wipe the sweat off her face because the three officers kept her hands cuffed behind her back the entire time.

124.  The officers also made Brittany do multiple field sobriety tests. One of the tests lasted so long that Brittany's eyes began to hurt (she wears glasses) and she became disoriented.

125.  Eventually, the officers told Brittany that she passed the sobriety tests.

126.  At no point during Brittany's 45-minute detention was she Mirandized.

127.  Despite thoroughly examining every nook and cranny of Brittany's car—and making a mess of the clothes and other belongings she had in the trunk— the officers found no marijuana, or anything else incriminating. Nevertheless, they lied and claimed to have found marijuana (which they never showed to Brittany).

128.  Officer Sellers told Brittany that he was charging her with marijuana

possession and for following too closely. Both charges were untrue.

129.   Officer Sellers then proceeded to explain that they were taking Brittany's car. He explained that typically she would be arrested for the marijuana charge, but that they would not be arresting her due to the pandemic. Nevertheless, he said that they considered her arrested "on paper" and would therefore tow and impound her car—even though she passed her sobriety tests and there was no indication that she could not safely drive her car away.

130.   On information and belief, Officer Sellers called Jett's Towing to come and tow Brittany's car. It may, however, have been Officer Doe 1 or Officer Doe 2 who called Jett's Towing.

131.   Within minutes, Jett's Towing arrived and towed Brittany's car.

132.   Brittany was now carless and phoneless because her phone had malfunctioned from sitting in the heat for so long. The officers drove her to her boyfriend and left.

133.   Brittany spent the morning of her 25th birthday handcuffed, humiliated, and robbed of her car on the side of the highway by Officer Sellers, Officer Doe 1, and Officer Doe 2.

134.   To get the car back, Brittany was forced to pay $175 to Brookside for a "release" that she had to take to Jett's Towing. There, she was forced to pay an additional $160 to Jett's Towing.

135.   Brittany was also forced to make three court appearances in Brookside Municipal Court for her following-too-closely and marijuana charges.

136.   The first time, she was forced to wait two hours, only to be told to come back at a later date with an attorney.

137.   While Brittany was in court at that first appearance, her father was waiting in the parking lot and spoke to a Brookside police officer. That officer told Brittany's father that most of the Brookside Police Department's tickets got dismissed because the Brookside Police Department patrolled and wrote tickets beyond its jurisdiction—including where Officer Sellers pulled over Brittany.

138.   Brittany hired an attorney, and at her second court appearance, her attorney asked for evidence supporting the marijuana charge. There was none.

139.   Finally, at her third appearance, the marijuana charge was dismissed for lack of evidence. This validated what Brittany knew all along: the officers never found marijuana in her car. It was a fabrication to justify towing the car.

140.   Even though the marijuana charge was dismissed, the dismissal was conditioned on Brittany's payment of at least $382 in court costs.

141.   On information and belief, conditioning dismissals on the payment of hundreds of dollars in court costs is common practice in the Brookside Municipal Court.

142.   Brittany paid the following-too-closely citation, around $195, even

though she knew that it too was fabricated.

143.   All told, between the towing and impound fees, the court costs, and the fines, Brittany paid Brookside and Jett's Towing nearly $1,000—to say nothing of having her birthday ruined and having to make three trips to Brookside Municipal Court to contest fabricated charges.

144.   Nevertheless, Brittany considers herself lucky because she observed others at the municipal court being assessed fines of thousands of dollars in a system that seemed to treat them as mere numbers to be processed for monetary collection— essentially, as human ATMs.

### B.    Plaintiff Brandon Jones

145.   On December 31, 2021, Brandon Jones was driving to his cousin's home in Brookside to pick up medicine because Brandon was sick with Covid-19. Brandon's wife, Dominque, was in the front seat. Their three young children (ages 11, 6, and 1) were in the back.

146.   A Brookside police officer pulled Brandon over. Brandon knows he was driving carefully and had not committed any traffic violations because he saw the police car several minutes earlier and was aware that it was following him.

147.   When the officer (on information and belief, Marcus Sellers) came to the window, Brandon asked why he was pulled over. The officer did not answer; he demanded Brandon's license and registration.

148.   The officer eventually said he pulled Brandon over because the car's registered owner had a warrant from another jurisdiction. (Brandon's wife, Dominique, had a warrant for a traffic violation that she was still paying off at the time.)

149.   Brandon gave the officer his license and proof of insurance. The proof of insurance Brandon showed the officer contained a record of recent payment, the policy's effective date, and the policy number. The officer refused to accept it, however, because it was not the "official" insurance card—which was in Brandon's other car at home.

150.   The officer took Brandon's license and registration to his police car. He then returned to Brandon's car, ordered Brandon to get out, and immediately handcuffed him without reason or explanation. In fact, the officer grabbed Brandon's arm and pulled it behind Brandon's back immediately after Brandon was out of his car.

151.   Brandon exhibited no signs of noncompliance, resistance, or danger. Even so, the officer handcuffed him on the side of the road in front of his small children, and he forced Brandon into the back of the police car.

152.   Brandon kept asking why he was handcuffed but got no answer.

153.   Brandon also told the officers that he was sick with Covid-19, but they did not appear to care.

154.   At this point, Brandon was detained in the back of the police car, pursuant to Brookside's policy, practice, and custom ("procedure," as Officer Sellers had described it to Plaintiff Brittany Coleman) of handcuffing drivers without any suspicion or need.

155.   At no point during the course of Brandon's detention was he Mirandized.

156.   Consistent with Brookside policy, practice, and custom, the officer called the jurisdiction where Dominique had the traffic warrant and asked if they wanted to come arrest her. (Having drivers arrested, of course, gives Brookside officers a reason to tow their cars and rake in "release" fees.)

157.   One officer told Dominique that she "might be arrested" in front of her small children. Another said, "You're lucky. I'm going to let you go," because the other jurisdiction had declined to come arrest her.

158.   While Brandon was handcuffed in the police car, Dominque called the relatives whose home they were planning to visit and explained the situation. One of the officers told Dominque to get anything they needed out of the car because the officers were going to have it towed.

159.   Dominique acknowledged that she had a suspended driver's license at that time (for the traffic violation she was paying off). But she implored the officers: "I'm guessing you're not going to let me drive it, since my license is suspended. But

my cousin is coming and maybe she can drive it."

160.   One of the officers replied with words to the following effect: "Get your purse out, and your kids out of the car." He explained that the reason they were towing the car was not because of Dominque's suspended license (or Brandon's), but for lack of insurance.

161.   The Jett's Towing truck arrived almost immediately to tow the car. Brandon's and Dominique's relatives arrived around the same time and picked the family up from the side of the road. In fact, the relatives arrived before the tow truck even left, so they could have driven Brandon's car from the scene.

162.   While Jett's Towing was hitching the car for towing, Brandon tried to visually inspect the car to make sure nothing valuable was left inside. One of the officers put his hand on his weapon and demanded that Brandon back away.

163.   The experience was traumatic for Brandon's and Dominque's children, to say nothing of the effects on Brandon and Dominique themselves. Their 6-year-old started crying because she was afraid her father was going to jail. Their 1-year-old was crying for her parents after Dominique was removed from the car. Afterward, their 11-year-old son told Dominique: "I'm just glad they didn't shoot my dad."

164.   When the tow truck left, the officers refused to tell Dominque where the tow yard was. She had to call the Brookside Town Hall, and the woman who

answered told Dominique that she could get information about the vehicle's location only after paying Brookside $175 for an "impound release" receipt.

165. The next day, Dominique traveled back to Brookside and paid the vehicle release fee with the family's money. She then went to Jett's Towing. The Jett's Towing employee admitted his view that in Brookside "they just want the money." Nevertheless, Jett's Towing charged an additional $168 for the family to get the car back.

166. The only citation the Brookside officers issued the night of the New Year's Eve stop was to Brandon for driving with a suspended license. On information and belief, that citation remains pending in Brookside's municipal court.

167. On information and belief, the Brookside Municipal Court's operations are suspended indefinitely.

168. On information and belief, the Brookside Municipal Court's operations have been suspended as a direct result of the exposure of the Town's abusive policing and ticketing policies.

169. Nevertheless, when Brandon called to learn the status of his case on or around January 31, a court employee told him that even though the municipal court is suspended for the foreseeable future, he could go ahead and pay the fines associated with his charge.

170. Brandon reasonably fears being pulled over, harassed, searched,

ticketed, and towed again if he has to go back to Brookside. Brandon will have to return to Brookside for his court appearances (in Brookside's financially interested municipal court). Brandon will also have to return to Brookside to visit his cousin, who lives there. Brandon and his cousin are close, and he wants to visit his cousin's home in Brookside without fear of the Brookside police.

### C.    Plaintiffs Chekeithia Grant and Alexis Thomas

171.    On February 15, 2020, Chekeithia Grant was setting up her mother's 60th birthday party. She sent her daughter, Alexis Thomas, to her house to pick up food for the party. Alexis was driving her mother's car.

172.    Brookside police pulled Alexis over. They said that one of the two tag lights on the car was out.

173.    Scared, Alexis immediately called Chekeithia to let her know that she had been pulled over by the police and that they were asking for proof of insurance. Chekeithia immediately began driving to the scene.

174.    The officer asked for Alexis's driver's license, which she gave him.

175.    Alexis was also looking for the proof of insurance. But she never had a chance to provide it, because a second officer approached and immediately claimed to smell marijuana, forced her out of the car, grabbed the phone out of her hand, slammed it on the seat, and handcuffed her.

176.    There was no reason for the officer to handcuff Alexis. Nor did he give

one, other than his marijuana-scent allegation. Alexis pointed out that the first officer had not made any allegation of smelling marijuana.

177.   Alexis exhibited no signs of noncompliance, resistance, or danger. Nevertheless, the officer handcuffed her on the side of the road and forced her into a police car. At no point was she Mirandized.

178.   Both officers began vigorously searching the car that Alexis had been driving.

179.   During the course of their search, Chekeithia arrived.

180.   Not seeing her daughter anywhere, Chekeithia was scared for Alexis's safety. She approached the car as the officers were searching it to ask about Alexis's whereabouts. One of the officers immediately shouted at her and demanded her identification.

181.   Chekeithia told the officer that her identification was in her purse, in the car that Alexis had been driving.

182.   The officer, without consent or any basis to believe the purse contained contraband, opened, rifled through, and searched Chekeithia's purse and wallet. He also threw her phone against the windshield of her car, breaking the phone screen, which remains broken to this day.

183.   In the course of his search of Chekeithia's purse, the officer found her identification in the wallet, and a small prescription bottle with what the officer

maintained was a small amount of marijuana.

184.   The officer slammed Chekeithia violently against the car she arrived in and arrested her.

185.   The officers had both cars (the one Alexis was driving and the one Chekeithia was driving) towed and impounded by Jett's Towing.

186.   Chekeithia's phone remained on the windshield of the car when it was towed. She found it on the roof of the car when she at last picked up the vehicle at Jett's Towing.

187.   Chekeithia, while being arrested, still did not know where Alexis was, and despite her repeated pleas, the officers refused to tell her.

188.   The officers moved Alexis from one police vehicle to another. Chekeithia still did not know where Alexis was.

189.   The officers took Chekeithia and Alexis to the Brookside jail separately and put them in separate cells.

190.   Both women, still separated, were subjected to invasive strip and cavity searches, and officers took their bras.

191.   The officers put Chekeithia in a cell alone with a male stranger whom they had also arrested.

192.   When Chekeithia banged on the door to tell the officers she was jailed with a man, they first threatened to charge her with attempted escape for banging on

the door, then they denied anyone else was in the cell, before they finally reunited Chekeithia with Alexis.

193.   The officers refused to let Chekeithia make a phone call. They allowed Alexis to call relatives to come free Chekeithia and Alexis from jail.

194.   Relatives came and paid over $845 to have Chekeithia and Alexis released on bond. Chekeithia and Alexis repaid them, in equal shares.

195.   The officers told Chekeithia they had lost her bra, so she was forced to leave the jail without it.

196.   By the time Chekeithia and Alexis were finally released, it was 11:00 P.M., and they had entirely missed Chekeithia's mother's 60th birthday party.

197.   The officers charged Chekeithia and Alexis with several stacked violations each, including possession of marijuana, possession of drug paraphernalia (seemingly for a cigar that contained no marijuana), obstruction of government operations (for Chekeithia's temerity to ask the officers what they had done with her daughter), and resisting arrest (for the same).

198.   To release their cars, Chekeithia paid $350 to Brookside and over $300 more to Jett's Towing. Alexis is repaying Chekeithia for half of those fees.

199.   At the time, Chekeithia and Alexis did not know (and had no reason to know) that their arrests and the towing and impoundment of their vehicles were due to Brookside's policy, practice, and custom of seizing vehicles to maximize the

Town's revenue.

200.   During the course of Chekeithia's and Alexis's prosecutions, their lawyer pointed out over and over to Town Attorney Parnell and Municipal Judge Wooten the procedural deficiencies in the women's charging documents that, under controlling law, required their dismissals.

201.   Even so, both women were forced to attend several court dates and were ultimately tried and convicted in Brookside Municipal Court. Each had thousands of dollars in fines, fees, and costs imposed on them.

202.   To appeal to the Jefferson County Circuit Court, they had to post hundreds of dollars in appeal bonds. Each paid their appeal bonds individually.

203.   Last month, Town Attorney Parnell informed the Jefferson County Circuit Court that, after two years of proceedings, Brookside wished to dismiss the charges against Chekeithia and Alexis in their entirety.

204.   The dismissal of all of their charges was vindication and relief, but Chekeithia and Alexis will never get back the birthday party they missed while in jail, nor the nearly $2,000 they were forced to pay for their freedom and their cars.

205.   Until Brookside's systematic policies and practices of policing for revenue generation became public in 2022, Chekeithia and Alexis did not know, and had no reason to know, that their experiences were part of Brookside's, Chief Jones's, and Jett's Towing's systematic profit-generation schemes.

IV.    **Brookside's policies, practices, and customs become public in January 2022, but those longstanding policies, practices, and customs have yet to be repealed or eradicated.**

206.    Brookside's policies, practices, and customs described above became national news in January of this year. Described in the media as "bombshell revelations," Brookside's policies, practices, and customs were unknown to the general public and even unknown to Alabama judges and executive-branch officials.

207.    In response to the disclosure of Brookside's policies, practices, and customs, the Lieutenant Governor of Alabama asked the Alabama Department of Examiners of Public Accounts to "conduct a full audit of the City of Brookside, focusing on, but not limited to, their police department, municipal court, general and departmental funds." In light of the recent disclosures about Brookside's policies, practices, and customs, the Lieutenant Governor wrote, "[i]t appears there is potential mismanagement, fraud and systemic abuse by the police department and municipal court system."

208.    In response to the disclosure of Brookside's policies, practices, and customs, Jefferson County Circuit Court Judge Shanta Owens last month dismissed dozens of Brookside convictions on appeal from the Brookside Municipal Court, ruling that, "Due to the lack of credibility and public trust of the Brookside Police Department under previous police leadership, all cases where the sole witness to the offense is a Brookside Police Officer will be met with heavy scrutiny by this Court."

209.   In response to the disclosure of Brookside's policies, practices, and customs, the Jefferson County District Attorney recently sought the dismissals of 96 felony drug cases brought by the Brookside Police Department. The District Attorney stated that, "We don't want to be associated with a police department that clearly felt like it was above the law." As recounted in local media, the District Attorney also "said he had no faith in the toxicology reports, the drug charges, or even the substances purported by Brookside Police to be drugs. 'What they said was cocaine could be baking powder,' he said." The District Attorney also characterized the Brookside Police Department under Chief Jones's leadership as "a rogue police force."

210.   Following the disclosures about Brookside's policies, practices, and customs, Chief Jones resigned this past January. The Brookside Police Department's second in command also has resigned. On information and belief, however, Brookside's profit-driven policies, practices, and customs have not been abolished. Moreover, even if the Town ceases some of its most abusive policies, practices, and customs as a result of recent public scrutiny or litigation, the Town easily could revive any of those unconstitutional policies, practices, and customs in the absence of appropriate declaratory and injunctive relief.

211.   For example, Mayor Bryan remains in office. Mayor Bryan was on the city council when Brookside instituted the policies, practices, and customs described

above. Mayor Bryan also nodded along when Chief Jones explained that a 600% revenue increase was a "failure" because Brookside should be generating even more income from its unconstitutional policing practices.

212.   Town Attorney Parnell also remains in office. He was the town prosecutor throughout (and before) Chief Jones's tenure. And he continues to charge, prosecute, and defend against appeals of Brookside's charges against dozens, if not hundreds, of people. He also is appealing Circuit Court Judge Owens's dismissals of dozens of Brookside prosecutions brought during Chief Jones's tenure, further demonstrating that Brookside continues to stand by the policies, practices, and customs detailed in this complaint. Indeed, in mid-February Parnell told the press after he missed an appearance in Jefferson County Circuit Court that it "should not be construed as a change in town policy."

213.   For the past several months, Brookside's municipal court has been suspended, due to the public scrutiny and misconduct of not only the police department but also Town Attorney Parnell and Municipal Judge Wooten. There is, effectively, no municipal court in Brookside, and on information and belief, there will not be a functioning municipal court in Brookside for the foreseeable future.

214.   On information and belief, however, when defendants call to inquire about the status of their pending cases, Brookside staff tell them that court will not be in session any time soon (meaning they will have no opportunity to fight their

charges), but that they still can pay the fines and fees assessed in their charging documents. In other words, prioritizing profit remains Brookside's policy, practice, and core operating principle.

215.   And of course, the millions of dollars in fines, fees, and forfeiture revenues Brookside has already generated for its police, prosecutor, and municipal court remain in the hands of the city council, police, prosecutor, and municipal court to do with as they please.

216.   As of April 2022, the Town's policymakers have yet to release the Town's 2021 financial disclosures, in a break from the past practice of releasing the previous year's disclosures no later than January. The Town's 2021 revenues remain in the hands of those policymakers—who have the power to continue the Town's revenue-driven policies, practices, and customs—but the public does not know how much money they hold or how they will use it.

217.   Under these circumstances, the advice that Jefferson County Sheriff Mark Pettway gave to a crowd of over 200 people on February 1, 2022 holds true: "Don't go through Brookside."

## CLASS ALLEGATIONS

218.   Plaintiffs seek to maintain this action both on behalf of themselves and on behalf of others similarly situated under Federal Rule of Civil Procedure 23.

219.    Plaintiffs propose two classes: the "Towing Class" and the "Charging Class."

220.    For the **Towing Class**, Plaintiffs propose the following class definition: "All persons who, since March 1, 2018, have paid fees to either the Town of Brookside or Jett's Towing (or both) to secure the release of a vehicle towed on the orders of the Brookside Police Department following a traffic stop" (the "Towing Class").

221.    The Towing Class meets all the Rule 23(a) prerequisites for maintaining a class action.

222.    *Numerosity under Rule 23(a)(1)*: The putative class is so numerous that joinder of all members is impracticable:

> a.      On information and belief, Brookside has ordered the towing and impounding of well over 1,200 vehicles since March 2018. On information and belief, Brookside has ordered the towing and impounding of hundreds of vehicles since 2020.

> b.      On information and belief, Brookside has required vehicle owners to pay Brookside fees to secure the release of all of the vehicles towed and impounded since March 2018. On information and belief, hundreds of persons paid those fees to Brookside during this period, typically around $175 per car. On

-44-

information and belief, Brookside has required vehicle owners to pay Brookside fees to secure the release of all of the vehicles towed and impounded since 2020. On information and belief, hundreds of persons have paid those fees to Brookside during this period.

c.     On information and belief, Jett's Towing has likewise required vehicle owners to pay it fees to secure the release of all of the vehicles ordered towed and impounded by Brookside police since March 2018. On information and belief, hundreds of persons paid those fees to Jett's Towing during this period. On information and belief, Jett's Towing has required vehicle owners to pay it fees to secure the release of all of the vehicles ordered towed and impounded by Brookside police since 2020. On information and belief, hundreds of persons have paid those fees to Jett's Towing during this period.

223.   *Commonality under Rule 23(a)(2)*:

a.     Questions of law or fact are common to Plaintiffs' towing-related claim and the putative Towing Class's towing-related claim.

b.     Common questions include:

1.     Whether Brookside's and Jett's Towing's conduct demonstrates that Brookside's policies, practices, and customs have created a situation where Brookside police and Jett's Towing have an incentive to seize, tow, and impound vehicles to maximize revenue.

2.     Whether Brookside and Jett's Towing are violating or have violated due process by engaging in conduct that demonstrates that Brookside's policies, practices, and customs have created a situation where Brookside police and Jett's Towing have an incentive to seize, tow, and impound vehicles to maximize revenue.

224.   ***Typicality under Rule 23(a)(3)***:

a.     Named Plaintiffs Brittany Coleman, Brandon Jones, and Chekeithia Grant's towing-related claim and the putative Towing Class's towing-related claim arise out of the same policy, practice, and custom of Brookside and Jett's Towing: seizing, towing, and impounding cars for profit.

b.     Named Plaintiffs Brittany Coleman, Brandon Jones, and Chekeithia Grant seek the same class-wide relief both for themselves and for other members of the putative Towing Class,

in the form of declaratory and injunctive relief, including disgorgement of fees related to the release of their cars, and an injunction barring Brookside's and Jett's Towing's policy, practice, and custom of seizing, towing, and impounding cars for profit, or creating an incentive to do so.

225. ***Adequacy of representation under Rule 23(a)(4)*:**

    a.    Named Plaintiffs Brittany Coleman, Brandon Jones, and Chekeithia Grant adequately represent the putative Towing Class because their interests are aligned, and there are no conflicts between them and members of the Towing Class. They have suffered the same injuries, at the hands of the same Defendants, and they are entitled to the same relief, in the form of declaratory and injunctive relief, including disgorgement of fees related to the release of their cars, and an injunction barring Brookside's and Jett's Towing's policy, practice, and custom of seizing, towing, and impounding cars for profit, or creating an incentive to do so.

    b.    The Towing Class would be ably represented by the Institute for Justice. The Institute for Justice is a nonprofit, public-interest law firm that, since its founding in 1991, has successfully litigated

constitutional issues nationwide. The Institute for Justice has also litigated numerous federal class actions and putative class actions involving property rights and profit-driven fines and forfeitures, including against Philadelphia (*Sourovelis v. City of Philadelphia*, No. 14-cv-4687, 2021 WL 344598, at *1 (E.D. Pa. Jan. 28, 2021) (appointing firm as Class Counsel and approving federal consent decree in challenge to civil forfeiture procedures)); against New York City (*Cho v. City of New York*, No. 16-cv-7961 (S.D.N.Y. Oct. 2, 2020) (ECF 111) (approving settlement of a putative class action, under which New York City agreed not to enforce agreements extracted through coercive property seizures)); against Pagedale, Missouri (*Whitner v. City of Pagedale*, No. 15-cv-1655 (E.D. Mo. May 21, 2018) (ECF 116) (approving federal consent decree prohibiting abusive ticketing practices)); and against the federal government (*Snitko v. United States*, No. 21-cv-4405 (C.D. Cal. Oct. 12, 2021) (ECF 78) (certifying class of property owners challenging FBI searches and seizures as unlawful)).

c.     The Towing Class likewise would be ably represented by Attorney William Dawson, who has decades of experience

litigating civil rights claims in the state and federal courts of the State of Alabama.

226.   The Towing Class also meets the requirements of Rule 23(b)(2) of the Federal Rules of Civil Procedure because Brookside and Jett's Towing have acted, or refused to act, on grounds generally applicable to the putative Towing Class. Declaratory and injunctive relief is appropriate with respect to all members of the class, including in the form of disgorgement of the fees paid by class members to Brookside and Jett's Towing for the release of their vehicles. Alternatively, disgorgement is appropriate relief incidental to the class's declaratory and injunctive relief under Rule 23(b)(2).

227.   For the **Charging Class**, Plaintiffs propose the following class definition: "All persons who have been charged with offenses in Brookside Municipal Court following traffic stops by the Brookside Police Department since March 1, 2018" (the "Charging Class").

228.   The Charging Class meets all the Rule 23(a) prerequisites for maintaining a class action.

229.   ***Numerosity under Rule 23(a)(1)***: The putative class is so numerous that joinder of all members is impracticable:

a.   On information and belief, Brookside has charged offenses in Brookside Municipal Court following traffic stops in hundreds, and potentially thousands, of instances since March 1, 2018.

230.   *Commonality under Rule 23(a)(2)*:

a.   Questions of law or fact are common to Plaintiffs' claims that Brookside has or did have a policy, practice, or custom of enforcing municipal violations in a manner that appears to or does incentivize or prioritize increasing Brookside's revenue, in violation of the Due Process Clause of the Fourteenth Amendment.

b.   Common questions include:

1.   Whether Brookside has (or had) a policy, practice, or custom of enforcing municipal violations in a manner that appears to or does incentivize or prioritize increasing Brookside's revenue.

2.   Whether Brookside's policy, practice, and custom of enforcing municipal violations in a manner that appears to or does incentivize or prioritize increasing Brookside's revenue violates the Fourteenth Amendment's Due Process Clause.

231. *Typicality under Rule 23(a)(3)*:

    a.    Plaintiffs' charging-related claims and the putative Charging Class's charging-related claims arise out of the same policy, practice, and custom of Brookside: enforcing municipal violations under a policy, practice, and custom that appears to or does incentivize or prioritize increasing Brookside's revenue, in violation of the Due Process Clause of the Fourteenth Amendment.

    b.    Plaintiffs seek the same class-wide relief both for themselves and for other members of the putative Charging Class, in the form of declaratory and injunctive relief, the certification and resolution of discrete legal issues pursuant to Rule 23(c)(4), and damages on either a bifurcated or partial-certification basis.

232. *Adequacy of representation under Rule 23(a)(4)*:

    a.    Named Plaintiffs adequately represent the putative Charging Class because their interests are aligned, and there are no conflicts between them and members of the Charging Class. They have suffered the same injuries, at the hands of the same Defendants, and they are entitled to the same relief.

b.    The Charging Class would be ably represented by the Institute for Justice. The Institute for Justice is a nonprofit, public-interest law firm that, since its founding in 1991, has successfully litigated constitutional issues nationwide. The Institute for Justice has also litigated numerous federal class actions and putative class actions involving property rights and profit-driven fines and forfeitures, including against Philadelphia (*Sourovelis v. City of Philadelphia*, No. 14-cv-4687, 2021 WL 344598, at *1 (E.D. Pa. Jan. 28, 2021)); against New York City (*Cho v. City of New York*, No. 16-cv-7961 (S.D.N.Y. Oct. 2, 2020) (ECF 111)); against Pagedale, Missouri (*Whitner v. City of Pagedale*, No. 15-cv-1655 (E.D. Mo. May 21, 2018) (ECF 116)); and against the federal government (*Snitko v. United States*, No. 21-cv-4405 (C.D. Cal. Oct. 12, 2021) (ECF 78)).

c.    The Charging Class likewise would be ably represented by Attorney William Dawson, who has decades of experience litigating civil rights claims in the state and federal courts of the State of Alabama.

233.   The Charging Class also meets the requirements of Rule 23(b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure. These requirements are pleaded collectively and in the alternative.

   a.   As to Rule 23(b)(2), the Town of Brookside has acted, or refused to act, on grounds generally applicable to the putative Charging Class. Declaratory and injunctive relief is appropriate with respect to all members of the class.

   b.   As to Rule 23(b)(3), questions of law or fact common to class members predominate over any questions affecting only individual members, and the class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

   c.   As to Rule 23(c)(4), the question of Brookside's liability is eligible for resolution on an issue-certified basis because whether Brookside's municipal enforcement practices, policies, and customs violate the U.S. Constitution is a "particular issue[]" that is appropriately decided on a class-wide basis.

# CAUSES OF ACTION

## COUNT 1
## 42 U.S.C. § 1983
### Biased Towing and Impounding—Unlawful Financial Interest in Violation of the Fourteenth Amendment
### (On behalf of Named Plaintiffs Brittany Coleman, Brandon Jones, and Chekeithia Grant, individually and on behalf of the Towing Class, against The Town of Brookside and Jett's Towing, Inc.)

234.   Named Plaintiffs Brittany Coleman, Brandon Jones, and Chekeithia Grant reallege and incorporate by reference each and every allegation set forth in paragraphs 1 through 233 above.

235.   The Due Process Clause of the Fourteenth Amendment requires that law enforcement be neutral, impartial, and objective. Brookside's law enforcement has a duty to enforce the law in service of the public interest, not in service of their or the Town's financial self-interests, whether personal or institutional.

236.   It is a violation of the Due Process Clause for law enforcement to have a personal or institutional financial stake in enforcing the laws.

237.   Seizing, towing, and impounding a person's vehicle is a formidable exercise of law-enforcement power.

238.   Brookside has a massive financial interest in exercising its power to seize, tow, and impound vehicles following traffic stops. At all times relevant to this case, Brookside has been overwhelmingly dependent on extracting fees from people

whose vehicles are seized, towed, and impounded on the orders of Brookside police officers.

239.   This financial interest has distorted Brookside's exercise of its power to seize, tow, and impound vehicles.

240.   This financial interest incentivizes Brookside police officers to seize, tow, and impound vehicles to maximize or increase revenue, and without regard for the public interest or individuals' constitutional rights.

241.   Jett's Towing is a knowing and active participant in and beneficiary of Brookside's towing policies, practices, and customs. It too has an incentive to maximize its revenue pursuant to Brookside's towing policies, practices, and customs. It is the "designated and approved Brookside impound lot." The company stands at the ready near police cars to tow vehicles, and it refuses to release them until Brookside collects its own predatory fees. Moreover, Brookside empowers Jett's Towing to not only charge the company's own towing, impound, and storage fees, but also to charge and collect "additional town fees."

242.   Because Brookside's policies, practices, and customs have created a situation where Brookside police and Jett's Towing have an incentive to seize, tow, and impound vehicles to maximize or increase revenue, Brookside (together with Jett's Towing) is violating the due process rights of Named Plaintiffs Brittany Coleman, Brandon Jones, and Chekeithia Grant and all others whose vehicles have

been towed in accordance with Brookside's profit-fueled policies, practices, and customs.

243.   As a direct and proximate result of Brookside's and Jett's Towing's actions, Named Plaintiffs Brittany Coleman, Brandon Jones, and Chekeithia Grant have suffered injury in the form of paying fees to Brookside and to Jett's Towing to secure the release of vehicles seized, towed, and impounded pursuant to Brookside's unconstitutional policies, practices, and customs.

244.   As a direct and proximate result of Brookside's and Jett's Towing's actions, the members of the Towing Class have likewise suffered injury in the form of paying fees to Brookside and to Jett's Towing to secure the release of vehicles seized, towed, and impounded pursuant to Brookside's unconstitutional policies, practices, and customs.

245.   Named Plaintiffs Brittany Coleman, Brandon Jones, and Chekeithia Grant and the Towing Class are entitled to declaratory and injunctive relief, including disgorgement, with interest, of the fees paid to Brookside and to Jett's Towing to secure the release of towed and impounded vehicles, and cancelation of any pending or outstanding fees.

246.   Named Plaintiffs Brittany Coleman, Brandon Jones, and Chekeithia Grant and the Towing Class are entitled to an injunction barring Brookside's and Jett's Towing's systemic policy, practice, and custom of seizing and towing vehicles

to maximize or increase their revenues from tow-related fees, or creating an incentive to do so.

**COUNT 2**
**42 U.S.C. § 1983**
**Biased Law Enforcement and Prosecution—Unlawful Financial Interest in Violation of the Fourteenth Amendment**
**(On behalf of all Named Plaintiffs individually and on behalf of the Charging Class against The Town of Brookside)**

247. Named Plaintiffs reallege and incorporate by reference each and every allegation set forth in paragraphs 1 through 233 above.

248. The Due Process Clause of the Fourteenth Amendment requires that law enforcement and prosecutors be neutral, impartial, and objective. Brookside's law enforcement and prosecutors have a duty to enforce the law in service of the public interest, not in service of their or the Town's financial self-interests, whether personal or institutional.

249. It is a violation of the Due Process Clause for law enforcement or prosecutors to have a personal or institutional financial stake in the cases they bring or prosecute.

250. Brookside's police department and town attorney have massive financial interests in the municipal-court cases that their officials charge and prosecute. Brookside (including its police department and town attorney) is dependent on obtaining fines, fees, and forfeiture revenues from the people that the Town's officials charge and prosecute.

251.   This financial interest is the result of and has given rise to town policies, practices, and customs that distort or threaten to distort Brookside's exercise of law-enforcement and prosecutorial powers.

252.   This financial interest is the result of and has given rise to town policies, practices, and customs that incentivize Brookside's police department and prosecutorial personnel to charge and prosecute municipal-court violations to maximize or increase revenue, and without regard for the public interest or individuals' constitutional rights.

253.   This financial interest is the result of and has given rise to town policies, practices, and customs that incentivize Brookside's town attorney to pursue and obtain municipal-court convictions in a manner that disregards the stringent ethical and constitutional responsibilities of prosecutors and violates individuals' constitutional rights.

254.   Because Brookside's policies, practices, and customs have created a situation where its law-enforcement and prosecutorial officials have a financial incentive to charge, convict, and fine defendants, those policies, practices, and customs violate the due process rights of the Named Plaintiffs, all of whom are or have been subjected to charges issued under Brookside's profit-fueled policies, practices, and customs.

255.   Because Brookside's policies, practices, and customs have created a situation where its law-enforcement and prosecutorial officials have a financial incentive to charge, convict, and fine defendants, those policies, practices, and customs violate the due process rights of the members of the Charging Class, all of whom are or have been subjected to charges issued under Brookside's profit-fueled policies, practices, and customs.

256.   Named Plaintiffs and the Charging Class are entitled to declaratory relief on the issue-certified question whether Brookside has or did have a policy, practice, or custom of enforcing municipal violations in a manner and pursuant to incentives that violate the Fourteenth Amendment's Due Process Clause. Separate from that issue-certified question, Named Plaintiffs and Charging Class members also are entitled to damages for injuries caused by Brookside's policy, practice, or custom of enforcing municipal violations in a manner and pursuant to incentives that violate the Fourteenth Amendment's Due Process Clause.

257.   Named Plaintiffs and the Charging Class are entitled to an injunction barring Brookside's municipal policy, practice, or custom of enforcing municipal violations in a manner that incentivizes or prioritizes the maximizing or increasing of revenue.

**COUNT 3**
**42 U.S.C. § 1983**
**Biased Adjudication—Unlawful Financial Interest in Violation of the**
**Fourteenth Amendment**
**(On behalf of all Named Plaintiffs individually and on behalf of the Charging**
**Class against The Town of Brookside)**

258.   Named Plaintiffs reallege and incorporate by reference each and every

allegation set forth in paragraphs 1 through 233 above.

259.   The Due Process Clause of the Fourteenth Amendment prohibits

judicial officers or municipal courts from having, or appearing to have, a direct or

indirect financial interest in a proceeding, regardless of whether that interest is

institutional or personal.

260.   Brookside's reliance on its municipal code to raise revenue has created

an institutional incentive, or the appearance of an incentive, for the Town to charge,

convict, and fine defendants, regardless of the nature of an individual's offense and

without regard for the public interest or individuals' constitutional rights.

261.   Brookside's institutional reliance on revenue from fines, fees, and

forfeitures has created a conflict between the Town's pecuniary interest and its

municipal-court personnel's obligations to be, and appear to be, disinterested and

serving only the interests of justice. This conflict exists regardless of whether such

personnel actually do violate their obligations to be disinterested and serve only the

interests of justice.

262.   Brookside's institutional reliance on revenue from fines and fees has created an appearance of bias and interested decision-making that results in a lack of due process of law in the trial of defendants charged before the Brookside Municipal Court.

263.   Brookside's institutional pecuniary interest in raising revenue also has created an unconstitutional risk that irrelevant and impermissible factors can influence the resolution of cases prosecuted in the Brookside Municipal Court.

264.   Because Brookside's policies, practices, and customs have created a situation where municipal-court personnel have an incentive, or appear to have an incentive, to convict and fine defendants, Brookside has violated the due process rights of the Named Plaintiffs.

265.   Because Brookside's policies, practices, and customs have created a situation where municipal-court personnel have an incentive, or appear to have an incentive, to convict and fine defendants, Brookside has also violated the due process rights of the members of the Charging Class.

266.   As a direct and proximate result of Brookside's policy, practice, and custom of administering its municipal court in order to generate revenue, or appearing to do so, Named Plaintiffs and the members of the Charging Class have suffered harm to their constitutional rights.

267.   Named Plaintiffs and the Charging Class are entitled to declaratory relief on the issue-certified question whether Brookside has or did have a policy, practice, or custom of enforcing municipal violations in a manner and pursuant to incentives that violate the Fourteenth Amendment's Due Process Clause. Separate from that issue-certified question, Named Plaintiffs and Charging Class members also are entitled to damages for injuries caused by Brookside's policy, practice, or custom of enforcing municipal violations in a manner and pursuant to incentives that violate the Fourteenth Amendment's Due Process Clause.

268.   Named Plaintiffs and the Charging Class are entitled to an injunction barring Brookside's municipal policy, practice, or custom of enforcing municipal violations in a manner that appears to or does incentivize or prioritize maximizing or increasing Brookside's revenue.

## COUNT 4
### 42 U.S.C. § 1983
### Unconstitutional Seizures in Violation of the Fourth and Fourteenth Amendments
### (On behalf of Plaintiff Brittany Coleman, individually, against Defendants Marcus Sellers, Doe 1, and Doe 2)

269.   Plaintiff Brittany Coleman realleges and incorporates by reference paragraphs 1 through 233 above.

270.   Use of handcuffs during a traffic stop without any justification is a violation of the Fourth Amendment (applicable to the states through the Fourteenth Amendment).

271.   When he handcuffed Brittany Coleman, Officer Sellers had no reasonable belief that she presented a potential threat to safety.

272.   When he handcuffed Brittany Coleman, Officer Sellers had no legitimate justification for doing so.

273.   In fact, Officer Sellers told Brittany Coleman that handcuffing her was Brookside's "standard procedure" whenever officers required drivers to exit their vehicles or searched their vehicles.

274.   Officer Sellers and Officers Doe 1 and Doe 2 had no reasonable belief that Brittany Coleman presented a potential threat to safety and had no other legitimate justification for keeping her handcuffed and under arrest for the entire 45 minutes of her seizure.

275.   Officer Sellers and Officers Doe 1 and Doe 2 acted under color of law when they handcuffed Brittany Coleman and when they kept her handcuffed and under arrest for the entire 45 minutes of her seizure.

276.   It is clearly established that handcuffing a driver at a traffic stop without any justification is a violation of the Fourth Amendment. Every reasonable government official would have had fair warning that handcuffing Brittany Coleman without any justification was unconstitutional.

277.   It is clearly established that keeping a driver handcuffed throughout a traffic stop without any justification is a violation of the Fourth Amendment. Every

reasonable government official would have had fair warning that keeping Brittany Coleman handcuffed and under arrest for 45 minutes without any justification was unconstitutional.

278. The Fourth Amendment to the United States Constitution likewise secures the right to be free from unreasonable seizures of property.

279. Towing a car is a seizure under the Fourth Amendment and must be supported by either a warrant or an exception to the warrant requirement.

280. Officer Sellers and Officers Doe 1 and Doe 2 did not have a warrant when they seized Brittany Coleman's car and ordered it towed. Nor was the seizure and towing justified by any exception to the warrant requirement.

281. Following her traffic stop, Brittany Coleman could have legally and safely driven her car away from the scene of the stop.

282. There were no exigent circumstances that necessitated the towing of Brittany Coleman's car.

283. No other exception to the Fourth Amendment's warrant requirement permitted Officer Sellers to seize and order the towing of Brittany Coleman's car.

284. Officer Sellers acted under color of law when he ordered Brittany Coleman's car seized and towed.

285. It is clearly established that seizing and towing a driver's vehicle without a warrant and without any exception to the warrant requirement is a violation

of the Fourth Amendment. Every reasonable government official would have had fair warning that seizing and ordering towed Brittany Coleman's vehicle was unconstitutional.

286.   Officer Sellers's and Does 1 and 2's unconstitutional acts directly harmed Brittany Coleman and caused her pecuniary loss. Brittany Coleman therefore seeks the retrospective relief prayed for below.

### REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court:

A.   For purposes of Count 1:

   a.   Certify a class under Rule 23(b)(2) consisting of: "All persons who, since March 1, 2018, have paid fees to either the Town of Brookside or Jett's Towing (or both) to secure the release of a vehicle towed on the orders of the Brookside Police Department following a traffic stop" (the "Towing Class").

   b.   Declare, on a class-wide basis, that Brookside's systematic policy, practice, or custom of seizing, towing, and impounding vehicles to maximize or increase its revenue from tow-related fees violates the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

   c.   Enter an injunction requiring Brookside and Jett's Towing to

disgorge and return to Named Plaintiffs Brittany Coleman, Brandon Jones, and Chekeithia Grant and to the Towing Class the fees they have paid to Brookside and Jett's Towing to secure release of their vehicles, with interest, and to cancel any pending or outstanding fees owed by members of the Towing Class.

d. Enter an injunction barring Brookside's and Jett's Towing's systematic policy, practice, or custom of seizing, towing, and impounding vehicles to maximize or increase their revenues from tow-related fees.

B. For purposes of Counts 2 and 3:

a. Certify a class under Rules 23(b)(2), (b)(3), and (c)(4) consisting of: "All persons who have been charged with offenses in Brookside Municipal Court following traffic stops by the Brookside Police Department since March 1, 2018" (the "Charging Class").

b. Certify that class "with respect to particular issues," Fed. R. Civ. P. 23(c)(4), namely liability: Whether Brookside has or did have a municipal policy, practice, or custom of enforcing municipal violations in a manner that incentivizes or prioritizes (or, for Count 3, appears to incentivize or prioritize) maximizing or

increasing Brookside's revenue, in violation of the Due Process Clause of the Fourteenth Amendment.

c.    Declare, on a class-wide basis for each Count, that Brookside's municipal policy, practice, or custom of enforcing municipal violations in a manner that incentivizes or prioritizes (or, for Count 3, appears to incentivize or prioritize) maximizing or increasing Brookside's revenue violates the Due Process Clause of the Fourteenth Amendment.

d.    Upon that certification and the resolution of those particular issues on a class-wide basis, permit class members to pursue damages caused by Brookside's unconstitutional policy, practice, or custom of enforcing municipal violations in a manner that violates the Due Process Clause of the Fourteenth Amendment.

e.    Declare, as to the Named Plaintiffs for each Count, that Brookside's municipal policy, practice, or custom of enforcing municipal violations in a manner that incentivizes or prioritizes (or, for Count 3, appears to incentivize or prioritize) maximizing or increasing Brookside's revenue has violated the Named Plaintiffs' rights under the Due Process Clause of the Fourteenth

Amendment and award damages to the Named Plaintiffs for injuries caused by that violation.

f.    Enter an injunction barring Brookside's municipal policy, practice, or custom of enforcing municipal violations in a manner that appears to or does incentivize or prioritize the maximizing or increasing of Brookside's revenue.

C.    For purposes of Count 4: Award damages to Plaintiff Brittany Coleman in an amount to be proven at trial, against Defendants Sellers, Doe 1, and Doe 2.

D.    Award attorneys' fees, costs, and expenses for this action pursuant to 42 U.S.C. § 1988.

E.    Award further legal and equitable relief as this Court may deem just and proper.

Dated: April 4, 2022.                    Respectfully submitted,

s/ William M. Dawson                     s/ Jaba Tsitsuashvili
William M. Dawson                        Samuel B. Gedge (VA Bar No. 80387)*
DAWSON LAW OFFICE                        Jaba Tsitsuashvili (DC Bar No. 1601246)*
1736 Oxmoor Road, #101                   Suranjan Sen (TN Bar No. 038830)*
Birmingham, AL 35209                     INSTITUTE FOR JUSTICE
Phone: (205) 795-3512                    901 North Glebe Road, Suite 900
E-mail: bill@billdawsonlaw.com           Arlington, VA 22203
                                         Phone: (703) 682-9320
                                         Fax: (703) 682-9321
                                         E-mail: sgedge@ij.org;
                                         jtsitsuashvili@ij.org; ssen@ij.org

                                         William R. Maurer (WA Bar No. 25451)*
                                         INSTITUTE FOR JUSTICE
                                         600 University Street, Suite 1730
                                         Seattle, WA 98101
                                         Phone: (206) 957-1300
                                         E-mail: wmaurer@ij.org

                                         *Motions for admission pro hac vice
                                         forthcoming