FILED
2022 Jun-17  PM 03:35
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| BRITTANY COLEMAN;<br>BRANDON JONES;<br>CHEKEITHIA GRANT; and<br>ALEXIS THOMAS, on behalf of<br>themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>THE TOWN OF BROOKSIDE, ALABAMA;<br><br>JETT'S TOWING, INC.; and<br><br>MARCUS SELLERS, MARESHA MOSES, and<br>ANTHONY RAGSDALE, in their individual capacities,<br><br>Defendants. | Civil Action No. 2:22-cv-423-RDP<br><br>**FIRST AMENDED<br>CLASS ACTION<br>COMPLAINT** |

Plaintiffs and putative class representatives Brittany Coleman, Brandon Jones, Chekeithia Grant, and Alexis Thomas, by their undersigned counsel, allege as follows, on behalf of themselves and all others similarly situated:

## INTRODUCTION

1.    This civil rights case challenges the Town of Brookside's (the "Town" or "Brookside") years-long policy, practice, and custom of using its law-enforcement and municipal-court systems to generate revenue for the Town's police department, prosecutor's office, and municipal court. Since March 2018, the Town's policymakers have systematically deployed its police department not to protect the public, but to generate revenue, resulting in a 640% increase in revenue generated from "fines and forfeitures" within two years. That money has gone almost entirely right back to the police department for use on hiring, trainings, conferences, salaries,

1

expensive unmarked SUVs, a new communications center and jail, a K9 unit, and a SWAT tactical operations team, among other purchases—all to patrol a small town of fewer than 1,300 residents that sees essentially no serious crime.

2.     Police officers, prosecutors, and municipal judges are public officials, entrusted with enormous power over the cases they charge, prosecute, and adjudicate.

3.     As recognized by the U.S. Supreme Court, the Due Process Clause of the Fourteenth Amendment mandates that municipal courts cannot have (or appear to have) a financial interest in obtaining convictions.

4.     The U.S. Supreme Court has also made clear that the Due Process Clause prohibits law enforcement (police departments and prosecutor's offices) from having a financial interest or incentive in enforcing the law.

5.     Therefore, a municipality may not use or appear to use its municipal court to fund, or increase the funding of, municipal departments or operations.

6.     Similarly, a municipality may not have a system that incentivizes its police department or prosecutor's office to fund, or increase the funding of, municipal departments or operations.

7.     For years, Brookside has been systematically violating these principles.

8.     Since at least March 2018, the Town's policymakers have deployed its law-enforcement and municipal-court systems to maximize the Town's revenue streams, to the direct financial benefit of the very municipal departments and operations responsible for ticketing (the police department), prosecution (the prosecutor's office), and adjudication (the municipal court).

9.     Between 2017 and 2020, Brookside's annual revenue from "fines and forfeitures" skyrocketed by nearly 1,100%—from $51,473 to $610,307.

10.     By 2020, fines and forfeitures made up around 49% of the Town's annual revenue. Most of that revenue—often taken from people with no realistic ability to challenge the Town's policing for profit—has directly benefitted the Town's police department, which has used its skyrocketing budget on, among other things, military-style equipment and expensive unmarked black SUVs for its officers.

11.     That 49% figure is a near-fivefold increase from the percentage of the Town's revenue that came from fines and forfeitures in 2017. And it is nearly five times the amount that courts around the nation recognize as raising a presumption of unconstitutionally profit-driven or policing-dependent municipal budgeting.

12.     According to a state audit, between October 1, 2020 and February 2, 2022, the Brookside municipal court's "total receipts report" and its "account summary report" indicate that the municipal court generated $722,676, of which the Town (including the municipal court) retained $500,494.75.

13.     Those revenue numbers do not account for or indicate how much additional revenue the Town has taken in through its vehicle towing and impounding fee system, which operates outside of its municipal court system. (Indeed, the Town's vehicle towing and impounding fee system operates without any judicial or other neutral oversight.)

14.     The experiences of Plaintiffs Brittany Coleman, Brandon Jones, Chekeithia Grant, and Chekeithia's daughter Alexis Thomas (the "Named Plaintiffs") spotlight how Brookside's pursuit of revenue has harmed the Town's residents and people unfortunate enough to drive through (or near) the Town.

15.     In service of the Town's quest for revenue extraction, Brookside police officers have been systematically subjecting the Named Plaintiffs and thousands of others like them to

intrusions and indignities, including baseless and unconstitutional traffic stops, car searches, handcuffings, and arrests; fabricated allegations and violations; and unnecessary car tows and roadside strandings for the purpose of extracting vehicle "release" fees.

16.    The Town arranged for each of the Named Plaintiffs' cars to be towed by Defendant Jett's Towing, Inc. ("Jett's Towing"), which has regularly had tow trucks on standby directly next to, behind, or within a block or two of Brookside police cars in order to immediately tow and impound vehicles.

17.    Those towing and impounding policies and practices are an immensely lucrative revenue-raising device that Brookside's policymakers and Jett's Towing have, together, turbo-charged since 2018. Between 2018 and 2020, annual tows skyrocketed from 50 to 789.

18.    Jett's Towing refuses to release a car without proof that the owner or driver has paid a $175 "mandatory impound fee" to Brookside for a "release receipt." Then, the company charges an additional $160 (or more), plus daily impound fees.

19.    The Town also charged each Named Plaintiff with offenses in Brookside Municipal Court. The municipal court relies on the Brookside City Council for its funding, while simultaneously using the revenue it generates to fund municipal court and other Brookside salaries, as found by a state audit.

20.    The Brookside City Council is responsible for appointing the municipal judge, fixing his salary, and financing the municipal court's operations. Between 2019 and 2021, the council more than doubled the salary of the Town's municipal judge.

21.    During that same period, the council also increased the salary of the town attorney (the Town's sole prosecutor) by over $50,000, including more than doubling the part of his salary attributable to prosecuting municipal-court cases.

22.     This state of affairs suffers structural problems that violate the rights of everyone subjected to it. Brookside's policy, practice, and custom of relentlessly towing vehicles to generate ready cash for the Town violates the Due Process Clause of the Fourteenth Amendment. So, too, does the Town's single-minded goal of exploiting its criminal-justice system for profit.

23.     Plaintiffs thus seek to certify two classes and a sub-class.

24.     First, the "Towing Class," defined to cover: "All persons who, since March 1, 2018, have paid fees to either the Town of Brookside or Jett's Towing (or both) to secure the release of a vehicle towed on the orders of the Brookside Police Department following a traffic stop." On behalf of this class, Plaintiffs seek class-wide declaratory and injunctive relief against Brookside and Jett's Towing, including the disgorgement and cancelation of fees arising from their unconstitutional policies, practices, and customs.

25.     Second, the "Vehicle Retention Sub-Class," defined to cover: "All persons who, since June 17, 2020, have paid fees to the Town of Brookside to secure the release of a vehicle towed on the orders of the Brookside Police Department following a traffic stop." On behalf of this sub-class, Plaintiffs seek class-wide declaratory and injunctive relief against Brookside, including the disgorgement and cancelation of fees arising from its unlawful and unconstitutional policies, practices, and customs.

26.     Third, the "Charging Class," defined to cover: "All persons who have been charged with offenses in Brookside Municipal Court following traffic stops by the Brookside Police Department since March 1, 2018." On behalf of this class, Plaintiffs seek to establish Brookside's liability for the systemic due-process violations caused by the Town's profit-fueled enforcement policies, practices, and customs.

## JURISDICTION AND VENUE

27.     Plaintiffs bring this civil rights lawsuit pursuant to 42 U.S.C. § 1983 and the

Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, for violations of rights, privileges, or immunities secured by the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution and the Fourth Amendment to the U.S. Constitution.

28.    This Court has jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343 (civil rights jurisdiction).

29.    Venue is appropriate in this Court under 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2).

## THE PARTIES

30.    Plaintiff Brittany Coleman is an adult citizen of the United States and a resident of Georgia.

31.    Plaintiff Brandon Jones is an adult citizen of the United States and a resident of Alabama.

32.     Plaintiff Chekeithia Grant is an adult citizen of the United States and a resident of Alabama.

33.    Plaintiff Alexis Thomas is an adult citizen of the United States and a resident of Alabama.

34.    Defendant Town of Brookside is a municipal corporation located in Jefferson County, Alabama. Brookside controls, directs, and funds its police department, prosecutor, and municipal court.

35.    At all times relevant to the facts of this case, Brookside, its agents, and its employees have acted under color of law. The actions that give rise to Plaintiffs' claims are, unless otherwise indicated, taken pursuant to the policies, practices, and customs of Brookside, at the direction of, with the knowledge of, and through the actions of: its former and current policymakers (including its former and current mayors, its current municipal court judge, its current prosecutor, and its recently-resigned police chief); its former and current police officers; and a private towing

company (Defendant Jett's Towing, Inc.) that performs municipal functions in conjunction and coordination with and at the direction of those policymakers and officers.

36.     Defendant Jett's Towing, Inc. ("Jett's Towing") is an Alabama corporation with its principal place of business in Adamsville, Alabama. Jett's Towing is sued for its actions taken under color of law that give rise to Plaintiffs' claims. Jett's Towing's actions that give rise to Plaintiffs' claims are government functions because the authority to tow or impound vehicles for the reasons and in the manner described in this case derives from and is directly in conjunction and coordination with Brookside's exercise of municipal and police powers. Jett's Towing's actions that give rise to Plaintiffs' claims are done jointly with Brookside and pursuant to the policies, practices, and customs of Brookside. Jett's Towing perpetuates and profits from Brookside's policy, practice, and custom of towing and impounding vehicles for profit.

37.     Defendant Marcus Sellers was at all times relevant to this case a police officer employed by the Town of Brookside. He is sued in his individual capacity by Plaintiff Brittany Coleman.

38.     Defendant Maresha Moses was at all times relevant to this case a police officer employed by the Town of Brookside. He is sued in his individual capacity by Plaintiff Brittany Coleman.

39.     Defendant Anthony Ragsdale was at all times relevant to this case a police officer employed by the Town of Brookside. He is sued in his individual capacity by Plaintiff Brittany Coleman.

## STATEMENT OF FACTS

I.   **Brookside's policymakers institute and implement policies, practices, and customs designed to generate revenue from fines, fees, and forfeitures.**

40.   The Town of Brookside is a small city outside of Birmingham, Alabama. It is home to fewer than 1,300 residents. Its police jurisdiction covers six miles of roads and a 1.5-mile stretch of Interstate 22.

41.   From 2011 to 2018, Brookside reported to the State of Alabama a total of 55 serious crimes (defined as assault, burglary, homicide, larceny, motor vehicle theft, rape, or robbery). Of those 55 crimes over an eight-year period, none were rape or homicide.

42.   In 2017 and 2018, Brookside reported no serious crimes at all.

43.   In March 2018, the Brookside City Council named Michael Jones its new chief of police. They made him Brookside's only full-time officer.

44.   At that time, the Town's current mayor, Mike Bryan, was a member of the Brookside City Council.

45.   When the city council and mayor made Chief Jones the chief of police, he was already one of a small handful of part-time Brookside officers. So the Town's policymakers knew who he was and what his policing goals and strategies would be upon taking office.

46.   They hired him to fulfill and implement particular mandates and directives, starting with building a full-time police department.

47.   Chief Jones fulfilled and exploited his mandate with alacrity. He immediately instituted and began directing, overseeing, and participating in systematic practices designed to generate revenue.

48.   By 2021, he had grown Brookside's police force to nine full-time officers and several part-time officers. Counting just the nine full-time officers, that per-capita size is nearly

five times larger than the national average.

49.     The hiring spree that Brookside's policymakers (the city council, mayor, and Chief Jones) implemented had its intended effects: By relentlessly policing, ticketing, arresting, towing, prosecuting, and convicting Brookside residents and others, the Town has succeeded in maximizing its revenue, nearly all of which flows right back to the police department, with increased revenue for the town attorney, municipal judge, and municipal court as well.

50.     All of those budgets are controlled by the city council.

51.     Several statistics from 2018 (when Chief Jones took over and began instituting the mayor's and city council's directives) to 2020 (the latest year for which Brookside has made the data described below publicly available) illustrate, in raw numbers, the effects of the policies, practices, and customs instituted and implemented by Chief Jones and Brookside's other policymakers.

52.     From 2018 to 2020, Brookside police patrol hours grew from 1,735 to 12,372 to 17,375 per year. That is a tenfold increase.

53.     From 2018 to 2020, Brookside police issued 382, then 2,782, then 3,024 traffic citations per year. That is a near-eightfold increase.

54.     From 2018 to 2020, Brookside police, in conjunction with Defendant Jett's Towing, towed 50, then 508, then 789 vehicles per year. That is a near-sixteenfold increase. Put differently, in 2020 Brookside police were averaging more than two vehicle tows per day, every single day. And on information and belief, these efforts persisted throughout 2021, though Brookside has yet to release that year's data.

55.     In 2018, Brookside police made 90 misdemeanor arrests. In 2019, that number increased to 518. In 2020, that number increased to 1,273. That is a fourteenfold increase between

2018 and 2020.

56.     From 2018 to at least 2021, the mayor and Chief Jones applied for and received grants for their officers to work overtime, maximizing the hours they could devote to policing for profit without spending Brookside revenue.

57.     Brookside has not grown in residency or size nearly commensurate with those explosions of citations, vehicle tows, and misdemeanor arrests. Indeed, its population has stayed about the same since 2017.

58.     Nor is there any indication that crime was increasing (and certainly not substantially) in Brookside before or during this period.

59.     Brookside's 2020 towing, citation, and arrest figures, in particular, illustrate a commitment to aggressive and profit-driven policing, in light of the decreases in road and highway travel caused by the Covid-19 pandemic that year.

60.     In 2020, Brookside made about the same number of arrests for misdemeanor allegations (which are prosecuted in the Town's municipal court) as it had residents.

61.     In 2020, Brookside also collected $487 in fines and forfeitures for every man, woman, and child in the town (to say nothing of the amounts assessed but unpaid).

62.     From 2018 to 2020, Brookside's revenue from "fines and forfeitures" increased from $82,467 to $187,445 to $610,307 per year.

63.     It is unclear whether the $610,307 is the Town's gross revenue or its net revenue after accounting for fines and forfeiture related expenses, so the amount taken in may be greater still.

64.     On information and belief, the $610,307 in 2020 revenue from fines and forfeitures does not include the Town's additional substantial revenue from its vehicle towing and

impounding fee system (which operates outside of its municipal court system and without any judicial or other neutral oversight), under which the Town charges a $175 "mandatory impound fee" as a prerequisite for the release of every vehicle its police officers order towed.

65.    Brookside's 2020 increase in fines and forfeitures revenue is even more stark when measured against 2017, the year before Brookside's policymakers put Chief Jones in charge. That year, Brookside's fines and forfeitures revenue was $51,473.

66.    In other words, from 2017 to 2020, Brookside's annual fines and forfeitures revenue grew by nearly 1,100%.

67.    By 2020, fines and forfeitures revenue made up 49% of Brookside's total annual revenue.

68.    That is five times the amount that courts across the country deem presumptive evidence of overreliance on fines, fees, and forfeitures to fund municipal operations.

69.    Even in 2019, the percentage of Brookside's annual revenue that came from fines and forfeitures was over 20%—double the typical threshold for presumptive unconstitutionality.

70.    According to a state audit, in the 16 months between October 1, 2020 and February 2, 2022, the Brookside municipal court's "total receipts report" and its "account summary report" indicate that the municipal court generated $722,676, of which the Town (including the municipal court) retained $500,494.75.

71.    Those revenue numbers do not account for or indicate how much additional revenue the Town took in during that period through its vehicle towing and impounding fee system (discussed in detail below), which operates outside of its municipal court system and without any judicial or other neutral oversight.

72.    None of the revenue numbers cited above account for the significant amounts of

fines, fees, and forfeitures that Brookside has assessed but been unable to collect from its mostly poor or below-median-income residents.

73.     In 2019, over 18% of Brookside residents lived below the poverty line (compared to approximately 16.5% statewide), and Brookside's median household income was under $39,000 (compared to nearly $52,000 statewide).

**II.     Brookside's reliance on fines and fees revenue drives its towing and law-enforcement policies, practices, and customs.**

74.     None of the massive increases in revenue discussed above are coincidental. They are also not the result of changes in population size or driver behavior, nor meaningful increases in serious crime, in or around Brookside.

75.     Instead, Brookside's massive increases in revenue starting in 2018 are the result of deliberate policies, practices, and customs instituted by Brookside's former and current policymakers to generate as much revenue as possible.

76.     Almost all of the revenue increases generated by Brookside since 2018 go to the Brookside police department.

77.     Additional revenue increases go to the town prosecutor, town judge, and municipal court.

78.     Chief Jones was one of the policymakers responsible for Brookside's policies, practices, and customs.

79.     Jones made the officer-recruiting decisions and the officer-hiring decisions, and he supervised the dozen or so officers he employed at any given time, many of whom he knew to have checkered pasts.

80.     Jones tasked the officers with implementing his towing and ticketing practices, which, as detailed below, follow clear patterns and demonstrate systematic policies, practices, and

customs.

81.     Jones also regularly personally carried out and observed other officers carrying out the systematic practices described below.

82.     According to the first dispatcher Brookside hired under Jones, as reported in the media: "'We were working under a man who used fear as a tactic to make us do what he wanted us to do.'"

83.     In addition to the revenue-generating policing system Jones built, he also implemented policies that dispatcher attributed to "cruelty."

84.     According to another Brookside dispatcher, as reported in the media: "Jones made his own rules, based on his own sense of morality," and "The law [in Brookside] was what Mike Jones said it was. It was enforced by those he picked—despite their backgrounds—to be police officers."

85.     Brookside's other policymakers knew about, approved, and ratified Chief Jones's abusive revenue-generating policies, practices, and customs.

86.     As explained by current Mayor Mike Bryan, the former mayor and city council (which included Mike Bryan at the time) hired Chief Jones with a directive to build a new police force and implement his policies, practices, and customs.

87.     Since at least 2019, some Brookside residents and others (including the first dispatcher cited above) have complained directly to Brookside's policymakers—including the city council, mayors, and Jones himself—about abuses instituted and implemented by Jones and the officers he recruited, hired, and supervised.

88.     They have made those complaints in person, by phone, by email, and on Facebook.

89.     In the face of those direct complaints, Brookside's policymakers—including the

city council, mayors, and Jones—have deliberately and consistently chosen to continue the policies, practices, and customs of the Brookside police, prosecutor, and municipal court detailed herein.

90.     In fact, Jones's response to those complaints was—both personally and through the officers he supervised—to intimidate, harass, and threaten those with the temerity to speak out.

91.     According to the second Brookside dispatcher cited above, as reported in the media: "Town officials ignored signs of trouble because they were so infatuated with the influx of money that they 'had blinders on'" and decided to let Jones run Brookside as "'a dictatorship.'"

92.     In an interview in late 2021 or early 2022, Chief Jones said (with current Mayor Mike Bryan present and agreeing) that Brookside's policing is "a positive story" and that "a 600% increase" in annual revenue within two years is "a failure," because, according to Chief Jones, "with more officers and more productivity you'd have more" revenue generation and increases.

93.     To achieve that "productivity" in revenue generation starting in 2018, Brookside, Mayor Bryan, and Chief Jones instituted revenue-fueled policies, practices, and customs for towing vehicles and for law-enforcement activity more broadly.

> **A.      "They just want the money": Brookside's vehicle-towing system is a key element of its revenue-generation policies, practices, and customs.**

94.     Since at least March 2018, Brookside's policy, practice, and custom of seizing, towing, and impounding vehicles has been driven by the single-minded goal of maximizing town revenue instead of safeguarding the public interest or respecting constitutional rights.

95.     Brookside operates a vehicle towing and impounding system together with Jett's Towing.

96.     They have done so together since at least 2018.

97.     As explained in a state audit, according to the Brookside Town Clerk, Brookside

uses only one towing company.

98.     That company is Jett's Towing.

99.     Brookside did not solicit or receive bids for this towing service. That violates state law.

100.    Brookside and Jett's Towing do not have a contract for this towing service. That violates state law.

101.    Brookside Ordinance 519 (as amended by Brookside Ordinances 527 and 533) is the source of authority for Brookside's and Jett's Towing's vehicle towing and impounding fee system.

102.    Pursuant to Brookside Ordinance 519 (as amended by Brookside Ordinances 527 and 533), whenever Brookside orders the towing and impounding of a vehicle, it requires as conditions for the return of the vehicle: (1) "a valid driver's license, proof of ownership or lawful authority to operate the motor vehicle, and proof of valid motor vehicle insurance for that vehicle," and (2) "The vehicle is owned or leased by the arrestee, the arrestee gives written notarized permission to another person to operate the vehicle, and the conditions for release in subsection (1) of this ordinance (section) are met."

103.    Pursuant to Brookside Ordinance 519 (as amended by Brookside Ordinances 527 and 533), whenever Brookside orders the towing and impounding of a vehicle, Brookside requires a $175 "mandatory impound fee" as a condition for the return of the vehicle.

104.    That $175 mandatory impound fee "must be paid in cash, or by a cashier's check or money order made payable to the Town of Brookside, Alabama and specifically designated 'impound fee.'"

105.    On information and belief, the $175 mandatory impound fees paid by members of

the Towing Class and the Vehicle Retention Sub-Class are designated "impound fee" on Brookside's vehicle-impound reports and impound-release forms.

106.    The terms of the ordinance described above are also described in Brookside's "Vehicle Release Process" form, which explains: "A payment of $175.00 tow fee must be paid to the Court Clerk's office via credit card, certified check, or money order prior to release. A vehicle release form & receipt will be issued along with directions to the impound lot. The vehicle owner shall present the vehicle release form to the impound lot manager for the vehicle to be released. NOTE: Daily storage fees or additional town fees may be assessed and applied by the responding wrecker service, recovery firm, or storage lot to be paid directly to the service providers prior to release."

107.    Brookside's $175 mandatory impound fee is not imposed by or subject to review by a neutral judicial arbiter or any other neutral arbiter.

108.    Brookside imposes and keeps its $175 mandatory impound fee before the initiation or outcome of any criminal or other judicial proceedings.

109.    Brookside imposes and keeps its $175 mandatory impound fee regardless of the initiation or outcome of any criminal or other judicial proceedings.

110.    Brookside imposes and keeps its $175 mandatory impound fee regardless of any judicial finding of guilt or wrongdoing.

111.    Brookside's $175 mandatory impound fee goes entirely to Brookside, and therefore funds the city council, municipal court, prosecutor's office, and police department.

112.    Brookside's $175 mandatory impound fee is not related to the cost of administering Brookside's towing and impounding system.

113.    Brookside does not incur costs for the administration of its towing and impounding

system because that system is operated by Jett's Towing, which, on information and belief, does not charge Brookside any costs.

114.    Consistent with the terms of Brookside Ordinance 519 (as amended by Brookside Ordinances 527 and 533) described above, the way Brookside's and Jett's Towing's vehicle towing and impounding fee system operates is straightforward and well-established.

115.    For every vehicle that Brookside police order seized and towed, the owner or driver must pay Brookside $175 to get a piece of paper authorizing Jett's Towing to "release" the vehicle.

116.    After Jett's Towing tows and impounds a vehicle, Brookside refuses to tell the vehicle owner or driver where the car is until the owner or driver pays the $175 mandatory impound fee to Brookside for the piece of paper "releasing" the vehicle.

117.    Jett's Towing refuses to release a vehicle without proof that Brookside's $175 mandatory impound fee has already been paid to Brookside.

118.    Then, Jett's Towing charges its own fee of at least $160, plus daily impound fees, to release the vehicle.

119.    No neutral adjudicator is involved at any stage of this process. It operates entirely at the direction of Brookside's policymakers and Jett's Towing.

120.    Since March 2018, Brookside's reliance on its mandatory impound fees—which have not been and are not related to the cost of administering Brookside's vehicle towing and impounding system—has created an incentive for its police officers to order the towing of vehicles with the goal of maximizing revenue for Brookside.

121.    They do so by following systematic patterns of behavior, evincing department-wide policies, practices, and customs designed to create pretextual reasons to tow as many cars as possible.

122.    On information and belief, for example, in order to meet the Town's revenue-generation goals Brookside police officers regularly refuse to look at drivers' proof-of-insurance documentation and then order the drivers' vehicles towed for lack of insurance.

123.    On information and belief, in order to meet the Town's revenue-generation goals Brookside police regularly order vehicles towed even when people are physically present or about to be present who could legally and safely drive those vehicles away from the scene.

124.    On information and belief, a DMV supervisor in a nearby town told one victim of Brookside's towing policies, practices, and customs that Brookside police officers regularly allege that a vehicle's driver is not its owner. On information and belief, that policy, practice, and custom exists to meet the Town's revenue-generation goals by giving the officers the opportunity to order the drivers' vehicles towed (as happened to the woman who spoke to the DMV supervisor).

125.    On information and belief, in order to meet the Town's revenue-generation goals Brookside police officers regularly arrest drivers with the goal of thereby having the opportunity to order the drivers' vehicles towed.

126.    On information and belief, Brookside regularly has a Jett's Towing tow truck on standby directly next to, behind, or within a block or two of Brookside police cars in order to immediately tow vehicles, for the profit of Brookside and Jett's Towing.

127.    In short, Brookside's policy, practice, and custom is to use vehicle towing and impounding not as a legitimate law-enforcement or public-safety tool, but to maximize revenue for Brookside (and in turn, to maximize revenue for the Brookside Police Department and other municipal departments and functions).

128.    Jett's Towing is a knowing and active participant in and beneficiary of Brookside's towing and impounding policies, practices, and customs.

129.    For every vehicle that Brookside police order towed, the owner must pay Jett's Towing a fee of at least $160, plus daily impound fees, to regain the vehicle.

130.    That is in addition to—and conditioned upon—prior payment of Brookside's $175 mandatory impound fee.

131.    Jett's Towing is the "designated and approved Brookside impound lot."

132.    Even though no contract requires it, Jett's Towing stands at the ready near police cars to tow vehicles.

133.    As a matter of policy, practice, and custom, Brookside's officials are aware of and count on that quick and easy access to Jett's Towing's towing services.

134.    Jett's Towing refuses to release vehicles until Brookside collects its own $175 mandatory impound fee, as indicated by the Town's own "Vehicle Release Process" form, which says that presenting proof of payment to the Town is a prerequisite for Jett's Towing's release of a vehicle.

135.    Moreover, Brookside empowers Jett's Towing to not only charge the company's own towing, impound, and storage fees, but also to charge and collect "additional town fees."

136.    And Jett's Towing auctions off the vehicles of individuals who cannot afford to pay the release fees, for yet additional profit to the company.

137.    Brookside's profit-driven towing and impounding practices are reflected in data from recent years.

138.    In 2018, Brookside police ordered a total of 50 vehicles towed. In 2019, Brookside police ordered 508 vehicles towed. In 2020, Brookside police ordered 789 vehicles towed—an increase of over 1,400% within two years.

139.    With the $175 mandatory impound fee Brookside charges for each vehicle's

release, the vehicles seized in 2020 alone had the potential to add over $130,000 to Brookside's 2020 revenue.

140.    Jett's Towing stood to gain nearly as much from its $160 fee for every vehicle, if not more, given daily impound fees as well as profits from auctioning off cars that people could not afford to have released.

141.    Brookside's and Jett's Towing's increases in towing revenue are a direct result of the policies, practices, and customs instituted by Brookside through policymakers Michael Jones, the former and current mayors of the Town, and the City Council.

142.    As a representative of Jett's Towing told Plaintiff Brandon Jones's wife when she picked up their vehicle from Jett's Towing's impound lot: "They just want the money."

143.    That admission did not, of course, stop Jett's Towing from also demanding and collecting its fees from the Jones family.

144.    On information and belief, Brookside's and Jett's Towing's towing and impounding fee system remains in place.

145.    Brookside and Jett's Towing continue to administer the towing and impounding fee system together and in coordination.

146.    Brookside's and Jett's Towing's towing and impounding fee system remains without judicial or any other neutral oversight at any point in the process.

147.    Brookside's $175 mandatory impound fee has never been related to the cost of administering Brookside's and Jett's Towing's vehicle towing and impounding system.

148.    Brookside's $175 mandatory impound fee is still not related to the cost of administering Brookside's and Jett's Towing's vehicle towing and impounding system.

149.    The revenue generated by Brookside's $175 mandatory impound fee has always

redounded entirely to the benefit and profit of Brookside.

150.    The revenue generated by Brookside's $175 mandatory impound fee still redounds entirely to the benefit and profit of Brookside.

151.    The revenue generated by Jett's Towing's $160 fee, plus daily impound fees, has always redounded to the benefit and profit of Jett's Towing.

152.    The revenue generated by Jett's Towing's $160 fee, plus daily impound fees, still redounds to the benefit and profit of Jett's Towing.

153.    Because Brookside's and Jett's Towing's towing and impounding system is not subject to judicial review, because the fees generated by that system redound entirely to the benefit and profit of Brookside and Jett's Towing, and because Brookside and Jett's Towing do not return the fees generated by that system even to innocent individuals, Brookside and Jett's Towing have always had and continue to have incentives to tow and impound as many vehicles and extract as many impound fees as they can.

### B.    Brookside's reliance on fines and fees revenue has driven its law-enforcement policies, practices, and customs.

154.    At all times relevant to this case, Brookside has paired its profit-driven towing and impounding policies, practices, and customs with profit-driven law-enforcement policies, practices, and customs more broadly.

155.    At all times relevant to this case, Brookside's reliance on fines, fees, costs, and forfeiture revenues has created an incentive for its law-enforcement officials (including police officers and its town attorney) to maximize revenue.

156.    Similarly, that reliance has created the appearance (and the reality) that Brookside's municipal court has a financial interest in imposing fines, fees, and costs.

157.    The Brookside Municipal Court has jurisdiction over prosecutions of violations of

Brookside municipal ordinances only. *See* Ala. Code § 12-14-1(c); *see also* Ala. Const. art. VI, § 145. Municipalities like Brookside are authorized to adopt ordinances and to make violations of state misdemeanor statutes offenses against the municipality itself when the violations occur within the municipality's jurisdiction.

158.    Pursuant to that authority, Brookside's municipal court and municipal judge exercise judicial authority with respect to local ordinances enacted by Brookside.

159.    To the extent those ordinances reference state laws, they do so in order to adopt and incorporate the substance of those state laws as that of Brookside's own ordinances.

160.    Fines and fees assessed in cases heard in the Brookside Municipal Court are paid mostly, by a wide margin, to the Town of Brookside.

161.    From October 1, 2020 to February 2, 2022, the Brookside Municipal Court reported 3,342 receipts totaling $722,676. Of that amount, the Town (including the municipal court) retained $500,494.75.

162.    The mayor of Brookside has the power to remit fines and such costs as are payable to the municipality, and to commute sentences imposed by the municipal court (or the court to which an appeal is taken) for violations of municipal ordinances. Ala. Code § 12-14-15.

163.    Since Brookside's policymakers hired Chief Jones, Brookside has become heavily dependent on revenues derived from law enforcement through its municipal court.

164.    Brookside puts its fines, fees, and forfeiture revenue almost entirely back into its police department.

165.    As explained by the current mayor, $544,077 of the $610,307 in fines and forfeitures revenue Brookside raised in 2020 went directly to the Brookside police, in the form of training, conferences, computer and software purchases, vehicle maintenance and purchases, and

salaries. In other words, the police operate under a direct eat-what-you-kill profit-incentive system.

166.    The Brookside police have used their massive budget increases to acquire, among other things, military-style equipment, expensive unmarked black SUVs, a new communications center and jail, and a K9 unit.

167.    They even made use of a mine-resistant vehicle (known to residents as the town tank), which Chief Jones parked in front of city hall as a show of intimidation.

168.    According to the mayor, after the police got their cut, Brookside "only profited $70,886" in 2020 from what the Town designated its "fines and forfeitures."

169.    At all times relevant to this case, Brookside's reliance on the fines, fees, costs, and forfeitures assessed in Brookside Municipal Court has created an ever-present incentive for its law-enforcement officials to maximize revenue through their ticketing and charging policies, practices, and customs.

170.    The Brookside Police Department even named one of its drug dogs "K9 Cash."

171.    This incentive for Brookside's law-enforcement officials to maximize revenue through fines, fees, costs, and forfeitures is evidenced not just by the financial figures detailed above, but also by the Brookside Police Department's on-the-ground practices. For example:

a.    Brookside's practice of issuing hundreds of fabricated criminal citations under Alabama Code § 32-5-77, a left-lane driving law that does not provide for or allow the issuance of citations.

b.    Brookside's practice of issuing citations and towing vehicles for lack of insurance despite the presence of paperwork or documentation showing that the vehicles were in fact insured.

c.    Brookside's practice of unlawfully issuing hundreds of traffic citations on

stretches of Interstate 22 beyond and outside the Town's jurisdiction.

d.     Brookside's practice of stacking charges so that a single occurrence or violation results in a handful of (or even a dozen or more) charged violations, with pecuniary fines, fees, and court costs for each.

e.     Brookside's practice of waiting surreptitiously and targeting the residents of a particular housing project by pulling them over and ticketing them on allegations, sometimes fabricated, of failing to use a turn signal when entering the neighborhood, usually in the evening as people are coming home from work.

f.     Brookside's practice of waiting surreptitiously for people to exit the Dollar General parking lot and pulling them over on pretextual allegations in order to search their cars without any basis, in hopes of finding chargeable offenses and reasons to tow their cars.

g.     Brookside's practice of collecting cash bonds directly from arrestees in order to buy their freedom, sometimes with no documentation given to the arrestee of the amount paid.

172.    Chief Jones's public statements remove any doubt that using the criminal-justice system to maximize revenue through fines, fees, costs, and forfeitures is the central feature of the Brookside Police Department's policies, practices, and customs.

173.    As reported in a January 2022 news article, Chief Jones "said he'd like to see even more growth in revenue from fines and forfeitures."

174.    Jones also is quoted as saying: "'I see a 600% increase [as] a failure. If you had more officers and more productivity you'd have more. . . . I think it could be more.'"

175.   These statements reportedly were made in the hearing of and with the nodding approval of another Brookside policymaker—the current mayor (who was also on the city council when it put Chief Jones in charge of the Town's profit-driven policing).

176.   Brookside's revenue-maximizing goals (and successes) have created an ever-present incentive for Brookside's law-enforcement officials (including the police department and the prosecutor's office) to enforce the law in a way that generates or maximizes revenues and disregards the public interest, public safety, and constitutional rights.

177.   Brookside's law-enforcement officials (including the police department and the prosecutor's office) have acted on that revenue-generating incentive at all times relevant to this case.

178.   On information and belief, Brookside's law-enforcement officials (including the police department and the prosecutor's office) continue to act on that revenue-generating incentive.

**C.   Brookside's reliance on fines and fees revenue has driven the operation of its municipal court.**

179.   Brookside's revenue is heavily dependent on the fines, fees, court costs, and forfeitures assessed by its municipal court.

180.   The Brookside town attorney (at all times relevant to this case, Mark Parnell) is also the town prosecutor and prosecutes alleged violations charged in Brookside Municipal Court.

181.   The Brookside municipal judge (at all times relevant to this case, Jim Wooten) adjudicates alleged violations charged in Brookside Municipal Court.

182.   The Brookside City Council appoints Brookside's municipal judge. *See* Ala. Code § 12-14-30.

183.   Brookside's municipal judge has his salary fixed by the Brookside City Council, Ala. Code § 12-14-33(a), and that salary is paid by the Town of Brookside.

184.    Brookside is also responsible for furnishing the municipal court's facilities and support personnel. Ala. Code § 12-14-2(a).

185.    The Brookside City Council has the power to replace its municipal judge at the end of his term. Ala. Code § 12-14-30(b). The Brookside City Council even has the power to abolish the Brookside Municipal Court altogether. Ala. Code § 12-14-17.

186.    The Brookside town attorney is likewise hired and paid by the Brookside City Council.

187.    In short, the more revenue Brookside has, the more is available for its municipal judge, its municipal court and personnel, and its prosecutor, all of whom are hired by the City Council, which controls Brookside's revenue and budget.

188.    Between 2019 and 2021, in fact, as Brookside's revenues grew, so did Municipal Judge Wooten's annual salary, by 127%—from $8,800 to $20,000.

189.    Brookside's dependence on its municipal revenues has led, or has appeared to lead, Brookside's municipal court to perform official duties in a way that maximizes revenues while disregarding the public interest and constitutional rights.

190.    Brookside's successful efforts to increase its municipal revenues have led, or have appeared to lead, Brookside's municipal court to perform official duties in a way that maximizes revenues while disregarding the public interest and constitutional rights.

191.    According to a state audit, between October 1, 2020 and February 2, 2022, Brookside transferred $110,000 from the Municipal Court Account to the Town's General Fund, with notations explaining that the money was for salaries.

192.    Brookside provided no explanation as to why the transfers were considered necessary for salaries in the Town's General Fund Account.

193.    During that period, Brookside paid municipal court personnel salaries (including those of the judge, prosecutor, clerk, and magistrate) from the Municipal Court Account, not the Town's General Fund Account.

194.    In other words, the Municipal Court Account funds the salaries of the individuals, including the judge and prosecutor, with the power to maximize the amount of revenue in that account.

195.    And the Municipal Court Account also funds the salaries of other Town personnel.

196.    But the municipal court does not have procedures for an internal control system set out in writing as required.

197.    As the municipal court's revenue has grown, so have the salaries of the municipal judge and prosecutor.

198.    Between 2019 and 2021, the town attorney's annual salary attributable to his prosecutorial duties more than doubled—from $8,200 to $18,000.

199.    Overall, the town attorney's salary grew during that period from $21,132 to $72,115.

200.    When asked by a journalist, the town attorney reportedly said that one of the factors explaining his and the municipal judge's salary increases was Brookside's "increase in the number of cases having to be processed through the municipal court."

201.    That increase is the result of Brookside's policing policies, practices, and customs.

202.    Brookside's dependence on municipal-court revenues has thus led, or has appeared to lead, Brookside's municipal-court officials, namely the municipal judge and town prosecutor, to perform official duties in a way that maximizes revenues while disregarding the public interest and constitutional rights.

III.   **Plaintiffs have been injured by Brookside's profit-fueled towing, ticketing, charging, and fines-and-fees policies, practices, and customs.**

A.   **Plaintiff Brittany Coleman**

203.   On April 4, 2020, Brittany Coleman and her boyfriend were driving in separate cars to a birthday breakfast for Brittany.

204.   Brittany was following three or four car lengths behind her boyfriend. Suddenly, he pulled over to the side of the highway. Brittany was unsure why, and she pulled over too, still several car lengths behind.

205.   The reason Brittany's boyfriend pulled over was that he saw a police car following closely behind Brittany and realized before she did that the police officer was pulling her over.

206.   A lone male Brookside police officer (who, pursuant to Brookside policy, practice, and custom, wore no identifying information) approached Brittany's car. The officer was Defendant Marcus Sellers.

207.   Brittany asked why she was pulled over. Officer Sellers said that she was "tailgating" (following too closely) a car in front of her. She knew that she was not. Brittany was following her boyfriend because they were going to the same place. But she was three to four car lengths behind him.

208.   Brittany asked Officer Sellers which car she was allegedly tailgating. He pointed to her boyfriend's car, which was parked several car lengths ahead.

209.   Officer Sellers then claimed to smell marijuana in Brittany's car.

210.   There was no marijuana in Brittany's car.

211.   Brittany knew of the Brookside Police Department's reputation for escalation and harassment during traffic stops. So, fearful for her boyfriend's safety, she told him over the phone to drive away while she dealt with her traffic stop, and that she would catch up with him. He did

-28-

as she asked.

212.    On the basis of Officer Sellers's fabrication regarding the smell of marijuana, Officer Sellers told Brittany to get out of the car, and he immediately handcuffed her. Brittany did not understand why she was being handcuffed for no reason.

213.    When she asked Officer Sellers why she was being handcuffed, he told her that it was the Brookside Police Department's "standard procedure" to handcuff drivers upon searching their vehicles.

214.    Except for his fabrication regarding the smell of marijuana, Officer Sellers had no basis to search Brittany's car.

215.    Other than his explanation that it was "standard procedure," Officer Sellers did not give any other reason for handcuffing Brittany.

216.    There was no other reason; she did nothing indicating that she posed a threat or that there was anything dangerous on her person or in her car.

217.    Brittany was afraid, and she tried to call her mother using her phone's voice-activation function (because her hands were cuffed behind her back).

218.    Officer Sellers seized the phone and placed it on the hot trunk of his car, where it stayed for the approximately 45-minute duration of the stop, causing it to overheat and malfunction.

219.    Officer Sellers proceeded to search Brittany's car thoroughly for about half an hour.

220.    Two more officers arrived. Those officers were Defendants Maresha Moses and Anthony Ragsdale.

221.    The three officers kept Brittany handcuffed and standing directly in the hot sun for nearly 45 minutes. She could not even wipe the sweat off her face because the three officers kept

her hands cuffed behind her back the entire time.

222.    While Defendant Sellers searched Brittany's car, Officers Moses and Ragsdale made Brittany do multiple field sobriety tests. One of the tests lasted so long that Brittany's eyes began to hurt (she wears glasses) and she became disoriented.

223.    Eventually, Officers Moses and Ragsdale told Brittany that she passed the sobriety tests. Nevertheless, they kept her handcuffed.

224.    Like Officer Sellers, Officers Moses and Ragsdale knew there was no indication that Brittany posed a threat or that there was anything dangerous on her person or in her car. Nevertheless, they kept her handcuffed.

225.    At no point during Brittany's approximately 45-minute detention was she Mirandized.

226.    Despite thoroughly examining every nook and cranny of Brittany's car—and making a mess of the clothes and other belongings she had in the trunk—the officers found no marijuana, or anything else incriminating. Nevertheless, they lied and claimed to have found marijuana (which they never showed to Brittany).

227.    Officer Sellers told Brittany that he was charging her with marijuana possession and for following too closely. Both charges were untrue.

228.    Officer Sellers then proceeded to explain that they were taking Brittany's car. He explained that typically she would be arrested for the marijuana charge, but that they would not be arresting her due to the pandemic. Nevertheless, he said that they considered her arrested "on paper" and would therefore tow and impound her car—even though she passed her sobriety tests and there was no indication that she could not safely drive her car away.

229.    On information and belief, Officer Sellers called Jett's Towing to come and tow

Brittany's car. It may, however, have been Officer Moses or Officer Ragsdale who called Jett's Towing.

230.    Within minutes, Jett's Towing arrived and towed Brittany's car.

231.    Brittany was now carless and phoneless because her phone had malfunctioned from sitting in the heat for so long. One of the officers drove her to her boyfriend and left.

232.    Brittany spent the morning of her 25th birthday handcuffed, humiliated, and robbed of her car on the side of the highway by Officers Sellers, Moses, and Ragsdale.

233.    To get the car back, Brittany was forced to pay $175 to Brookside for a "release" that she had to take to Jett's Towing. There, she was forced to pay an additional $160 to Jett's Towing.

234.    Brittany was also forced to make three court appearances in Brookside Municipal Court for her following-too-closely and marijuana charges.

235.    The first time, she was forced to wait two hours, only to be told to come back at a later date with an attorney.

236.    While Brittany was in court at that first appearance, her father was waiting in the parking lot and spoke to a Brookside police officer. That officer told Brittany's father that most of the Brookside Police Department's tickets got dismissed because the Brookside Police Department patrolled and wrote tickets beyond its jurisdiction—including where Officer Sellers pulled over Brittany.

237.    Brittany hired an attorney, and at her second court appearance, her attorney asked for evidence supporting the marijuana charge. There was none.

238.    Finally, at her third appearance, the marijuana charge was dismissed for lack of evidence. This validated what Brittany knew all along: the officers never found marijuana in her

car. It was a fabrication to justify towing the car.

239.   Even though the marijuana charge was dismissed, the dismissal was conditioned on Brittany's payment of at least $382 in court costs.

240.   On information and belief, conditioning dismissals on the payment of hundreds of dollars in court costs is common practice in the Brookside Municipal Court.

241.   Brittany paid the following-too-closely citation, around $195, even though she knew that it too was fabricated.

242.   All told, between the towing and impounding fees, the court costs, and the fine, Brittany paid Brookside and Jett's Towing nearly $1,000—to say nothing of having her birthday ruined and having to make three trips to Brookside Municipal Court to contest fabricated charges.

243.   Nevertheless, Brittany considers herself lucky because she observed others at the municipal court being assessed fines of thousands of dollars in a system that seemed to treat them as mere numbers to be processed for monetary collection—essentially, as human ATMs.

### B.   Plaintiff Brandon Jones

244.   On December 31, 2021, Brandon Jones was driving to his cousin's home in Brookside to pick up medicine because Brandon was sick with Covid-19. Brandon's wife, Dominque, was in the front seat. Their three young children (ages 11, 6, and 1) were in the back.

245.   Two Brookside police officers pulled Brandon over. They were Marcus Sellers and Robert Stewart.

246.   Brandon knows he was driving carefully and had not committed any traffic violations because he saw the police car several minutes earlier and was aware that it was following him. In fact, Officers Sellers and Stewart went out of their way to change direction on the highway and follow Brandon for no reason.

247.   Shortly after Officers Sellers and Stewart began following Brandon for no reason,

one of the officers excitedly proclaimed, "That's it."

248.    While following Brandon for no reason, Officers Sellers and Stewart ran the information on Brandon's car for any outstanding warrants.

249.    At that time, they had no reason to pull him over, and no reason to run the search for any outstanding warrants.

250.    When their search returned an outstanding warrant for the owner of the car (from another jurisdiction), Officers Sellers and Stewart pulled Brandon over on that basis.

251.    When Officer Sellers came to the window, Brandon asked why he was pulled over. Officer Sellers said it was because of the warrant he uncovered through his search. He demanded Brandon's license and registration.

252.    Brandon gave Officer Sellers his identifying information and proof of insurance. The proof of insurance Brandon showed Officer Sellers contained a record of recent payment, the policy's effective date, and the policy number. Consistent with Brookside policy, practice, and custom, Officer Sellers refused to accept it, however, because it was not the "official" insurance card—which was in Brandon's other car at home.

253.    Officer Sellers took Brandon's and Dominque's documents back to the police car and learned that Dominique had an outstanding warrant for a failure to appear for a traffic offense in another jurisdiction and that Brandon had a suspended driver's license.

254.    Despite knowing the non-violent nature of these offenses (which came back as traffic violations) and acknowledging that there were "kids in the backseat," Officer Sellers returned to Brandon's car, ordered Brandon to get out, and immediately frisked and handcuffed him without reason or explanation.

255.    Brandon exhibited no signs of noncompliance, resistance, or danger.

256. He readily submitted to Officer Sellers's unexplained and unnecessary frisk.

257. Even so, Officers Sellers and Stewart together grabbed Brandon and handcuffed him on the side of the road in front of his small children, and they forced Brandon into the back of their police car.

258. At this point, Brandon was detained in the back of the police car, pursuant to Brookside's policy, practice, and custom ("standard procedure," as Officer Sellers had described it to Plaintiff Brittany Coleman) of handcuffing drivers without any suspicion or need.

259. At no point during the course of Brandon's detention was he Mirandized.

260. Consistent with Brookside policy, practice, and custom, Officers Sellers and Stewart called the jurisdictions where Dominique and Brandon had their traffic warrants and asked if they wanted to come arrest them.

261. Having drivers arrested, of course, gives Brookside officers a reason to tow their cars and rake in "release" fees in the form of the $175 mandatory impound fee.

262. Both jurisdictions declined to come arrest Brandon or Dominique for their traffic-violation warrants.

263. While Brandon was handcuffed in the police car, Dominque called the relatives whose home they were planning to visit and explained the situation.

264. Dominique told Officer Sellers that those relatives were coming and that there were at least two of them, so that one of them could drive Brandon's car away even if Brandon and Dominique could not because of their suspended licenses. She implored Officer Sellers to allow them to do so.

265. Nevertheless, Officer Sellers decided to have Brandon's car towed and impounded by Jett's Towing.

266.   The Jett's Towing truck arrived almost immediately to tow the car.

267.   Brandon's and Dominique's relatives arrived around the same time and picked the family up from the side of the road, where Brandon's small child was crying.

268.   Brandon's relatives arrived before the tow truck even left, so they could have driven Brandon's car from the scene.

269.   While Jett's Towing was hitching the car for towing, Brandon tried to visually inspect the car to make sure nothing valuable was left inside, after he removed his small child's car seat from the back. Officer Sellers put his hand on his weapon and demanded that Brandon back away.

270.   The experience was traumatic for Brandon's and Dominque's children, to say nothing of the effects on Brandon and Dominique themselves. Their 6-year-old started crying because she was afraid her father was going to jail. Their 1-year-old was crying for her parents after Dominique was removed from the car. Afterward, their 11-year-old son told Dominique: "I'm just glad they didn't shoot my dad."

271.   Officers Sellers and Stewart refused to tell Brandon or Dominque where the Jett's Towing tow yard or impound lot was. Dominique had to call the Brookside Town Hall, and the woman who answered told Dominique that she could get information about the vehicle's location only after paying Brookside $175 for an "impound release" receipt.

272.   The next day, Dominique traveled back to Brookside and paid the vehicle release fee with the family's money.

273.   She then went to Jett's Towing. The Jett's Towing employee admitted his view that in Brookside "they just want the money." Nevertheless, Jett's Towing charged an additional $168 for the family to get the car back.

274.    The only citation Officers Sellers and Stewart issued the night of the New Year's Eve stop was to Brandon for driving with a suspended license. That citation remains pending in Brookside's municipal court.

275.    When Brandon called to learn the status of his case on or around January 31, a court employee told him that even though the municipal court was suspended for the foreseeable future, he could go ahead and pay the fines associated with his charge.

276.    Brandon reasonably fears being pulled over, harassed, searched, ticketed, and towed again if he has to go back to Brookside. Brandon will have to return to Brookside for his court appearances (in Brookside's financially interested municipal court). Brandon will also have to return to Brookside to visit his cousin, who lives there. Brandon and his cousin are close, and he wants to visit his cousin's home in Brookside without fear of the Brookside police.

C.    Plaintiffs Chekeithia Grant and Alexis Thomas

277.    On February 15, 2020, Chekeithia Grant was setting up her mother's 60th birthday party. She sent her daughter, Alexis Thomas, to her house to pick up food for the party. Alexis was driving her mother's car.

278.    Brookside police pulled Alexis over. They said that one of the two tag lights on the car was out.

279.    Scared, Alexis immediately called Chekeithia to let her know that she had been pulled over by the police and that they were asking for proof of insurance. Chekeithia immediately began driving to the scene.

280.    The officer asked for Alexis's driver's license, which she gave him.

281.    Alexis was also looking for the proof of insurance. But she never had a chance to provide it, because a second officer approached and immediately claimed to smell marijuana, forced her out of the car, grabbed the phone out of her hand, slammed it on the seat, and handcuffed

her.

282.     There was no reason for the officer to handcuff Alexis. Nor did he give one, other than his marijuana-scent allegation. Alexis pointed out that the first officer had not made any allegation of smelling marijuana.

283.     Alexis exhibited no signs of noncompliance, resistance, or danger. Nevertheless, the officer handcuffed her on the side of the road and forced her into a police car. At no point was she Mirandized.

284.     Both officers began vigorously searching the car that Alexis had been driving.

285.     During the course of their search, Chekeithia arrived.

286.     Not seeing her daughter anywhere, Chekeithia was scared for Alexis's safety. She approached the car as the officers were searching it to ask about Alexis's whereabouts. One of the officers immediately shouted at her and demanded her identification.

287.     Chekeithia told the officer that her identification was in her purse, in the car that Alexis had been driving.

288.     The officer, without consent or any basis to believe the purse contained contraband, opened, rifled through, and searched Chekeithia's purse and wallet. He also threw her phone against the windshield of her car, breaking the phone screen, which remains broken to this day.

289.     In the course of his search of Chekeithia's purse, the officer found her identification in the wallet, and a small prescription bottle with what the officer maintained was a small amount of marijuana.

290.     The officer slammed Chekeithia violently against the car she arrived in and arrested her.

291.     The officers had both cars (the one Alexis was driving and the one Chekeithia was

driving) towed and impounded by Jett's Towing.

292.    Chekeithia's phone remained on the windshield of the car when it was towed. She found it on the roof of the car when she at last picked up the vehicle at Jett's Towing.

293.    Chekeithia, while being arrested, still did not know where Alexis was, and despite her repeated pleas, the officers refused to tell her.

294.    The officers moved Alexis from one police vehicle to another. Chekeithia still did not know where Alexis was.

295.    The officers took Chekeithia and Alexis to the Brookside jail separately and put them in separate cells.

296.    Both women, still separated, were subjected to invasive strip and cavity searches, and officers took their bras.

297.    The officers put Chekeithia in a cell alone with a male stranger whom they had also arrested.

298.    When Chekeithia banged on the door to tell the officers she was jailed with a man, they first threatened to charge her with attempted escape for banging on the door, then they denied anyone else was in the cell, before they finally reunited Chekeithia with Alexis.

299.    The officers refused to let Chekeithia make a phone call. They allowed Alexis to call relatives to come free Chekeithia and Alexis from jail.

300.    Relatives came and paid over $845 to have Chekeithia and Alexis released on bond. Chekeithia and Alexis repaid them, in equal shares.

301.    The officers told Chekeithia they had lost her bra, so she was forced to leave the jail without it.

302.    By the time Chekeithia and Alexis were finally released, it was 11:00 P.M., and they

had entirely missed Chekeithia's mother's 60th birthday party.

303.    The officers charged Chekeithia and Alexis with several stacked violations each, including possession of marijuana, possession of drug paraphernalia (seemingly for a cigar that contained no marijuana), obstruction of government operations (for Chekeithia's temerity to ask the officers what they had done with her daughter), and resisting arrest (for the same).

304.    To release their cars, Chekeithia paid $350 to Brookside and over $300 more to Jett's Towing. Alexis is repaying Chekeithia for half of those fees.

305.    At the time, Chekeithia and Alexis did not know (and had no reason to know) that their arrests and the towing and impoundment of their vehicles were due to Brookside's policy, practice, and custom of seizing vehicles to maximize the Town's revenue.

306.    During the course of Chekeithia's and Alexis's prosecutions, their lawyer pointed out over and over to Town Attorney Parnell and Municipal Judge Wooten the procedural deficiencies in the women's charging documents that, under controlling law, required their dismissals.

307.    Even so, both women were forced to attend several court dates and were ultimately tried and convicted in Brookside Municipal Court. Each had thousands of dollars in fines, fees, and costs imposed on them.

308.    To appeal to the Jefferson County Circuit Court, they had to post hundreds of dollars in appeal bonds. Each paid their appeal bonds individually.

309.    In March 2022, Town Attorney Parnell informed the Jefferson County Circuit Court that, after two years of proceedings, Brookside wished to dismiss the charges against Chekeithia and Alexis in their entirety.

310.    The dismissal of all of their charges was vindication and relief, but Chekeithia and

Alexis will never get back the birthday party they missed while in jail, nor the nearly $2,000 they were forced to pay for their freedom and their cars.

311.    Until Brookside's systematic policies and practices of policing for revenue generation became public in 2022, Chekeithia and Alexis did not know, and had no reason to know, that their experiences were part of Brookside's, Chief Jones's, and Jett's Towing's systematic profit-generation schemes.

312.    At the time of their arrests in February 2020, Brookside's profit-generation scheme could not be known because it was not until the release of Brookside's 2020 financial information in 2021 that the extent of Brookside's skyrocketing revenues was knowable.

**IV.    Brookside's policies, practices, and customs become public in January 2022, but those longstanding policies, practices, and customs have yet to be repealed or eradicated.**

313.    Brookside's policies, practices, and customs described above became national news in January of this year. Described in the media as "bombshell revelations," Brookside's policies, practices, and customs were unknown to the general public and even unknown to Alabama judges and executive-branch officials.

314.    In response to the disclosure of Brookside's policies, practices, and customs, the Lieutenant Governor of Alabama asked the Alabama Department of Examiners of Public Accounts to "conduct a full audit of the City of Brookside, focusing on, but not limited to, their police department, municipal court, general and departmental funds." In light of the recent disclosures about Brookside's policies, practices, and customs, the Lieutenant Governor wrote, "[i]t appears there is potential mismanagement, fraud and systemic abuse by the police department and municipal court system."

315.    In response to the disclosure of Brookside's policies, practices, and customs, Jefferson County Circuit Court Judge Shanta Owens dismissed dozens of Brookside convictions

-40-

on appeal from the Brookside Municipal Court, ruling in March 2022 that, "Due to the lack of credibility and public trust of the Brookside Police Department under previous police leadership, all cases where the sole witness to the offense is a Brookside Police Officer will be met with heavy scrutiny by this Court."

316.    In response to the disclosure of Brookside's policies, practices, and customs, the Jefferson County District Attorney recently sought the dismissals of 96 felony drug cases brought by the Brookside Police Department. The District Attorney stated that, "We don't want to be associated with a police department that clearly felt like it was above the law." As recounted in local media, the District Attorney also "said he had no faith in the toxicology reports, the drug charges, or even the substances purported by Brookside Police to be drugs. 'What they said was cocaine could be baking powder,' he said." The District Attorney also characterized the Brookside Police Department under Chief Jones's leadership as "a rogue police force."

317.    Following the disclosures about Brookside's policies, practices, and customs, Chief Jones resigned this past January. The Brookside Police Department's second in command also has resigned. On information and belief, however, Brookside's profit-driven policies, practices, and customs have not been abolished. Moreover, even if the Town ceases some of its most abusive policies, practices, and customs as a result of recent public scrutiny or litigation, the Town easily could revive any of those unconstitutional policies, practices, and customs in the absence of appropriate declaratory and injunctive relief.

318.    For example, Mayor Bryan remains in office, and he is not up for reelection until 2025. Mayor Bryan was on the city council when Brookside instituted the policies, practices, and customs described above. Mayor Bryan also nodded along when Chief Jones explained that a 600% revenue increase was a "failure" because Brookside should be generating even more income

from its unconstitutional policing practices.

319.    Town Attorney Parnell also remains in office. He was the town prosecutor throughout (and before) Chief Jones's tenure. And he continues to charge, prosecute, and defend against appeals of Brookside's charges against dozens, if not hundreds, of people. He also is appealing Circuit Court Judge Owens's dismissals of dozens of Brookside prosecutions brought during Chief Jones's tenure, further demonstrating that Brookside continues to stand by the policies, practices, and customs detailed in this complaint. Indeed, in mid-February Parnell told the press after he missed an appearance in Jefferson County Circuit Court that it "should not be construed as a change in town policy."

320.    For several months following the public revelations of its revenue-driven policies, practices, and customs, Brookside's municipal court was suspended, due to the public scrutiny and misconduct of not only the police department but also Town Attorney Parnell and Municipal Judge Wooten. There was, effectively, no municipal court in Brookside for several months.

321.    On information and belief, however, when defendants called during that period to inquire about the status of their pending cases, Brookside staff told them that court would not be in session any time soon (meaning they would have no opportunity to fight their charges), but that they still could pay the fines and fees assessed in their charging documents. In other words, prioritizing profit remains Brookside's policy, practice, and core operating principle.

322.    And of course, the millions of dollars in fines, fees, and forfeiture revenues Brookside has already generated for its police, prosecutor, and municipal court remain in the hands of the city council, police, prosecutor, and municipal court to do with as they please.

323.    As of June 2022, the Town's policymakers have yet to release the Town's 2021 financial disclosures, in a break from the past practice of releasing the previous year's disclosures

no later than January. The Town's 2021 revenues remain in the hands of those policymakers—who have the power to continue the Town's revenue-driven policies, practices, and customs—but the public does not know how much money they hold or how they will use it.

324.    When Brookside resumed operating its municipal court in May 2022, Judge Wooten recused from pending cases. But he continues to hear new cases without any changes to salary or funding policies.

325.    Prosecutor Parnell, true to his word that Brookside's policies have not changed, continues to prosecute all pending and new cases.

326.    The new judge assigned to hear the pending cases from which Judge Wooten recused has not issued blanket dismissals or indicated a change in town or municipal court policy.

327.    He has, instead, together with Prosecutor Parnell, instituted a device to insulate Brookside and its officials from accountability for their years of abusive and predatory policies, practices, and customs.

328.    One of those abusive and predatory policies, practices, and customs has been stacking charges so that a single occurrence or violation results in a handful of (or even a dozen or more) charged violations, with pecuniary fines, fees, and court costs for each.

329.    The new judge and Prosecutor Parnell now offer some defendants the option of pleading guilty to one of their counts and paying a reduced fine plus full court costs, in exchange for dismissal of their other counts.

330.    But there is a catch: That offer is contingent on waiving the right to sue Brookside or any of its departments or officials.

331.    This system does not signal any change in policy.

332.    To the contrary, it signals only a desire to ensure that Brookside and its officials

keep their years of ill-gotten profits, continue to generate more, and avoid any accountability for the suffering they have caused and continue to cause.

333.    Under these circumstances, the advice that Jefferson County Sheriff Mark Pettway gave to a crowd of over 200 people on February 1, 2022 holds true: "Don't go through Brookside."

## CLASS ALLEGATIONS

334.    Plaintiffs seek to maintain this action both on behalf of themselves and on behalf of others similarly situated under Federal Rule of Civil Procedure 23.

335.    Plaintiffs propose two classes and one sub-class: the "Towing Class," the "Vehicle Retention Sub-Class," and the "Charging Class."

336.    For the **Towing Class**, to which Count 1 pertains, Plaintiffs propose the following class definition: "All persons who, since March 1, 2018, have paid fees to either the Town of Brookside or Jett's Towing (or both) to secure the release of a vehicle towed on the orders of the Brookside Police Department following a traffic stop" (the "Towing Class").

337.    The Towing Class meets all the Rule 23(a) prerequisites for maintaining a class action.

338.    ***Numerosity under Rule 23(a)(1)***: The putative class is so numerous that joinder of all members is impracticable:

      a.    On information and belief, Brookside has ordered the towing and impounding of well over 1,200 vehicles since March 2018. On information and belief, Brookside has ordered the towing and impounding of hundreds of vehicles since 2020.

      b.    On information and belief, Brookside has required vehicle owners to pay Brookside mandatory impound fees to secure the release of all of the vehicles towed and impounded since March 2018. On information and

belief, hundreds of persons paid those fees to Brookside during this period, typically $175 per car. On information and belief, Brookside has required vehicle owners to pay Brookside mandatory impound fees to secure the release of all of the vehicles towed and impounded since 2020. On information and belief, hundreds of persons have paid those fees to Brookside during this period.

c.   On information and belief, Jett's Towing has likewise required vehicle owners to pay it fees to secure the release of all of the vehicles ordered towed and impounded by Brookside police since March 2018. On information and belief, hundreds of persons paid those fees to Jett's Towing during this period. On information and belief, Jett's Towing has required vehicle owners to pay it fees to secure the release of all of the vehicles ordered towed and impounded by Brookside police since 2020. On information and belief, hundreds of persons have paid those fees to Jett's Towing during this period.

339.   ***Commonality under Rule 23(a)(2)***:

a.   Questions of law or fact are common to Plaintiffs' towing-related claim and the putative Towing Class's towing-related claim.

b.   Common questions include:

1.   Whether Brookside's and Jett's Towing's conduct demonstrates that Brookside's policies, practices, and customs have created a situation where Brookside police and Jett's Towing have an incentive to seize, tow, and impound vehicles to maximize revenue.

      2.     Whether Brookside and Jett's Towing are violating or have violated due process by engaging in conduct that demonstrates that Brookside's policies, practices, and customs have created a situation where Brookside police and Jett's Towing have an incentive to seize, tow, and impound vehicles to maximize revenue.

340.    *Typicality under Rule 23(a)(3)*:

    a.    Named Plaintiffs Brittany Coleman, Brandon Jones, and Chekeithia Grant's towing-related claim and the putative Towing Class's towing-related claim arise out of the same policy, practice, and custom of Brookside and Jett's Towing: seizing, towing, and impounding cars for profit.

    b.    Named Plaintiffs Brittany Coleman, Brandon Jones, and Chekeithia Grant seek the same class-wide relief both for themselves and for other members of the putative Towing Class, in the form of declaratory and injunctive relief, including disgorgement of fees related to the release of their cars, and an injunction barring Brookside's and Jett's Towing's policy, practice, and custom of seizing, towing, and impounding cars for profit, or creating an incentive to do so.

341.    *Adequacy of representation under Rule 23(a)(4)*:

    a.    Named Plaintiffs Brittany Coleman, Brandon Jones, and Chekeithia Grant adequately represent the putative Towing Class because their interests are aligned, and there are no conflicts between them and members of the Towing Class. They have suffered the same injuries, at the hands of the same Defendants, and they are entitled to the same relief, in the form of

declaratory and injunctive relief, including disgorgement of fees related to the release of their cars, and an injunction barring Brookside's and Jett's Towing's policy, practice, and custom of seizing, towing, and impounding cars for profit, or creating an incentive to do so.

b.   The Towing Class would be ably represented by the Institute for Justice. The Institute for Justice is a nonprofit, public-interest law firm that, since its founding in 1991, has successfully litigated constitutional issues nationwide. The Institute for Justice has also litigated numerous federal class actions and putative class actions involving property rights and profit-driven fines and forfeitures, including against Philadelphia (*Sourovelis v. City of Philadelphia*, No. 14-cv-4687, 2021 WL 344598, at *1 (E.D. Pa. Jan. 28, 2021) (appointing firm as Class Counsel and approving federal consent decree in challenge to civil forfeiture procedures)); against New York City (*Cho v. City of New York*, No. 16-cv-7961 (S.D.N.Y. Oct. 2, 2020) (ECF 111) (approving settlement of a putative class action, under which New York City agreed not to enforce agreements extracted through coercive property seizures)); against Pagedale, Missouri (*Whitner v. City of Pagedale*, No. 15-cv-1655 (E.D. Mo. May 21, 2018) (ECF 116) (approving federal consent decree prohibiting abusive ticketing practices)); and against the federal government (*Snitko v. United States*, No. 21-cv-4405 (C.D. Cal. Oct. 12, 2021) (ECF 78) (certifying class of property owners challenging FBI searches and seizures as unlawful)).

      c.      The Towing Class likewise would be ably represented by Attorney William Dawson, who has decades of experience litigating civil rights claims in the state and federal courts of the State of Alabama.

342.    The Towing Class also meets the requirements of Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. These requirements are pleaded collectively and in the alternative.

      a.      As to Rule 23(b)(2), the Town of Brookside has acted, or refused to act, on grounds generally applicable to the putative Towing Class. Declaratory and injunctive relief is appropriate with respect to all members of the class, including in the form of disgorgement of the fees paid by class members to Brookside and Jett's Towing for the release of their vehicles. Alternatively, disgorgement is appropriate relief incidental to the class's declaratory and injunctive relief under Rule 23(b)(2).

      b.      As to Rule 23(b)(3), questions of law or fact common to class members (including those in the Commonality section above) predominate over any questions affecting only individual members, and the class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

343.    For the **Vehicle Retention Sub-Class**, to which Count 4 pertains, Plaintiffs propose the following class definition: "All persons who, since June 17, 2020, have paid fees to the Town of Brookside to secure the release of a vehicle towed on the orders of the Brookside Police Department following a traffic stop" (the "Vehicle Retention Sub-Class").

344.    The Vehicle Retention Sub-Class meets all the Rule 23(a) prerequisites for maintaining a class action.

345.    ***Numerosity under Rule 23(a)(1)***: The putative class is so numerous that joinder of all members is impracticable:

      a.     On information and belief, Brookside has ordered the towing and impounding of hundreds of vehicles since June 2020.

      b.     On information and belief, Brookside has required vehicle owners to pay Brookside mandatory impound fees to secure the release of all of the vehicles towed and impounded since June 2020. On information and belief, hundreds of persons paid those fees to Brookside during this period, in the amount of $175 per car.

346.    ***Commonality under Rule 23(a)(2)***:

      a.     Questions of law or fact are common to Named Plaintiff Brandon Jones's vehicle-retention-related claims and the putative Vehicle Retention Sub-Class's vehicle-retention-related claims.

      b.     Common questions include:

           1.     Whether Brookside imposes a $175 mandatory impound fee as a condition for the release of vehicles ordered towed by its police department.

           2.     Whether Brookside's $175 mandatory impound fee is related to the cost of administering its towing and impounding system.

           3.     Whether the fees generated by that system redound entirely to the benefit and profit of Brookside.

4.      Whether Brookside had or continues to have an incentive to tow and impound as many vehicles and extract as many mandatory impound fees as it can.

347.   *Typicality under Rule 23(a)(3)*:

a.      Named Plaintiff Brandon Jones's vehicle-retention-related claim and the putative Vehicle Retention Sub-Class's vehicle-retention-related claim arise out of the same policy, practice, and custom of Brookside: seizing, towing, and impounding cars and charging a "mandatory impound fee" for their release.

b.      Named Plaintiff Brandon Jones seeks the same class-wide relief both for himself and for other members of the putative Vehicle Retention Sub-Class, in the form of declaratory and injunctive relief, including disgorgement of fees related to the release of their cars, and an injunction barring Brookside's policy, practice, and custom of seizing, towing, and impounding cars and charging a "mandatory impound fee" for their release.

348.   *Adequacy of representation under Rule 23(a)(4)*:

a.      Named Plaintiff Brandon Jones adequately represents the putative Vehicle Retention Sub-Class because their interests are aligned, and there are no conflicts between him and members of the Vehicle Retention Sub-Class. They have suffered the same injuries, at the hands of the same Defendant, and they are entitled to the same relief, in the form of declaratory and injunctive relief, including disgorgement of fees related to the release of their cars, and an injunction barring Brookside's policy, practice, and

custom of seizing, towing, and impounding cars and charging a "mandatory impound fee" for their release.

b.       The Vehicle Retention Sub-Class would be ably represented by the Institute for Justice. The Institute for Justice is a nonprofit, public-interest law firm that, since its founding in 1991, has successfully litigated constitutional issues nationwide. The Institute for Justice has also litigated numerous federal class actions and putative class actions involving property rights and profit-driven fines and forfeitures, including against Philadelphia (*Sourovelis v. City of Philadelphia*, No. 14-cv-4687, 2021 WL 344598, at *1 (E.D. Pa. Jan. 28, 2021) (appointing firm as Class Counsel and approving federal consent decree in challenge to civil forfeiture procedures)); against New York City (*Cho v. City of New York*, No. 16-cv-7961 (S.D.N.Y. Oct. 2, 2020) (ECF 111) (approving settlement of a putative class action, under which New York City agreed not to enforce agreements extracted through coercive property seizures)); against Pagedale, Missouri (*Whitner v. City of Pagedale*, No. 15-cv-1655 (E.D. Mo. May 21, 2018) (ECF 116) (approving federal consent decree prohibiting abusive ticketing practices)); and against the federal government (*Snitko v. United States*, No. 21-cv-4405 (C.D. Cal. Oct. 12, 2021) (ECF 78) (certifying class of property owners challenging FBI searches and seizures as unlawful)).

c.       The Vehicle Retention Sub-Class likewise would be ably represented by Attorney William Dawson, who has decades of experience litigating civil rights claims in the state and federal courts of the State of Alabama.

349.     The Vehicle Retention Sub-Class also meets the requirements of Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. These requirements are pleaded collectively and in the alternative.

      a.    As to Rule 23(b)(2), the Town of Brookside has acted, or refused to act, on grounds generally applicable to the putative Vehicle Retention Sub-Class. Declaratory and injunctive relief is appropriate with respect to all members of the sub-class, including in the form of disgorgement of the fees paid by class members to Brookside for the release of their vehicles. Alternatively, disgorgement is appropriate relief incidental to the sub-class's declaratory and injunctive relief under Rule 23(b)(2).

      b.    As to Rule 23(b)(3), questions of law or fact common to sub-class members (including those in the Commonality section above) predominate over any questions affecting only individual members, and the class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

350.     For the **Charging Class**, to which Counts 2 and 3 pertain, Plaintiffs propose the following class definition: "All persons who have been charged with offenses in Brookside Municipal Court following traffic stops by the Brookside Police Department since March 1, 2018" (the "Charging Class").

351.     The Charging Class meets all the Rule 23(a) prerequisites for maintaining a class action.

352.     ***Numerosity under Rule 23(a)(1)***: The putative class is so numerous that joinder of all members is impracticable:

a.   On information and belief, Brookside has charged offenses in Brookside Municipal Court following traffic stops in hundreds, and potentially thousands, of instances since March 1, 2018.

353.   ***Commonality under Rule 23(a)(2)***:

a.   Questions of law or fact are common to Plaintiffs' claims that Brookside has or did have a policy, practice, or custom of enforcing municipal violations in a manner that appears to or does incentivize or prioritize increasing Brookside's revenue, in violation of the Due Process Clause of the Fourteenth Amendment.

b.   Common questions include:

1.   Whether Brookside has (or had) a policy, practice, or custom of enforcing municipal violations in a manner that appears to or does incentivize or prioritize increasing Brookside's revenue.

2.   Whether Brookside's policy, practice, and custom of enforcing municipal violations in a manner that appears to or does incentivize or prioritize increasing Brookside's revenue violates the Fourteenth Amendment's Due Process Clause.

354.   ***Typicality under Rule 23(a)(3)***:

a.   Plaintiffs' charging-related claims and the putative Charging Class's charging-related claims arise out of the same policy, practice, and custom of Brookside: enforcing municipal violations under a policy, practice, and custom that appears to or does incentivize or prioritize increasing

Brookside's revenue, in violation of the Due Process Clause of the Fourteenth Amendment.

b.    Plaintiffs seek the same class-wide relief both for themselves and for other members of the putative Charging Class, in the form of declaratory and injunctive relief, the certification and resolution of discrete legal issues pursuant to Rule 23(c)(4), and damages on either a bifurcated or partial-certification basis.

355.    ***Adequacy of representation under Rule 23(a)(4)***:

a.    Named Plaintiffs adequately represent the putative Charging Class because their interests are aligned, and there are no conflicts between them and members of the Charging Class. They have suffered the same injuries, at the hands of the same Defendants, and they are entitled to the same relief.

b.    The Charging Class would be ably represented by the Institute for Justice. The Institute for Justice is a nonprofit, public-interest law firm that, since its founding in 1991, has successfully litigated constitutional issues nationwide. The Institute for Justice has also litigated numerous federal class actions and putative class actions involving property rights and profit-driven fines and forfeitures, including against Philadelphia (*Sourovelis v. City of Philadelphia*, No. 14-cv-4687, 2021 WL 344598, at *1 (E.D. Pa. Jan. 28, 2021)); against New York City (*Cho v. City of New York*, No. 16-cv-7961 (S.D.N.Y. Oct. 2, 2020) (ECF 111)); against Pagedale, Missouri (*Whitner v. City of Pagedale*, No. 15-cv-1655 (E.D. Mo. May 21, 2018)

(ECF 116)); and against the federal government (*Snitko v. United States*, No. 21-cv-4405 (C.D. Cal. Oct. 12, 2021) (ECF 78)).

    c.    The Charging Class likewise would be ably represented by Attorney William Dawson, who has decades of experience litigating civil rights claims in the state and federal courts of the State of Alabama.

356.    The Charging Class also meets the requirements of Rule 23(b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure. These requirements are pleaded collectively and in the alternative.

    a.    As to Rule 23(b)(2), the Town of Brookside has acted, or refused to act, on grounds generally applicable to the putative Charging Class. Declaratory and injunctive relief is appropriate with respect to all members of the class.

    b.    As to Rule 23(b)(3), questions of law or fact common to class members (including those in the Commonality section above) predominate over any questions affecting only individual members, and the class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

    c.    As to Rule 23(c)(4), the question of Brookside's liability is eligible for resolution on an issue-certified basis because whether Brookside's municipal enforcement practices, policies, and customs violate the U.S. Constitution is a "particular issue[]" that is appropriately decided on a class-wide basis. Deciding that determinative and preliminary question promotes judicial efficiency. It allows for a determination of the propriety of class-wide prospective relief before the adjudication, if any, of individual claims

for retrospective relief. And it does not evince any effort to evade Rule 23(b)(3)'s predominance requirement because before deciding whether to permit individual damages claims, the Court will decide the predominating question: whether Brookside has operated its policing system and/or its municipal court system in violation of law.

## CAUSES OF ACTION

### COUNT 1
### 42 U.S.C. § 1983
**Biased Towing and Impounding—Unlawful Financial Interest in Violation of the Fourteenth Amendment**
**(On behalf of Named Plaintiffs Brittany Coleman, Brandon Jones, and Chekeithia Grant, individually and on behalf of the Towing Class, against The Town of Brookside and Jett's Towing, Inc.)**

357.    Named Plaintiffs Brittany Coleman, Brandon Jones, and Chekeithia Grant reallege and incorporate by reference each and every allegation set forth in paragraphs 1 through 356 above.

358.    In particular, this Count relies on the allegations that relate to The Town of Brookside's and Jett's Towing Inc.'s vehicle towing and impounding system, including as detailed at paragraphs 1–36, 40–178, and 203–342 above.

359.    This Count is brought on behalf of Named Plaintiffs Brittany Coleman, Brandon Jones, and Chekeithia Grant, individually and on behalf of the Towing Class, against The Town of Brookside and Jett's Towing, Inc.

360.    This Count is brought against The Town of Brookside based on its operation of a vehicle towing and impounding system designed and implemented to generate and maximize revenue and profit for The Town of Brookside.

361.    This Count is brought against Jett's Towing, Inc. based on its operation of a vehicle towing and impounding system designed and implemented to generate and maximize revenue and profit for Jett's Towing.

362.    The Due Process Clause of the Fourteenth Amendment requires that law enforcement be neutral, impartial, and objective. Brookside's law enforcement has a duty to enforce the law in service of the public interest, not in service of their or the Town's financial self-interests, whether personal or institutional.

363.    It is a violation of the Due Process Clause for law enforcement to have a personal or institutional financial stake in enforcing the laws.

364.    Seizing, towing, and impounding a person's vehicle is a formidable exercise of law-enforcement power.

365.    Brookside has a massive financial interest in exercising its power to seize, tow, and impound vehicles following traffic stops. At all times relevant to this case, Brookside has been overwhelmingly dependent on extracting fees from people whose vehicles are seized, towed, and impounded on the orders of Brookside police officers.

366.    This financial interest has distorted Brookside's exercise of its power to seize, tow, and impound vehicles.

367.    This financial interest incentivizes Brookside police officers to seize, tow, and impound vehicles to maximize or increase revenue, and without regard for the public interest or individuals' constitutional rights.

368.    Jett's Towing is a knowing and active participant in and beneficiary of Brookside's towing policies, practices, and customs. It too has an incentive to maximize its revenue pursuant to Brookside's towing policies, practices, and customs. It is the "designated and approved Brookside impound lot." The company stands at the ready near police cars to tow vehicles, and it refuses to release them until Brookside collects its own predatory fees. Moreover, Brookside

empowers Jett's Towing to not only charge the company's own towing, impound, and storage fees, but also to charge and collect "additional town fees."

369.    Because Brookside's policies, practices, and customs have created a situation where Brookside police and Jett's Towing have an incentive to seize, tow, and impound vehicles to maximize or increase revenue, Brookside and Jett's Towing are together violating the due process rights of Named Plaintiffs Brittany Coleman, Brandon Jones, and Chekeithia Grant and all others whose vehicles have been towed in accordance with Brookside's and Jett's Towing's profit-fueled policies, practices, and customs.

370.    As a direct and proximate result of Brookside's and Jett's Towing's actions, Named Plaintiffs Brittany Coleman, Brandon Jones, and Chekeithia Grant have suffered injury in the form of paying fees to Brookside and to Jett's Towing to secure the release of vehicles seized, towed, and impounded pursuant to Brookside's and Jett's Towing's unconstitutional policies, practices, and customs.

371.    As a direct and proximate result of Brookside's and Jett's Towing's actions, the members of the Towing Class have likewise suffered injury in the form of paying fees to Brookside and to Jett's Towing to secure the release of vehicles seized, towed, and impounded pursuant to Brookside's and Jett's Towing's unconstitutional policies, practices, and customs.

372.    Named Plaintiffs Brittany Coleman, Brandon Jones, and Chekeithia Grant and the Towing Class are entitled to declaratory and injunctive relief, including disgorgement, with interest, of the fees paid to Brookside and to Jett's Towing to secure the release of towed and impounded vehicles, and cancelation of any pending or outstanding fees.

373.    Named Plaintiffs Brittany Coleman, Brandon Jones, and Chekeithia Grant and the Towing Class are entitled to an injunction barring Brookside's and Jett's Towing's systemic

policy, practice, and custom of seizing and towing vehicles to maximize or increase their revenues from tow-related fees, or creating an incentive to do so.

## COUNT 2
## 42 U.S.C. § 1983
## Biased Law Enforcement and Prosecution—Unlawful Financial Interest in Violation of the Fourteenth Amendment
### (On behalf of all Named Plaintiffs, individually and on behalf of the Charging Class, against The Town of Brookside)

374.   Named Plaintiffs reallege and incorporate by reference each and every allegation set forth in paragraphs 1 through 356 above.

375.   In particular, this Count relies on the allegations that relate to The Town of Brookside's policing policies, practices, and customs and The Town of Brookside's prosecution policies, practices, and customs, including as detailed at paragraphs 1–35, 40–93, 154–335, and 350–356 above.

376.   This Count is brought on behalf of all Named Plaintiffs, individually and on behalf of the Charging Class, against The Town of Brookside.

377.   This Count is brought against The Town of Brookside based on its operation of its law enforcement and prosecution systems in ways that are designed and implemented to generate and maximize revenue and profit for The Town of Brookside.

378.   The Due Process Clause of the Fourteenth Amendment requires that law enforcement and prosecutors be neutral, impartial, and objective. Brookside's law enforcement and prosecutors have a duty to enforce the law in service of the public interest, not in service of their or the Town's financial self-interests, whether personal or institutional.

379.   It is a violation of the Due Process Clause for law enforcement or prosecutors to have a personal or institutional financial stake in the cases they bring or prosecute.

380.     Brookside's police department and town attorney have massive financial interests in the municipal-court cases that their officials charge and prosecute. Brookside (including its police department and town attorney) is dependent on obtaining fines, fees, and forfeiture revenues from the people that the Town's officials charge and prosecute.

381.     This financial interest is the result of and has given rise to town policies, practices, and customs that distort or threaten to distort Brookside's exercise of law-enforcement and prosecutorial powers.

382.     This financial interest is the result of and has given rise to town policies, practices, and customs that incentivize Brookside's police department and prosecutorial personnel to charge and prosecute municipal-court violations to maximize or increase revenue, and without regard for the public interest or individuals' constitutional rights.

383.     This financial interest is the result of and has given rise to town policies, practices, and customs that incentivize Brookside's town attorney to pursue and obtain municipal-court convictions in a manner that disregards the stringent ethical and constitutional responsibilities of prosecutors and violates individuals' constitutional rights.

384.     Because Brookside's policies, practices, and customs have created a situation where its law-enforcement and prosecutorial officials have a financial incentive to charge, convict, and fine defendants, those policies, practices, and customs violate the due process rights of the Named Plaintiffs, all of whom are or have been subjected to charges issued under Brookside's profit-fueled policies, practices, and customs.

385.      Because Brookside's policies, practices, and customs have created a situation where its law-enforcement and prosecutorial officials have a financial incentive to charge, convict, and fine defendants, those policies, practices, and customs violate the due process rights of the

members of the Charging Class, all of whom are or have been subjected to charges issued under Brookside's profit-fueled policies, practices, and customs.

386.　Named Plaintiffs and the Charging Class are entitled to declaratory relief on the issue-certified question whether Brookside has or did have a policy, practice, or custom of enforcing municipal violations in a manner and pursuant to incentives that violate the Fourteenth Amendment's Due Process Clause. Separate from that issue-certified question, Named Plaintiffs and Charging Class members also are entitled to damages for injuries caused by Brookside's policy, practice, or custom of enforcing municipal violations in a manner and pursuant to incentives that violate the Fourteenth Amendment's Due Process Clause.

387.　Named Plaintiffs and the Charging Class are entitled to an injunction barring Brookside's municipal policy, practice, or custom of enforcing municipal violations in a manner that incentivizes or prioritizes the maximizing or increasing of revenue.

### COUNT 3
### 42 U.S.C. § 1983
### Biased Adjudication—Unlawful Financial Interest in Violation of the Fourteenth Amendment
### (On behalf of all Named Plaintiffs, individually and on behalf of the Charging Class, against The Town of Brookside)

388.　Named Plaintiffs reallege and incorporate by reference each and every allegation set forth in paragraphs 1 through 356 above.

389.　In particular, this Count relies on the allegations that relate to The Town of Brookside's municipal court adjudication policies, practices, and customs, including as detailed at paragraphs 1–35, 40–93, 154–335, and 350–356 above.

390.　This Count is brought on behalf of all Named Plaintiffs, individually and on behalf of the Charging Class, against The Town of Brookside.

391.     This Count is brought against The Town of Brookside based on its operation of its municipal court system in ways that are designed and implemented, or appear to be designed and implemented, to generate and maximize revenue and profit for The Town of Brookside.

392.     The Due Process Clause of the Fourteenth Amendment prohibits judicial officers or municipal courts from having, or appearing to have, a direct or indirect financial interest in a proceeding, regardless of whether that interest is institutional or personal.

393.     Brookside's reliance on its municipal code to raise revenue has created an institutional incentive, or the appearance of an incentive, for the Town to charge, convict, and fine defendants, regardless of the nature of an individual's offense and without regard for the public interest or individuals' constitutional rights.

394.     Brookside's institutional reliance on revenue from fines, fees, and forfeitures has created a conflict between the Town's pecuniary interest and its municipal-court personnel's obligations to be, and appear to be, disinterested and serving only the interests of justice. This conflict exists regardless of whether such personnel actually do violate their obligations to be disinterested and serve only the interests of justice.

395.     Brookside's institutional reliance on revenue from fines and fees has created an appearance of bias and interested decision-making that results in a lack of due process of law in the trial of defendants charged before the Brookside Municipal Court.

396.     Brookside's institutional pecuniary interest in raising revenue also has created an unconstitutional risk that irrelevant and impermissible factors can influence the resolution of cases prosecuted in the Brookside Municipal Court.

397. Because Brookside's policies, practices, and customs have created a situation where municipal-court personnel have an incentive, or appear to have an incentive, to convict and fine defendants, Brookside has violated the due process rights of the Named Plaintiffs.

398. Because Brookside's policies, practices, and customs have created a situation where municipal-court personnel have an incentive, or appear to have an incentive, to convict and fine defendants, Brookside has also violated the due process rights of the members of the Charging Class.

399. As a direct and proximate result of Brookside's policy, practice, and custom of administering its municipal court in order to generate revenue, or appearing to do so, Named Plaintiffs and the members of the Charging Class have suffered harm to their constitutional rights.

400. Named Plaintiffs and the Charging Class are entitled to declaratory relief on the issue-certified question whether Brookside has or did have a policy, practice, or custom of enforcing municipal violations in a manner and pursuant to incentives that violate the Fourteenth Amendment's Due Process Clause. Separate from that issue-certified question, Named Plaintiffs and Charging Class members also are entitled to damages for injuries caused by Brookside's policy, practice, or custom of enforcing municipal violations in a manner and pursuant to incentives that violate the Fourteenth Amendment's Due Process Clause.

401. Named Plaintiffs and the Charging Class are entitled to an injunction barring Brookside's municipal policy, practice, or custom of enforcing municipal violations in a manner that appears to or does incentivize or prioritize maximizing or increasing Brookside's revenue.

## COUNT 4
### 42 U.S.C. § 1983
**Retention of Vehicles on Condition of Payment of Mandatory Impound Fee in Violation of the Fourteenth Amendment**
**(On behalf of Named Plaintiff Brandon Jones, individually and on behalf of the Vehicle Retention Sub-Class, against The Town of Brookside)**

402.   Named Plaintiff Brandon Jones realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 356 above.

403.   In particular, this Count relies on the allegations that relate to The Town of Brookside's and Jett's Towing Inc.'s vehicle towing and impounding system, including as detailed at paragraphs 1–29, 31, 34–35, 40–153, 244–276, 313–335, and 343–349 above.

404.   This Count is brought on behalf of Named Plaintiff Brandon Jones, individually and on behalf of the Vehicle Retention Sub-Class, against The Town of Brookside.

405.   This Count is brought against The Town of Brookside based on its policy, practice, and custom of conditioning the release of impounded vehicles on the payment to The Town of Brookside of a $175 mandatory impound fee that is unrelated to the cost of administering Brookside's vehicle towing and impounding system.

406.   Brookside's $175 mandatory impound fee has never been related to the cost of administering Brookside's vehicle towing and impounding system.

407.   Brookside's $175 mandatory impound fee is still not related to the cost of administering Brookside's vehicle towing and impounding system.

408.   The revenue generated by Brookside's $175 mandatory impound fee has always redounded entirely to the benefit and profit of Brookside.

409.   The revenue generated by Brookside's $175 mandatory impound fee still redounds entirely to the benefit and profit of Brookside.

410.    Brookside has not incurred and does not incur costs for the administration of its towing and impounding system because that system is operated by Jett's Towing, which, on information and belief, does not charge Brookside any costs.

411.    Brandon Jones and the members of the Vehicle Retention Sub-Class have a property right in their vehicles. They likewise have a property right in their money.

412.    Brookside may not condition the return of Brandon Jones's and the members of the Vehicle Retention Sub-Class's vehicles on the payment to Brookside of a $175 mandatory impound fee that is unrelated to the cost of administering Brookside's vehicle towing and impounding system. Conditioning the return of Brandon Jones's and the members of the Vehicle Retention Sub-Class's vehicles on the payment to Brookside of a fee that is unrelated to the cost of administering Brookside's vehicle towing and impounding system violates Brandon Jones's and the Sub-Class's rights under the Due Process Clause of the Fourteenth Amendment.

413.    As a direct and proximate result of Brookside's actions, Named Plaintiff Brandon Jones has suffered injury in the form of having the release of his impounded vehicle be conditioned on payment to Brookside of a $175 mandatory impound fee that is unrelated to the cost of administering Brookside's vehicle towing and impounding system.

414.    As a direct and proximate result of Brookside's actions, the members of the Vehicle Retention Sub-Class have likewise suffered injury in the form of having the release of their impounded vehicles be conditioned on payment to Brookside of a $175 mandatory impound fee that is unrelated to the cost of administering Brookside's vehicle towing and impounding system.

415.    Named Plaintiff Brandon Jones and the Vehicle Retention Sub-Class are entitled to declaratory and injunctive relief, including disgorgement, with interest, of the fees paid to

Brookside to secure the release of towed and impounded vehicles, and cancelation of any pending or outstanding fees.

416.    Named Plaintiff Brandon Jones and the Vehicle Retention Sub-Class are entitled to an injunction barring Brookside's unconstitutional policy, practice, and custom of conditioning the release of impounded vehicles on the payment to Brookside of a mandatory impound fee that is unrelated to the cost of the administration of Brookside's vehicle towing and impounding system.

**COUNT 5**
**42 U.S.C. § 1983**
**Unconstitutional Seizures in Violation of the Fourth and Fourteenth Amendments**
**(On behalf of Plaintiff Brittany Coleman, individually, against Defendants Marcus Sellers, Maresha Moses, and Anthony Ragsdale)**

417.    Plaintiff Brittany Coleman realleges and incorporates by reference paragraphs 1 through 356 above.

418.    In particular, this Count relies on the allegations that relate to the handcuffing of Brittany Coleman and the seizure, towing, and impounding of Brittany Coleman's car, including as detailed at paragraphs 1–30, 37–93, 203–243, and 313–333 above.

419.    This Count is brought on behalf of Named Plaintiff Brittany Coleman, individually, against Marcus Sellers, Maresha Moses, and Anthony Ragsdale.

420.    This Count is brought against Marcus Sellers for handcuffing Brittany Coleman in violation of the Fourth Amendment and for seizing, towing, and impounding Brittany Coleman's car in violation of the Fourth Amendment.

421.    This Count is brought against Maresha Moses and Anthony Ragsdale for keeping Brittany Coleman handcuffed in violation of the Fourth Amendment and for seizing, towing, and impounding Brittany Coleman's car in violation of the Fourth Amendment.

422.    Use of handcuffs during a traffic stop without any justification is a violation of the Fourth Amendment (applicable to the states through the Fourteenth Amendment).

423.     When he handcuffed Brittany Coleman, Officer Sellers had no reasonable belief that she presented a potential threat to safety.

424.     When he handcuffed Brittany Coleman, Officer Sellers had no legitimate justification for doing so.

425.     In fact, Officer Sellers told Brittany Coleman that handcuffing her was Brookside's "standard procedure" whenever officers required drivers to exit their vehicles or searched their vehicles.

426.     Officers Sellers, Moses, and Ragsdale had no reasonable belief that Brittany Coleman presented a potential threat to safety and had no other legitimate justification for keeping her handcuffed and under arrest for the entire 45 minutes of her seizure.

427.     Officers Sellers, Moses, and Ragsdale acted under color of law when they handcuffed Brittany Coleman and when they kept her handcuffed and under arrest for the entire 45 minutes of her seizure.

428.     It is clearly established that handcuffing a driver at a traffic stop without any justification is a violation of the Fourth Amendment. Every reasonable government official would have had fair warning that handcuffing Brittany Coleman without any justification, as Officer Sellers did, was unconstitutional.

429.     It is clearly established that keeping a driver handcuffed throughout a traffic stop without any justification is a violation of the Fourth Amendment. Every reasonable government official would have had fair warning that keeping Brittany Coleman handcuffed and under arrest for 45 minutes without any justification, as Officers Sellers, Moses, and Ragsdale did, was unconstitutional.

430.    The Fourth Amendment to the United States Constitution likewise secures the right to be free from unreasonable seizures of property.

431.    Towing a car is a seizure under the Fourth Amendment and must be supported by either a warrant or an exception to the warrant requirement.

432.    Officers Sellers, Moses, and Ragsdale did not have a warrant when they seized Brittany Coleman's car and ordered it towed. Nor was the seizure and towing justified by any exception to the warrant requirement.

433.    Following her traffic stop, Brittany Coleman could have legally and safely driven her car away from the scene of the stop.

434.    There were no exigent circumstances that necessitated the towing of Brittany Coleman's car.

435.    No other exception to the Fourth Amendment's warrant requirement permitted Officers Sellers, Moses, and Ragsdale to seize and order the towing of Brittany Coleman's car.

436.    Officers Sellers, Moses, and Ragsdale acted under color of law when they ordered Brittany Coleman's car seized and towed.

437.    It is clearly established that seizing and towing a driver's vehicle without a warrant and without any exception to the warrant requirement is a violation of the Fourth Amendment. Every reasonable government official would have had fair warning that seizing and ordering towed Brittany Coleman's vehicle, as Officers Sellers, Moses, and Ragsdale did, was unconstitutional.

438.    Officers Sellers's, Moses's, and Ragsdale's unconstitutional acts directly harmed Brittany Coleman and caused her pecuniary loss. Brittany Coleman therefore seeks the retrospective relief prayed for below.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court:

A.      For purposes of Count 1:

       a.      Certify a class under Rules 23(b)(2) and (b)(3) consisting of: "All persons who, since March 1, 2018, have paid fees to either the Town of Brookside or Jett's Towing (or both) to secure the release of a vehicle towed on the orders of the Brookside Police Department following a traffic stop" (the "Towing Class").

       b.      Declare, on a class-wide basis, that Brookside's and Jett's Towing's systematic policy, practice, or custom of seizing, towing, and impounding vehicles to maximize or increase their revenue from tow-related fees violates the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

       c.      Enter an injunction or award damages requiring Brookside and Jett's Towing to disgorge and return to Named Plaintiffs Brittany Coleman, Brandon Jones, and Chekeithia Grant and to the Towing Class the fees they have paid to Brookside and Jett's Towing to secure release of their vehicles, with interest, and to cancel any pending or outstanding fees owed by members of the Towing Class.

       d.      Enter an injunction barring Brookside's and Jett's Towing's systematic policy, practice, or custom of seizing, towing, and impounding vehicles to maximize or increase their revenues from tow-related fees.

B.      For purposes of Counts 2 and 3:

a.   Certify a class under Rules 23(b)(2), (b)(3), and (c)(4) consisting of: "All persons who have been charged with offenses in Brookside Municipal Court following traffic stops by the Brookside Police Department since March 1, 2018" (the "Charging Class").

b.   Certify that class "with respect to particular issues," Fed. R. Civ. P. 23(c)(4), namely liability: Whether Brookside has or did have a municipal policy, practice, or custom of enforcing municipal violations in a manner that incentivizes or prioritizes (or, for Count 3, appears to incentivize or prioritize) maximizing or increasing Brookside's revenue, in violation of the Due Process Clause of the Fourteenth Amendment.

c.   Declare, on a class-wide basis for each Count, that Brookside's municipal policy, practice, or custom of enforcing municipal violations in a manner that incentivizes or prioritizes (or, for Count 3, appears to incentivize or prioritize) maximizing or increasing Brookside's revenue violates the Due Process Clause of the Fourteenth Amendment.

d.   Upon that certification and the resolution of those particular issues on a class-wide basis, permit class members to pursue damages caused by Brookside's unconstitutional policy, practice, or custom of enforcing municipal violations in a manner that violates the Due Process Clause of the Fourteenth Amendment.

e.   Declare, as to the Named Plaintiffs for each Count, that Brookside's municipal policy, practice, or custom of enforcing municipal violations in a manner that incentivizes or prioritizes (or, for Count 3, appears to

incentivize or prioritize) maximizing or increasing Brookside's revenue has violated the Named Plaintiffs' rights under the Due Process Clause of the Fourteenth Amendment and award damages to the Named Plaintiffs for injuries caused by that violation.

f.   Enter an injunction barring Brookside's municipal policy, practice, or custom of enforcing municipal violations in a manner that appears to or does incentivize or prioritize the maximizing or increasing of Brookside's revenue.

C.   For purposes of Count 4:

a.   Certify a sub-class under Rules 23(b)(2) and (b)(3) consisting of: "All persons who, since June 17, 2020, have paid fees to the Town of Brookside to secure the release of a vehicle towed on the orders of the Brookside Police Department following a traffic stop" (the "Vehicle Retention Sub-Class").

b.   Declare, on a class-wide basis, that Brookside's policy, practice, and custom of conditioning the release of impounded vehicles on payment to Brookside of a $175 mandatory impound fee that is unrelated to the cost of the administration of Brookside's vehicle towing and impounding system violates the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

c.   Enter an injunction or award damages requiring Brookside to disgorge and return to Named Plaintiff Brandon Jones and to the Vehicle Retention Sub-Class the fees they have paid to Brookside to secure release of their vehicles, with interest, and to cancel any pending or outstanding fees owed by

members of the Vehicle Retention Sub-Class.

    d.    Enter an injunction barring Brookside's policy, practice, and custom of conditioning the release of impounded vehicles on payment to Brookside of a mandatory impound fee that is unrelated to the cost of the administration of Brookside's vehicle towing and impounding system.

D.    For purposes of Count 5: Award damages to Plaintiff Brittany Coleman in an amount to be proven at trial, against each of Defendants Sellers, Moses, and Ragsdale.

E.    Award attorneys' fees, costs, and expenses for this action pursuant to 42 U.S.C. § 1988.

F.    Award further legal and equitable relief as this Court may deem just and proper.

Dated: June 17, 2022.        Respectfully submitted,

s/ William M. Dawson

William M. Dawson
DAWSON LAW OFFICE
1736 Oxmoor Road, #101
Birmingham, AL 35209
Phone: (205) 795-3512
E-mail: bill@billdawsonlaw.com

s/ Jaba Tsitsuashvili

Samuel B. Gedge (VA Bar No. 80387)*
Jaba Tsitsuashvili (DC Bar No. 1601246)*
Suranjan Sen (TN Bar No. 038830)*
Victoria Clark (TX Bar No. 24109731)*
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, VA 22203
Phone: (703) 682-9320
Fax: (703) 682-9321
E-mail: sgedge@ij.org; jtsitsuashvili@ij.org; ssen@ij.org; tclark@ij.org

William R. Maurer (WA Bar No. 25451)*
INSTITUTE FOR JUSTICE
600 University Street, Suite 1730
Seattle, WA 98101
Phone: (206) 957-1300
E-mail: wmaurer@ij.org

*Admitted pro hac vice

**Certificate of Service**

I hereby certify that on June 17, 2022 I electronically filed the foregoing with the Clerk of

the Court using the CM/ECF system, which will send notification of such filing to the following:

James W. Porter II
R. Warren Kinney
PORTER, PORTER & HASSINGER, P.C.
880 Montclair Rd, Suite 175
Birmingham, AL 35213
jwporterii@pphlaw.net
wkinney@pphlaw.net
*Counsel for The Town of Brookside*

Tom Hale
HALE SIDES LLC
505 20th St. North, Suite 600
Birmingham, AL 35203
thale@halesides.com
*Counsel for Marcus Sellers*

Jay Tidwell
TIDWELL LAW GROUP, LLC
2001 Park Place N, Suite 253
Birmingham, AL 35203
jay@tidwelllawgroup.com
*Counsel for Jett's Towing, Inc.*

*s/ Jaba Tsitsuashvili*
Jaba Tsitsuashvili