FILED

2022 Jul-25  PM 04:54
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| BRITTANY COLEMAN, et al., | Civil Action No. 2:22-cv-423-RDP |
| Plaintiffs, | **CLASS ACTION** |
| v. | **ORAL ARGUMENT REQUESTED** |
| THE TOWN OF BROOKSIDE, ALABAMA, et al., | |
| Defendants. | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO THE TOWN OF BROOKSIDE'S
MOTION TO DISMISS (Doc. 39) FIRST AMENDED COMPLAINT (Doc. 32)**

# TABLE OF CONTENTS

Page

Introduction ................................................................................................................1

Background ..................................................................................................................1

Standard of Review ....................................................................................................3

Argument ....................................................................................................................4

I.     Under controlling caselaw, Counts 1 through 4 plausibly allege due process violations arising from financially interested decisionmaking and procedures..................4

    A.    Count 1 plausibly alleges that Brookside, its police department, and its officers have massive financial interests in their lucrative, oversight-free car towing system, and that the department acts on that interest...................................5

    B.    Count 2 plausibly alleges that Brookside, its police department, and its prosecutor have massive financial interests in the town's traffic ticketing system. ...............................................................................................................9

    C.    Count 3 plausibly alleges at least the appearance of institutional and personal financially interested decisionmaking by the Brookside municipal judge...............................................................................................................13

    D.    Count 4 is not foreclosed by Brookside's inapposite "post-deprivation remedies" argument, and it plausibly alleges that Brookside's impound fee system violates due process under *Mathews v. Eldridge* ......................................17

II.    Brookside's effort to dismiss Plaintiffs' class allegations is premature and baseless, particularly in light of its concession that Plaintiffs' claims arise from the policies, practices, and customs of the town's handful of policymakers. .........................................19

    A.    Brookside cannot show that Plaintiffs' class allegations fail on the face of the Complaint by arguing against nonexistent claims. ..........................................20

    B.    Plaintiffs' class allegations plausibly allege commonality and typicality. ............22

    C.    Plaintiffs' class allegations for injunctive relief under Rule 23(b)(2) request run-of-the-mill due process relief, and discovery will reveal whether Plaintiffs' attendant requests for monetary relief are viable. ...............................23

    D.    Discovery will reveal whether Plaintiffs' class allegations under Rule 23(b)(3) predominate over individualized issues..................................................24

Conclusion ................................................................................................................25

Certificate of Non-Frivolous Submissions and Certificate of Service...........................27

# TABLE OF AUTHORITIES

Page

## Cases

*AA Suncoast Chiropractic Clinic, P.A. v. Progressive Am. Ins. Co.*,
 938 F.3d 1170 (11th Cir. 2019) ............................................................... 24

*Bell v. Colvin*, 2015 WL 4656362 (N.D. Ala. Aug. 6, 2015) ................................. 3, 18

*Bell v. Publix Super Markets, Inc.*, 982 F.3d 468 (7th Cir. 2020) ............................. 2

*Black Diamond Land Mgmt., LLC v. Twin Pines Coal Co.*, 2016 WL 3617974
 (N.D. Ala. July 6, 2016).......................................................................... 3

*Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225 (11th Cir. 2016) ..................... 25

*Brucker v. City of Doraville*, 2020 WL 8173291 (N.D. Ga. Dec. 16, 2020) ............... 17

*Brucker v. City of Doraville*, 38 F.4th 876 (11th Cir. 2022)............................... passim

*Burton v. Dist. of Columbia*, 277 F.R.D. 224 (D.D.C. 2011) ...................................... 20

*Caliste v. Cantrell*, 937 F.3d 525 (5th Cir. 2019) ..................................................... 15

*Carpenter v. Bd. of Trustees*, 2016 WL 1573267 (N.D. Ala. Apr. 19, 2016) ............... 3

*Cnty. of Sacramento v. Lewis*, 523 U.S. 833 (1998) ................................................. 21

*Covey v. Colonial Pipeline Co.*, 2021 WL 724600 (N.D. Ala. Feb. 24, 2021) ...... 3, 18

*Day v. Taylor*, 400 F.3d 1272 (11th Cir. 2005) ......................................................... 2

*Dimanche v. Brown*, 783 F.3d 1204 (11th Cir. 2015).................................................. 2

*Faught v. Am. Home Shield Corp.*, 2007 WL 9657811 (N.D. Ala. Dec. 20, 2007) ...... 4

*Foman v. Davis*, 371 U.S. 178 (1962) ...................................................................... 25

*Halmos v. Bomardier Aerospace Corp.*, 404 F. App'x 376 (11th Cir. 2010)............... 2

*Harjo v. City of Albuquerque*, 326 F. Supp. 3d 1145 (D.N.M. 2018) ................... 9, 13

*Harper v. Prof'l Probation Servs. Inc.*, 976 F.3d 1236 (11th Cir. 2020)...................... 3

*Herrera v. JFK Med. Ctr. Ltd. P'ship*, 648 F. App'x 930 (11th Cir. 2016)........... 22, 25

*Hudson v. Palmer*, 468 U.S. 517 (1984)................................................................... 9

*Hughes v. Greentrack, Inc.*, 2010 WL 11470616 (N.D. Ala. Apr. 16, 2010).............. 20

*In re Murchison*, 349 U.S. 133 (1955).................................................................... 7

*Jones v. Depuy Synthes Prods., Inc.*, 330 F.R.D. 298 (N.D. Ala. 2018) ................... 19

*JSPS, Inc. v. First Nonprofit Ins. Co.*, 2020 WL 6472678 (M.D. Ga. Sept. 30, 2020) ......... 2

*King v. UA Local 91*, 2020 WL 4003019 (N.D. Ala. July 15, 2020) ......................... 22

*Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982) ............................... 9, 16, 17, 18

*Marshall v. Jerrico*, 446 U.S. 238 (1980).......................................................... passim

*Mathews v. Eldridge*, 424 U.S. 319 (1976)........................................... 5, 17, 18, 19

*McNair v. Allen*, 515 F.3d 1168 (11th Cir. 2008)..................................................... 20

*Mills v. Foremost Ins. Co.*, 511 F.3d 1300 (11th Cir. 2008)............................... 22, 24

*Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978) ............................................ 4

*Moore v. Walter Coke, Inc.*, 294 F.R.D. 620 (N.D. Ala. Sept. 30, 2013)............... 19, 23

*Sides v. State Farm Life Ins. Co.*, 2018 WL 9812049 (M.D. Ala. Nov. 30, 2018)............... 22

*Speaker v. HHS*, 623 F.3d 1371, (11th Cir. 2010) ................................................... 2

*Teagan v. City of McDonough*, 949 F.3d 670 (11th Cir. 2020).................................. 17

*Tumey v. Ohio*, 273 U.S. 510 (1927) ................................................................... 21, 22

*Van Orden v. Meyers*, 2011 WL 4600688 (E.D. Mo. Sept. 30, 2011) ........................................ 24

*Walker v. City of Calhoun*, 901 F.3d 1245 (11th Cir. 2018)........................................ 17

*Wallace v. VF Jeanswear Ltd. P'ship*, 2020 WL 999341 (N.D. Ala. Mar. 2, 2020) .................. 23

*Wal-Mart v. Dukes*, 564 U.S. 338 (2011) ........................................................ 20, 23

*Ward v. Village of Monroeville*, 409 U.S. 57 (1972) ................................................ 16

## Statutes, Ordinances, and Rules

Ala. Code § 12-14-3 .................................................................................. 15

Ala. Code § 12-14-17 ................................................................................ 15

Ala. Code § 12-14-19 ................................................................................ 15

Ala. Code § 12-14-30 ................................................................................ 15

Brookside Ordinance 519 (as amended by Brookside Ordinances 527 and 523)................. 6, 9, 18

Fed. R. Civ. P. 12 ............................................................................ passim

Fed. R. Civ. P. 15 ................................................................................ 25

Fed. R. Civ. P. 23 ............................................................................ passim

**INTRODUCTION**

This putative class action challenges Defendant Town of Brookside's unconstitutionally profit-fueled systems of car towing and impound fees collection (Counts 1 and 4) and traffic ticketing and fines collection (Counts 2 and 3). Brookside's arguments for dismissal (Doc. 39) are meritless. As detailed in the First Amended Complaint (the "Complaint," Doc. 32), since 2018, Brookside's policymakers have used the town's police department, prosecutor, and municipal court to generate and maximize revenue, with massive institutional and personal financial incentives and rewards for those departments. Counts 1 through 3 plausibly allege as much under the Eleventh Circuit's rubric in *Brucker v. City of Doraville*, 38 F.4th 876, 881–88 (11th Cir. 2022). Count 4 plausibly alleges, under the familiar *Mathews v. Eldridge* framework, that Brookside's impound fee system intolerably risks erroneous deprivations of property without safeguards. And Brookside's effort to short-circuit the class certification process at the pleading stage fails.

**BACKGROUND**

Since 2018, Brookside's policymakers have prioritized revenue and profit over justice. The town's police department, prosecutor, and municipal court operationalize those priorities and have massive financial interests and incentives to do so. The particular facts that support each claim are detailed below in the course of Plaintiffs' arguments. Broadly:

Brookside's profit generation and maximization goals manifest through its car towing and traffic ticketing systems. Since 2018, the police chief (who resigned in January 2022) and current mayor and council have used those systems to rake in cash and dole it back out to the police, prosecutor, and municipal judge. From 2018 to 2020 (the most recent year for which the town has released data), in the tiny town with virtually no serious crime, the town's: full-time police force increased ninefold; patrol hours went from 1,735 to 12,372 to 17,375; car impounds went from 50

1

to 508 to 789; traffic citations went from 382 to 2,782 to 3,024; and misdemeanor arrests went from 90 to 518 to 1,273. Doc. 32 ¶¶ 40–61. Unsurprisingly, by 2020, the town raked in:

- Over $130,000 from car tows—which are pure, oversight-free profit for the police department because the town outsources operation of the towing system to Defendant Jett's Towing, Inc., lets the police keep 100% of impound fees, and provides no neutral review. Doc. 32 ¶¶ 64, 71, 101–103, 112–113, 139; Ala. Dep't of Examiners of Public Accounts, Report on the Town of Brookside (Apr. 15, 2022) ("2022 State Audit") at 7, *available at* https://examiners.alabama.gov/PDFLink.aspx?IDReport=6500.[1]

- Over $610,000 from fines and forfeitures—an 1,100% increase from 2017 and constituting 49% of the town's entire annual budget. Doc. 32 ¶¶ 62–69.

The police chief and mayor made clear that these revenue explosions are the metric by which they judge the town's "productivity." Doc. 32 ¶¶ 92–93, 172–178. And the fruits of that "productivity" redound almost entirely to the police department, which initiates every tow and ticket, and does so abusively, *see* Doc. 32 ¶¶ 40–61, 80, 121–127, 171, 226–228, 264–268, 281:

- In addition to keeping 100% of its $175-per-car impound fee (over $130,000 in 2020 alone), in 2020 the police department got 89% of the tiny town's separate, massive fines and forfeitures bounty ($544,000 of $610,000). Doc. 32 ¶¶ 64, 71, 163–171.

The town prosecutor and municipal judge benefit too:

- Those increases in police "productivity" coincide with the town prosecutor's $50,000 salary increase from 2019 to 2021, including a nearly $10,000 increase in his annual salary attributable to prosecutorial duties. Doc. 32 ¶¶ 198–200. And the town increased his pay for each court appearance from $600 to $1,000 in 2019. 2022 State Audit at 7.

---

[1] The Court can consider information from the State Audit without converting Brookside's 12(b)(6) motion into one for summary judgment. The audit is cited throughout the Complaint and is fairly encompassed by it. *E.g.*, FAC ¶¶ 12, 19, 70, 97–106, 191–197; *see Speaker v. HHS*, 623 F.3d 1371, 1379–80 (11th Cir. 2010); *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005). The audit is also a public record whose contents are judicially noticeable without converting a Rule 12(b)(6) motion into a Rule 56 motion. *Halmos v. Bomardier Aerospace Corp.*, 404 F. App'x 376, 377 (11th Cir. 2010) (per curiam); *Dimanche v. Brown*, 783 F.3d 1204, 1213 (11th Cir. 2015). And the references to the audit here "are offered not to convert [Brookside's] motion to one for summary judgment under Rule 12(d) but only to illustrate the allegations that are the proper focus of the Rule 12(b)(6) motion." *Bell v. Publix Super Markets, Inc.*, 982 F.3d 468, 480 n.2 (7th Cir. 2020); *JSPS, Inc. v. First Nonprofit Ins. Co.*, 2020 WL 6472678, at *2 (M.D. Ga. Sept. 30, 2020).

- From 2019 to 2021, as Brookside's revenues grew, so did the municipal judge's annual salary, by 127%—from $8,800 to $20,000. Doc. 32 ¶ 188. And the town increased his pay for each court appearance from $600 to $1,000 in 2019. 2022 State Audit at 7.

The prosecutor himself explained that the reason for his and the municipal judge's increased pay was Brookside's "increase in the number of cases having to be processed through the municipal court." Doc. 32 ¶ 200. And he went on to explain that the policies giving rise to these systems of profit generation and maximization remain in place. Doc. 32 ¶ 319.

The named Plaintiffs here are four of the thousands of victims of the town's predatory policies and practices. Their experiences exemplify the real life financial and dignitary costs of such abuse. Doc. 32 ¶¶ 203–312. So they have brought this case against Brookside and Jett's Towing to seek class-wide injunctive and monetary relief. Doc. 32 ¶¶ 334–356, 357–416.

## STANDARD OF REVIEW

To survive a motion to dismiss, a complaint must state enough facts to raise a reasonable expectation that discovery will reveal evidence to support the claim. *Carpenter v. Bd. of Trustees*, 2016 WL 1573267, at *2 (N.D. Ala. Apr. 19, 2016) (Proctor, J.). That task is context specific, and the allegations must permit the court, based on its judicial experience and common sense, to infer more than the mere possibility of misconduct. *Id.* Courts accept as true all non-conclusory allegations, viewing the allegations in the light most favorable to the plaintiffs and drawing all reasonable inferences in their favor. *Harper v. Prof'l Probation Servs. Inc.*, 976 F.3d 1236, 1238 n.1 (11th Cir. 2020); *Black Diamond Land Mgmt., LLC v. Twin Pines Coal Co.*, 2016 WL 3617974, at *8 (N.D. Ala. July 6, 2016) (Proctor, J.).[2]

---

[2] Brookside says the Complaint is a "shotgun pleading," *see* Doc. 39 at 5–6, but makes no effort to explain why, so the point is waived. *Covey v. Colonial Pipeline Co.*, 2021 WL 724600, at *9 n.11 (N.D. Ala. Feb. 24, 2021) (Proctor, J.); *Bell v. Colvin*, 2015 WL 4656362, at *13 (N.D. Ala. Aug. 6, 2015) (Proctor, J.). In any event, the Complaint easily overcomes any such concerns, for the reasons stated in Plaintiffs' response to Jett's Towing's motion to dismiss, Doc. 55 at 15.

Where a defendant moves to short-circuit the class certification process and dismiss class allegations under Rule 12(b)(6), the court will not dismiss the class claims as long as the class allegations make it plausible that discovery will lead to facts that would justify certifying a class. *Faught v. Am. Home Shield Corp.*, 2007 WL 9657811, at *1 (N.D. Ala. Dec. 20, 2007) (Proctor, J.). Class claims are subject to dismissal only in rare circumstances, where the proposed class is so broad, amorphous, and vague that it fails to meet the standard of definiteness. *Id.*

## ARGUMENT

Plaintiffs' Complaint plausibly alleges that Brookside's: **(1)** police department and officers have institutional and personal financial interests in their administration of the town's car towing system (Count 1) and traffic ticketing system (Count 2); **(2)** prosecutor has personal and institutional financial interests in his administration of the traffic ticketing system (Count 2); **(3)** municipal judge has, or appears to have, institutional and personal financial interests in his administration of the traffic ticketing system (Count 3); and **(4)** towing system risks erroneous, profit-fueled deprivations of property without countervailing interests or safeguards (Count 4).

And the Complaint's class allegations easily satisfy the forgiving plausibility threshold at this stage, where pre-discovery motions to dismiss are disfavored.

### I.    Under controlling caselaw, Counts 1 through 4 plausibly allege due process violations arising from financially interested decisionmaking and procedures.

Brookside does not dispute—and therefore concedes—that Plaintiffs adequately plead municipal policy claims under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). So the Court accepts for Counts 1 through 4 that "Brookside's massive increases in revenue starting in 2018 are the result of deliberate policies, practices, and customs instituted by Brookside's former and current policymakers to generate as much revenue as possible." Doc. 32 ¶ 75.

Brookside is right that Plaintiffs' claims sound in procedural due process. *See* Doc. 39 at 20; *Brucker*, 38 F.4th at 881. But the town does not correctly state the method of analysis for any claim. As explained and applied below, at this stage, for Counts 1 through 3, the analysis asks whether Plaintiffs have plausibly alleged that the relevant town actors may have institutional or personal financial interests arising from the town systems they administer. *Brucker*, 38 F.4th at 881–88. For Count 4, at this stage, the analysis asks, under the familiar *Mathews v. Eldridge* framework, whether Plaintiffs have plausibly alleged that the challenged procedure excessively risks erroneous deprivation, in light of the personal property and government interests involved.

Under those analyses, Brookside's arguments against the merits of Plaintiffs' well-pleaded policy and practice claims are foreclosed by controlling precedent. Counts 1, 2, and 3 should proceed because, under the fact-intensive inquiry required, Plaintiffs' allegations plausibly suggest that Brookside's police, prosecutor, and municipal judge—institutionally and individually—are (or, in the case of the municipal judge, at least appears to be) "financially dependent on the maintenance of a high level of" revenue generated by Brookside's towing and ticketing policies and practices. *Brucker*, 38 F.4th at 888 (quoting *Marshall v. Jerrico*, 446 U.S. 238, 251 (1980)). Count 4 should proceed because under the *Mathews v. Eldridge* framework, Brookside's lucrative, oversight-free impound fee system has every hallmark of a procedure that risks erroneous deprivations of crucial property (cars and cash) without any opportunity to be heard or any countervailing government interest (indeed, only a profit-fueled government interest).

### A.   Count 1 plausibly alleges that Brookside, its police department, and its officers have massive financial interests in their lucrative, oversight-free car towing system, and that the department acts on that interest.

**1.** Count 1 alleges that Brookside and its police department have financial interests in the operation of their car towing and impound fee collection system, which functions pursuant to town ordinance, policy, practice, and custom. Doc. 32 ¶¶ 357–373. Specifically, the Brookside police

department has an incentive to order the towing of as many cars as possible because under Brookside Ordinance 519 (as amended by Brookside Ordinances 527 and 533), the police department assesses and keeps a $175 fee for the return of each car, without any neutral pre- or post-deprivation oversight. Doc. 32 ¶¶ 101–103, 119. These impound fees are a windfall because the town incurs no cost for the towing system, which is operated by a private company (Jett's Towing) that charges its own fee directly to drivers, not to Brookside. Doc. 32 ¶¶ 112–113.

As alleged, this system violates due process because it plausibly suggests a police department that is "financially dependent on the maintenance of a high level of penalties." *Brucker*, 38 F.4th at 888 (quoting *Jerrico*, 446 U.S. at 251). And Plaintiffs' Complaint alleges such financial dependence. From 2018 (the year Brookside implemented its profit-fueled policies and practices) to 2020 (the most recent year for which the town has made the data available), the town's police department went from towing 50 cars, to 508, to 789—without any noticeable increases in residency or crime. Doc. 32 ¶¶ 54, 57–58. That is a more than 1,400% increase, and it generated over $130,000 in profit for the police department in 2020 alone. Doc. 32 ¶¶ 139, 147–152. That money goes straight to the police department, the agency ordering the impounds. Doc. 32 ¶ 64; 2022 State Audit at 7 (impound fees "are deposited into the Police Department account that is part of the Town's yearly audit"). So the department has (and acts on) an incentive to maximize the revenue coming from those fees, which not only flow directly to the department but are also unmoored from the department's expenses.

Under these circumstances, the Complaint plausibly alleges that the police department (1) "receive[s] funding based on . . . the amounts of penalties [i.e. impound fees] it collect[s]," rather than "based on the expenses it incur[s]," and (2) operates "the kind of bounty system that raises core due process concerns." *Brucker*, 38 F.4th at 887–88 (assessing *Jerrico* factors).

Moreover, not only are these fees pure profit, the police department imposes and collects them without any pre- or post-deprivation oversight. Doc. 32 ¶¶ 112–113, 119. All of those factors, coupled with the department's practice of towing cars in dubious and unnecessary circumstances, Doc. 32 ¶¶ 121–127, 226–228, 264–268, 281, demonstrate not only the department's incentive to use and abuse its towing power, but also plausibly allege the sort of "actual bias" that "of course" violates due process under any standard. *In re Murchison*, 349 U.S. 133, 136 (1955).

Plaintiffs have also plausibly alleged that the town's police officers face "personal financial pressures" to generate and maximize revenue through the towing system, *Brucker*, 38 F.4th at 887, because the explosion of that system coincides directly with the town's ability to fund the massive expansion of the size of its police force, Doc. 32 ¶¶ 46–54. In other words, if revenue drops, the police force must shrink—putting "at risk of termination" the very officers with the power to head off that risk by using the towing system to generate hundreds of thousands of oversight-free dollars for the town, the department, and ultimately their own jobs. *Brucker*, 38 F.4th at 887.

In short, Plaintiffs' allegations in support of Count 1 plausibly suggest that Brookside's police—institutionally and individually—are "financially dependent on the maintenance of a high level of" impound fees. *Id.* at 888 (quoting *Jerrico*, 446 U.S. at 251).

**2.** Brookside's arguments to the contrary lack merit. *First*, Brookside contends that "absent any allegations tying the number of citations issued to a police officer's salary or the retention of his job," Plaintiffs cannot "show a level of impartiality [sic] rising to a constitutional violation." *See* Doc. 39 at 22 (citing *Brucker*). But *Brucker* reinforces precisely the opposite view, acknowledging that a department's budgetary reliance on fines and fees could violate due process if the office was "financially dependent" on those fines and fees. 38 F.4th at 888 (citation omitted).

While the court determined that the summary judgment record there did not support such a conclusion, the well-pleaded allegations here are far more extreme.

In *Brucker*, for example, the court noted that the police department's "funding [wa]s based on its projected expenses, not on the amount it collects from penalties." 38 F.4th at 888. But here, Count 1 alleges a direct eat-what-you-kill program where the police department *imposes and keeps all of the expense-free profit* from its per-car $175 mandatory impound fee (which the department exploits with gusto). Doc. 32 ¶¶ 54, 57–58, 64, 76, 101–103, 112–113, 119, 147–152. In *Brucker*, the court observed that "penalty funds [we]re spread out over eighteen other departments, with the city council making final budget decisions." 38 F.4th at 888. But here, not only does the overwhelming weight (89%) of the town's fines and forfeitures go to the police department, but *100%* of the separately-imposed impound fees (the relevant figure for Count 1) go to the department. Doc. 32 ¶¶ 64, 76, 168; 2022 State Audit at 7. Moreover, town leadership has worked hand-in-glove with the police to exploit their power for financial gain. Doc. 32 ¶¶ 43–51, 74–93.

In *Brucker*, the court concluded that between 11 and 25% of Doraville's general fund came from fines and fees—a percentage that, standing alone, the court deemed "too low" to win a due process claim in the circumstances of that case. 38 F.4th at 888. The analogous ratio in Brookside, though, is 49%; indeed, with respect to the system at issue in Count 1, it is 100%. Doc. 32 ¶¶ 64, 67. And the town ensures that "[a]lmost all of the revenue increases generated by Brookside since 2018 go to the Brookside police department." Doc. 32 ¶ 76. Under *Brucker*'s fact-intensive inquiry, the detailed allegations here plausibly suggest that Brookside's profit-fueled towing system violates due process.

*Second*, Brookside contends that the "availability of post-deprivation remedies" cures any due process concerns with its oversight-free, profit-fueled towing system. *See* Doc. 39 at 23–25.

Because Plaintiffs could have sued Brookside or its officers for conversion, the town suggests, that "post-deprivation remedy . . . obviates the need to file a procedural due process claim pursuant to § 1983." *See id.* at 24. But this principle applies only to one-off deprivations of property by a rogue officer. It does not apply where—as here—"a deprivation of property is caused by conduct pursuant to established state procedure, rather than random and unauthorized action." *Hudson v. Palmer*, 468 U.S. 517, 532 (1984). The doctrine does no work with respect to Plaintiffs' challenge to Brookside's profit-fueled towing system, which operates pursuant to "established" municipal procedure, policy, and practice (i.e. "by operation of law") under Brookside Ordinance 519 (as amended by Brookside Ordinances 527 and 533). *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436 (1982); *cf. Brucker*, 38 F.4th at 881–88 (making no mention of the doctrine in analyzing due process claims against municipality and its departments). Indeed, the doctrine is "particularly" inapt where—as here, *see* Doc. 39 at 24—the only proposed alternative remedy is "in the form of an independent tort action." *Logan*, 455 U.S. at 436.

In sum, Count 1 should proceed on the basis of the police department's plausibly alleged institutional and personal financial interests because "there is a realistic possibility that [officers'] judgment will be distorted, because in effect, the more revenues [they raise], the more money [they] can spend." *Harjo v. City of Albuquerque*, 326 F. Supp. 3d 1145, 1195 (D.N.M. 2018).

### B. Count 2 plausibly alleges that Brookside, its police department, and its prosecutor have massive financial interests in the town's traffic ticketing system.

While Count 1 challenges Brookside's towing system, Count 2 pleads a similar due process challenge to Brookside's profit-fueled traffic ticketing system. It alleges that Brookside, its police, and its prosecutor have financial interests in that system, and that since 2018 the police and prosecutor have used that system to skyrocket the town's annual revenues from fines and forfeitures for their own institutional and personal financial benefit. Doc. 32 ¶¶ 374–387. By 2020,

those revenues increased by 600% compared to 2018 and 1,100% compared to 2017. Doc. 32 ¶¶ 62, 65–66. Because that system funds the police department and the jobs of the individual officers within it, the Complaint plausibly alleges that Brookside's police are institutionally and personally "financially dependent on the maintenance of a high level of penalties," in violation of due process. *Brucker*, 38 F.4th at 888 (quoting *Jerrico*, 446 U.S. at 251).

So too is the prosecutor, who has seen his salary increases tied directly to the town's skyrocketing ticketing revenue. In fact, under Brookside's own articulation of the standard, Count 2 must proceed against the prosecutor because, in his own telling, "his pay depends on the number of cases he handles." *See* Doc. 39 at 25. "When asked by a journalist, the town attorney reportedly said that one of the factors explaining his and the municipal judge's salary increases was Brookside's 'increase in the number of cases having to be processed through the municipal court.'" Doc. 32 ¶ 200; *see* Doc. 32 ¶¶ 52–56 (traffic ticketing and charging explosions), 198–199 (prosecutor's significant pay raises during period of traffic ticketing and charging explosions).

The conclusion is simple: The greater the town's revenue from traffic ticketing and charging, the greater the financial rewards for the police and prosecutor in control of that ticketing and charging. Therefore, applying the same *Brucker* analysis discussed at length above with respect to Count 1, Plaintiffs have plausibly alleged that the police and prosecutor are funded based "on the amounts of penalties [they] collect[]," suggesting a "bounty system that raises core due process concerns." 38 F.4th at 887–88. Plaintiffs' allegations do not describe a policing and prosecution system in which the possibility of financially interested decisionmaking is "exceptionally remote," but one in which it is all but inevitable. *Cf. Jerrico*, 446 U.S. at 250.

***The police department's institutional and personal interests.*** The police department and its individual officers have massive financial interests in Brookside's ticketing revenues. The town

has used those revenues to fund the police department's hiring sprees, salaries, trainings, conferences, computers and software, new expensive unmarked SUVs and their ongoing maintenance, new communications center and jail, and military style equipment. Doc. 32 ¶¶ 49, 165–166. In 2020, the tiny town gave the police department *89%* ($544,077) of the massive $610,307 it collected in fines and forfeitures. That $610,307 is an 1,100% increase in fines and forfeitures revenue since 2017. And it constituted 49% of the entire 2020 town budget. Doc. 32 ¶¶ 66–67, 165–166. Those figures dwarf the 11 to 25% at issue in *Brucker*. *See* 38 F.4th at 888. And the town also gives the police department *100%* of the oversight-free, cost-free impound fees the department imposes, coming to over $130,000 in 2020 alone (a nearly sixteen-fold increase from 2018, when the town's policymakers implemented and supercharged their moneymaking towing and ticketing systems). Doc. 32 ¶¶ 51–56, 64, 139, 146–153; 2022 State Audit at 7.

A system in which town revenue is so dependent on policing and in which more town revenue means more police funding—including for hiring, salaries, and a plethora of job perks—is a system in which the police are "financially dependent on the maintenance of a high level of penalties." *Brucker*, 38 F.4th at 888 (quoting *Jerrico*, 446 U.S. at 251). If those penalties dry up, so too will the conferences, cars, computers, and even jobs—putting the department's officers "at risk of termination"—a risk they can head off by simply ticketing for profit. *Id.* at 887.

A direct comparator helps illustrate the point: In 2017, Brookside could not have afforded all the full-time officers it employs now, nor could it afford the expensive perks those officers get, because it was collecting about $50,000 in fines and forfeitures revenue. Doc. 32 ¶ 65. If that revenue reverts from the $610,000 it reached in 2020, Doc. 32 ¶ 62, so too will the number of officers the town can employ and the perks it can give them. In the face of no noticeable increases in residency or crime, and no serious crimes at all in 2017 or 2018, Doc. 32 ¶¶ 41–42, 57–58, that

system of job creation and perks plausibly explains why, from 2018 to 2020, Brookside's police increased their: patrol hours from about 1,700 to about 17,000; traffic citations from 382 to 3,024; car impounds from 50 to 789; and misdemeanor arrests from 90 to 1,273. Doc. 32 ¶¶ 52–56. As the police chief explained in January 2022, none of that was accident or coincidence—it was part of his and the mayor's deliberate, concerted policy of increasing revenue and hiring "more officers" for "more productivity"—i.e. more revenue. Doc. 32 ¶¶ 91–93, 173–175.

These allegations track the *Brucker* factors for institutional financial interests and suggest that the police department's funding is "based on . . . the amount it collects from penalties" because (1) the town's police-dependent revenue is not "spread out"—it goes almost entirely to the police (89% of the town's fines and forfeitures revenue and 100% of the town's separate impound fees revenue), Doc. 32 ¶¶ 64, 76, 165–166; and (2) indications are that the police chief guided, if not usurped, "final budget decisions," along with the current mayor, both of whom embrace revenue generation as the benchmark for "productivity," Doc. 32 ¶¶ 78–85, 91–93. 38 F.4th at 887–88.

***The prosecutor's personal and institutional interests.*** Those increases in police "productivity" coincide with the town prosecutor's $50,000 annual salary increase from 2019 to 2021. Doc. 32 ¶ 199. That includes a nearly $10,000 increase in his annual salary attributable to his prosecutorial duties. Doc. 32 ¶ 198. And the town increased his pay for each court appearance from $600 to $1,000 in 2019. 2022 State Audit at 7. The prosecutor himself explained that the reason for his increased pay was Brookside's "increase in the number of cases having to be processed through the municipal court." Doc. 32 ¶ 200.

That ends the inquiry because the prosecutor himself draws a direct line between Brookside's policy and practice of increased prosecution and his financial rewards. That distinguishes this case from *Brucker*, where the court recognized that a system (like here) in which

"the prosecutor's pay . . . depend[s] on the number of cases he handles" is a "compensation structure" that could "raise significant due process concerns." 38 F.4th at 886. Additionally, given the mayor's agreement with the police chief that the town should prioritize revenue generation and the way the police department and prosecutor act on those priorities, Doc. 32 ¶¶ 173–178, it is plausible that discovery may reveal that the town's "leadership has . . . pressured [the prosecutor] to generate revenue." *Brucker*, 38 F.4th at 887.

In short, Brookside's is a "scheme injecting a personal interest, financial or otherwise, into the enforcement process" for the town's lone prosecutor. *Jerrico*, 446 U.S. at 249–50. Moreover, as the *Brucker* court recognized, the prosecutor's dual role as town attorney may give rise to an institutional interest because he may have "executive responsibility over the institution's finances." 38 F.4th at 887. There, the summary judgment record revealed no such responsibility, but discovery in this case may show that Brookside's dual prosecutor/town attorney does have such executive responsibility and is therefore subject to institutional interests in addition to his already apparent personal incentives to charge and convict as many traffic tickets as possible.

Count 2 should proceed based on the institutional and personal financial interests plausibly alleged against the town police department, its officers, and the town prosecutor because "there is a realistic possibility that [their] judgment will be distorted, because in effect, the more revenues [they raise], the more money [they] can spend." *Harjo*, 326 F. Supp. 3d at 1195.

### C. Count 3 plausibly alleges at least the appearance of institutional and personal financially interested decisionmaking by the Brookside municipal judge.

**1.** Count 3 alleges that Brookside's municipal judge has, or appears to have, institutional and personal financial interests in convicting and fining the traffic defendants hauled into his court by the town's financially interested police department and prosecutor. Doc. 32 ¶¶ 388–401.

13

Unlike police and prosecutors, who "need not be entirely neutral and detached," *Brucker*, 38 F.4th at 886 (cleaned up), judges must be and appear to be "impartial and disinterested, *id.* at 882 (citations omitted). If institutional or personal interests "would offer a possible temptation to the average [person] as a judge . . . to forsake impartiality," the system offends due process. *Id.* (quotation marks and citations omitted). This is an easier standard for Plaintiffs to satisfy than the one governing police and prosecutors, and the plausibility of the "possible temptation" that Plaintiffs allege is apparent for a simple reason: The municipal judge's salary has more than doubled in conjunction with Brookside's massive revenue growth and because of the increased number of cases he hears and people he convicts, and his pay per court appearance has nearly doubled. Doc. 32 ¶¶ 188, 200, 2022 State Audit at 7. Indeed, his recent recusal from all cases initiated before Brookside's abuses came to light suggests an acknowledgment of at least the appearance of impropriety based on his role in—and rewards from—Brookside's profit-fueled traffic ticketing policies and practices. Doc. 32 ¶ 324.

***The judge's institutional interest.*** Here, Brookside's municipal judge has or appears to have an institutional financial interest because (1) he serves under a policymaking group that openly prioritizes revenue generation and maximization and has the power to remove him at the end of his term, Doc. 32 ¶¶ 75, 173–175, 182–185, which plausibly suggests at least the appearance of a "policy or custom guiding the disposition of individual cases" in accordance with those policymakers' profit-generation goals, *Brucker*, 38 F.4th at 883; and (2) a recent state audit suggests that the judge exercises "some executive responsibility over [the town's] finances," *id.* at 882; *see* Doc. 32 ¶¶ 191–197 (explaining that the municipal court funds the salaries of its own personnel). Under *Brucker*, those allegations suffice to plausibly suggest at least the appearance of the municipal judge's institutional financial interest in the town's revenue-generation goals.

14

***The judge's personal interest.*** Additionally, the municipal judge has or appears to have a personal financial interest because between 2019 and 2021, as Brookside's revenues grew, so did the municipal judge's annual salary, by 127%—from $8,800 to $20,000. Doc. 32 ¶ 188. And the town increased his pay for each court appearance from $600 to $1,000 in 2019. 2022 State Audit at 7. As the town prosecutor explained, the reason for the judge's increased pay was Brookside's "increase in the number of cases having to be processed through the municipal court." Doc. 32 ¶ 200. In other words, the prosecutor draws a direct line between Brookside's policy and practice of increased prosecution and its municipal judge's financial rewards, as well as the amount his court can spend on "staffing and supplies." *Caliste v. Cantrell*, 937 F.3d 525, 531 (5th Cir. 2019). That lack of "independen[ce]" between "salary [and] caseload," as well as additional professional benefits, alone meaningfully distinguishes this case from *Brucker* and plausibly suggests the judge's personal interest in the town's ticketing and revenue flows. *Cf.* 38 F.4th at 886.

This case may also plausibly differ from *Brucker* on the basis of the judge's job security and the potential influence of the town's revenue-hungry leadership on his decisionmaking. In *Brucker*, the analysis turned largely on the town's and judge's agreement that he had for-cause removal protection and was serving an indefinite and seemingly never-ending term. *Id.* at 884–85. Here, (1) there is no indication that the town cannot remove the judge for any reason (or no reason) at the end of his four-year term, Ala. Code § 12-14-30; (2) the town can, at any time, add additional judges, Ala. Code § 12-14-3, which might impact the current judge's per-appearance pay, *see* 2022 State Audit at 7; and (3) the town can, at any time, abolish the municipal court and reestablish it with a new judge, Ala. Code §§ 12-14-17, 12-14-19. Given the Brookside judge's potentially lesser job security than the judge enjoyed in *Brucker*, coupled with the Brookside mayor's agreement with the police chief that the town should be prioritizing revenue generation, Doc. 32 ¶¶ 173–175,

the circumstances plausibly suggest that discovery may reveal that the town's "leadership has . . . pressured the judge to generate revenues." *Brucker*, 38 F.4th at 885.

In short, all those factors distinguish this case from *Brucker* with respect to the judge's personal financial interests because there, unlike here, the judge had "no executive authority," his "salary [was] independent of his caseload," and discovery had already revealed the lack of pressure to generate revenue by city policymakers. *Id.* at 882–86. Indeed, the Brookside judge's recent recusal, Doc. 32 ¶ 324, suggests a potential acknowledgment of at least the appearance of partiality arising from his role in the town's policies and practices of prioritizing revenue over justice.

**2.** Brookside's two efforts to evade these realities fail. *First*, its "availability of appeal" argument, *see* Doc. 39 at 27, fails for the same reason its "availability of post-deprivation remedies" argument fails with respect to Count 1: These arguments do not apply to Plaintiffs' challenge to Brookside's "established [municipal] procedure" in the form of its profit-fueled traffic ticketing system. *Logan*, 455 U.S. at 436. Indeed, the Court rejected this argument in the context of a challenge to a financially interested court system in *Ward v. Village of Monroeville*. 409 U.S. 57, 61 (1972). And if this argument applied to claims of financially interested judicial decisionmaking systems, the *Brucker* court could have disposed of the analogous claim there on that simple ground and foregone its extensive, factbound analysis of the operation of the municipal court. *Cf.* 38 F.4th at 882–86 (making no mention of the right of appeal in individual cases as relevant to financially interested judicial system analysis).

*Second*, Brookside's argument that it cannot be liable for the conduct of its municipal court because the court is purportedly under the control of the state, rather than the municipality, *see* Doc. 39 at 28–30, ignores the facts salient to determining whether the Brookside municipal court is a municipal actor under the actual circumstances of this case.

In *Teagan v. City of McDonough*, the judge "acted on behalf of the state because he was exercising his authority under state law to preside over a state misdemeanor offense." 949 F.3d 670, 676 (11th Cir. 2020). Here, by contrast: (1) Brookside's municipal court is a creature of the town as a general matter, Doc. 32 ¶¶ 160, 182–185; and (2) Brookside's municipal court acts purely on behalf of the town with respect to the conduct that gives rise to Count 3 because the court "has jurisdiction over prosecutions of violations of Brookside municipal ordinances only" and "exercise[s] judicial authority with respect to local ordinances," which "reference state laws [only] to adopt and incorporate the substance of those state laws as that of Brookside's own ordinances," Doc. 32 ¶¶ 157–159. So this is a situation where "a municipal court judge acts on behalf of a municipality" because he "exercises judicial authority with respect to local ordinances enacted by the municipality." *Teagan*, 949 F.3d at 676 n.3 (citing *Walker v. City of Calhoun*, 901 F.3d 1245, 1256 (11th Cir. 2018)); *see Brucker v. City of Doraville*, 2020 WL 8173291, at *4 (N.D. Ga. Dec. 16, 2020) (municipal court is municipal actor where "it has jurisdiction to try violations of city ordinances and some state misdemeanor offenses, including traffic offenses").

Count 3 should proceed because it plausibly alleges that Brookside's municipal judge faces a "possible temptation" of institutional and personal financially interested decisionmaking. *Brucker*, 38 F.4th at 882.

> **D.**    **Count 4 is not foreclosed by Brookside's inapposite "post-deprivation remedies" argument, and it plausibly alleges that Brookside's impound fee system violates due process under *Mathews v. Eldridge*.**

**1.** As it does with Counts 1 and 3, Brookside argues that Count 4 is foreclosed by the "availability of post-deprivation remedies" doctrine. *See* Doc. 39 at 30–31. As with Counts 1 and 3, Brookside's argument is foreclosed by *Logan*, which makes clear that the doctrine applies to one-off deprivations of property "as a result of a random and unauthorized act"; it does not apply to Plaintiffs' challenge to Brookside's profit-fueled towing system, which operates pursuant to

"established" municipal procedure, policy, and practice (i.e. "by operation of law") under Brookside Ordinance 519 (as amended by Brookside Ordinances 527 and 533). 455 U.S. at 436. The Eleventh Circuit cases on which Brookside relies (*Cotton*, *Case*, *Lindsey*, and *Laskar*, *see* Doc. 39 at 24, 30–31) all arose in the context of a one-off deprivation, none of which was alleged to be pursuant to state or municipal law, ordinance, procedure, policy, practice, or custom. *Logan* makes clear that those cases are inapposite to Count 4, which alleges that Brookside violates due process via its municipal ordinance, procedure, policy, practice, and custom. Doc. 32 ¶¶ 402–416.

Brookside also baldly asserts that the complaint "nowhere provides facts capable of plausibly asserting that the Town's retention of vehicles violates the Fourteenth Amendment." *See* Doc. 39 at 30. But that conclusory statement is backed by no explanation, analysis, citation to the complaint, or citation to legal authority, so it is waived. *See supra* n.2 (citing authority).

**2.** Regardless, the complaint explains that Brookside's "policy, practice, and custom of conditioning the release of impounded vehicles on the payment to [the town] of a $175 mandatory impound fee" violates due process because that fee (1) is not related to the cost of administering Brookside's car towing system, for which the town incurs no costs, Doc. 32 ¶¶ 112–113, 405; (2) is unmoored from the initiation or outcome of criminal or other judicial proceedings, Doc. 32 ¶¶ 108–110; and (3) redounds entirely to the profit of Brookside's police department, which imposes and keeps 100% of the fee without any guardrails against abuse because the fee is never subject to review by any neutral arbiter, Doc. 32 ¶¶ 64, 107, 111.

Under the familiar *Mathews v. Eldridge* framework, that system has every hallmark of a procedure that risks erroneous deprivations of crucial property (cars and cash) without any countervailing government interest, because Brookside's system (1) provides zero—let alone meaningful—pre- or post-deprivation opportunity to be heard; (2) is entirely unmoored from a

18

person's guilt or innocence; and (3) serves no government interest beyond generating and maximizing revenue and profit for the police department—which imposes and keeps hundreds of thousands of dollars without any oversight or procedural safeguards. 424 U.S. 319, 333–34 (1976).

Any interest in crime prevention or deterrence the impound fee might serve is belied and outweighed by the fact that it is unmoored from guilt or innocence and thus greatly risks erroneous deprivations—all while providing a direct self-funding mechanism for the police department. Doc. 32 ¶¶ 64, 147–153; 2022 State Audit at 20 (impound fees are "deposited into the Town's Police Department bank account," and "thirty-six percent of [impound fee] payments [from a 2021 sampling] were in response to offenses that were not listed in the Town's ordinances").

Count 4 should proceed because it plausibly alleges a system and procedure with intolerably high risks of erroneous deprivations of crucial property without countervailing interests or safeguards—indeed, a system the police department demonstrably exploits for profit.

## II. Brookside's effort to dismiss Plaintiffs' class allegations is premature and baseless, particularly in light of its concession that Plaintiffs' claims arise from the policies, practices, and customs of the town's handful of policymakers.

"Eleventh Circuit precedent suggests that granting . . . pre-certification motions [to dismiss class allegations] is disfavored." *Jones v. Depuy Synthes Prods., Inc.*, 330 F.R.D. 298, 306 (N.D. Ala. 2018) (collecting cases). So it is unsurprising that Brookside cites no case where a claim was held to be properly pleaded but class allegations were dismissed as inadequately pleaded before the class certification stage. *See* Doc. 39 at 8–17. Moreover, all of Brookside's class allegation arguments attack strawman claims and should be rejected on that basis alone.

In their particulars, Brookside's arguments amount to an assertion that Plaintiffs' well-established due process claims "are categorically unfit for class treatment," but cite no authority suggesting why. *Moore v. Walter Coke, Inc.*, 294 F.R.D. 620, 630 (N.D. Ala. Sept. 30, 2013). To the contrary, Plaintiffs' class allegations are plausibly capable of certification, and discovery is

necessary to be sure. Indeed, the "Supreme Court's ruling in [*Wal-Mart v. Dukes*, 564 U.S. 338 (2011)] confirms that pre-certification discovery should ordinarily be available where a plaintiff has alleged a *potentially viable* class claim." *Id.* at 628 (quoting *Burton v. Dist. of Columbia*, 277 F.R.D. 224, 230 (D.D.C. 2011)). Under these circumstances, the Court should reject Brookside's broadside attacks on commonality, typicality, cohesiveness, and predominance, especially where the town does not even bother to conduct the analyses on a class-by-class or claim-by-claim basis.[3]

### A. Brookside cannot show that Plaintiffs' class allegations fail on the face of the Complaint by arguing against nonexistent claims.

Brookside does not challenge the adequacy of Plaintiffs' allegations that, with respect to Counts 1 through 4, "Brookside's massive increases in revenue starting in 2018 are the result of deliberate policies, practices, and customs instituted by Brookside's former and current policymakers to generate as much revenue as possible." Doc. 32 ¶ 75. That concession, combined with the general rule against resolving the adequacy of class allegations at the pleading stage, dooms the town's effort to prematurely dispose of Plaintiffs' class allegations. *See Hughes v. Greenetrack, Inc.*, 2010 WL 11470616, at *1–2 (N.D. Ala. Apr. 16, 2010) (Proctor, J.) (Eleventh Circuit "caution[s] against premature certification analyses" at the motion to dismiss stage, consistent with "the strong policy among the federal courts to allow discovery relevant to" the Rule 23 requirements) (cleaned up; citations omitted).

That is because Counts 1 through 4, properly construed, do not turn on the individual circumstances in which any Plaintiff or putative class member has been stopped, towed, ticketed, charged, prosecuted, or convicted. *Contra* Doc. 39 at 11–12, 16–17 & n.5. Rather, each Count

---

[3] For the same reasons, Brookside's statute-of-limitations attack on the facial plausibility of the Towing and Charging Classes, *see* Doc. 39 at 7 n.2, is at best premature. Brookside's profit-generation policies were unknown until it released its 2020 financial data in 2021, and could not have been expected to be known by Plaintiffs or the class until becoming national news in January 2022. Doc. 32 ¶¶ 311–313; *McNair v. Allen*, 515 F.3d 1168, 1173 (11th Cir. 2008).

turns on whether Plaintiffs have plausibly pleaded interested decisionmaking (which they have, for the reasons discussed above) pursuant to town policies (which is uncontested). These claims simply ask whether Brookside's systems are biased and whether every class member was subjected to Brookside's systems, without regard to the circumstances of each class member's interaction with those systems. *Tumey v. Ohio*, 273 U.S. 510, 532 (1927) ("It is certainly not fair to *each defendant* brought before the mayor for the careful and judicial consideration of his guilt or innocence that the *prospect* of such a prospective loss by the mayor should weigh against his acquittal.") (emphases added); *Brucker*, 38 F.4th at 881–88 (assessing whether the city "violated [the plaintiffs'] procedural due process rights through biased adjudication, prosecution, and law enforcement" without regard to or mention of the plaintiffs' individual circumstances).

In fact, every argument Brookside raises against Plaintiffs' class allegations (commonality and typicality under Rule 23(a); cohesiveness under Rule 23(b)(2); and predominance under Rule 23(b)(3)) requires Brookside to erect and fight a strawman: To convince the Court that its arguments turn on assessing the circumstances of each class member's interaction with Brookside, the town rewrites the Complaint, insisting that "Plaintiffs' claims should be analyzed under Fourth, *not* Fourteenth, Amendment jurisprudence" because, Brookside asserts, that is the "specific constitutional provision" by which the claims are "covered." *See* Doc. 39 at 11 n.4 (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998)). But that is incorrect, as a matter of century-old, undisputed doctrine. From *Tumey* in 1927 to *Jerrico* in 1980 to *Brucker* in 2022, courts hold in no uncertain terms that the specific constitutional provision covering claims for institutionally or personally interested law enforcement or judicial decisionmaking is the Due Process Clause (under the Fifth Amendment for federal action and the Fourteenth Amendment for municipal action). *Tumey*, 273 U.S. at 514; *Jerrico*, 446 U.S. at 242; *Brucker*, 38 F.4th at 881.

Because all of Brookside's class allegation arguments necessarily rely on a false premise (i.e. that Plaintiffs' claims turn on individual interactions with Brookside), the Court should deny the town's pleading stage class certification gambit on that basis alone. Brookside cannot meet its burden of showing that Plaintiffs' class allegations fail "from the face of the pleading[]," *Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1309 (11th Cir. 2008), when all of its arguments are based on a rewrite of the pleading and an imagined "theory of liability" unbounded from Plaintiffs' actual claims. *Herrera v. JFK Med. Ctr. Ltd. P'ship*, 648 F. App'x 930, 935–36 (11th Cir. 2016). Stated differently, "determination of class-certification issues at the pleading-stage is premature here, where the parties dispute the proof required for the class claims." *Sides v. State Farm Life Ins. Co.*, 2018 WL 9812049, at *6 (M.D. Ala. Nov. 30, 2018) (report & recommendation) (citing *Herrera*, 648 F. App'x at 934–36).

In any event, each of Brookside's arguments also fails in its particulars.

### B.     Plaintiffs' class allegations plausibly allege commonality and typicality.

Brookside argues that all of Plaintiffs' class allegations fail Rule 23(a)'s commonality and typicality requirements, on the false premise that each class member's interaction with Brookside will be at issue and have unique defenses. *See* Doc. 39 at 9–13. The town's argument is wrong as to both class requirements, which "tend to merge." *King v. UA Local 91*, 2020 WL 4003019, at *8 (N.D. Ala. July 15, 2020). When contesting the operation of a profit-fueled system, as the claims and putative classes here do, individual circumstances give way to one question: Is the system unconstitutionally compromised? *See Tumey*, 273 U.S. at 535 ("[n]o matter what the evidence was against [the plaintiff], he had a right to have an impartial judge"); *id.* at 534 (a biased system "necessarily involves a lack of due process of law in the trial of defendants charged with crimes").

Given that question, Plaintiffs' class allegations are strikingly different from those in *Wal-Mart*, where the putative gender discrimination class members numbered over a million and held

different jobs at different levels for variable periods in thousands of stores with separate supervisors applying varying regional policies. 564 U.S. at 359–60. Here, the putative class members have been towed or ticketed by one small police department at the behest of one admittedly profit-fueled police chief, been subjected to prosecution and adjudication by the same prosecutor and judge, and paid fines and impound fees to the same town and towing company. They also number in the thousands, not millions. Doc. 32 ¶ 15. And unlike the employment decisions challenged in *Wal-Mart*, which had to account for thousands of supervisors' interactions with women they knew, potentially introducing non-gender based considerations into the propriety of every employment decision, every class member here has the "same, simple relationship" with Brookside, *Moore*, 294 F.R.D. at 629: a mass of strangers from whom the town extracts revenue.

In short, here, unlike in *Wal-Mart*, with respect to each claim there is a common harm (violation of due process pursuant to profit-fueled municipal policy) caused by a single entity (the town) controlled and implemented by a small handful of policymakers (the town council, mayor, police chief, prosecutor, and judge) inflicted on a common group of readily ascertainable people (those who have been towed or ticketed by Brookside) for a single reason (to generate revenue), with no interpersonal complications. These circumstances do not, on their face, satisfy Brookside's burden of demonstrating the facial implausibility of class certification. They "are sufficient to plausibly show that discovery *could* lead to facts that *may* justify certifying a class." *Wallace v. VF Jeanswear Ltd. P'ship*, 2020 WL 999341, at *5 (N.D. Ala. Mar. 2, 2020).

C.   **Plaintiffs' class allegations for injunctive relief under Rule 23(b)(2) request run-of-the-mill due process relief, and discovery will reveal whether Plaintiffs' attendant requests for monetary relief are viable.**

Next, Brookside argues that Plaintiffs' class allegations do not satisfy Rule 23(b)(2). *See* Doc. 39 at 14–15. But for purposes of injunctive relief, once it is established that Plaintiffs' claims adequately plead the existence of policy-based unconstitutional systems—which they do, for the

reasons discussed above—Rule 23(b)(2) is the avenue for obtaining a class-wide injunction of that system. *Van Orden v. Meyers*, 2011 WL 4600688, at *9 (E.D. Mo. Sept. 30, 2011) ("By implementing an allegedly unconstitutional program and by enforcing an allegedly unconstitutional reimbursement scheme, [defendants] 'have acted or refused to act on grounds generally appliable to the class.'") (quoting Rule 23(b)(2)). Therefore, regardless of the viability of Plaintiffs' requests for monetary relief, all three of Plaintiffs' classes define the parameters of class-wide injunctive relief. *See Mills*, 511 F.3d at 1308–09 (lack of predominance under Rule 23(b)(3) "does not automatically bar class certification" under Rule 23(b)(2)).

With regard to Plaintiffs' claims for monetary relief via Rule 23(b)(2): Even after *Wal-Mart*, the Eleventh Circuit still permits plaintiffs "to seek monetary relief through a Rule 23(b)(2) injunction class if the monetary relief [is] 'incidental' to injunctive relief—that is, if it would flow 'automatically' to class members without 'complex individualized determinations.'" *AA Suncoast Chiropractic Clinic, P.A. v. Progressive Am. Ins. Co.*, 938 F.3d 1170, 1174 nn.2, 5 (11th Cir. 2019) (citation omitted). Plaintiffs have alleged, with respect to the Towing Class and the Vehicle Retention Sub-Class, that disgorgement is an appropriate monetary remedy, either as a form of injunctive relief or incidental to injunctive relief, because the return of fees unlawfully collected would be an automatic task without complex individualized determinations. Doc. 32 ¶¶ 342, 349. Under the Eleventh Circuit's "incidental" standard, those allegations are plausible, and only by proceeding to discovery can the parties determine whether complex individualized determinations would be necessary to disgorge Brookside's (and Jett's Towing's) impound fees.

### D. Discovery will reveal whether Plaintiffs' class allegations under Rule 23(b)(3) predominate over individualized issues.

Finally, Brookside asserts that Plaintiffs' class allegations fail Rule 23(b)(3)'s predominance requirement for monetary relief. *See* Doc. 39 at 15–17. This argument applies to the

Towing Class and Vehicle Retention Sub-Class. Doc. 32 ¶¶ 342, 349. With regard to the members of both classes, this is not the "extreme" case where it is apparent from the Complaint that "computation of each individual's damages will be so complex, fact-specific, and difficult that the burden on the court would be simply intolerable." *Herrera*, 648 F. App'x at 936. To the contrary, the damages calculations arising from Brookside's (and Jett's Towing's) impound fees would be ministerial, in the form of disgorging the amounts paid—which requires no calculations, only reviews of ledgers and receipts. To the extent some class members would have additional damages arising from the deprivations of their cars, the face of the complaint does not indicate that those calculations would be so complex, fact-specific, and difficult that the burden on the court would be "intolerable." *Id.* Only with discovery could Brookside carry its burden to show that this is the rare case that overcomes the "black letter rule recognized in every circuit that individual damages calculations generally do not defeat a finding that common issues predominate." *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1239 (11th Cir. 2016) (cleaned up).

## CONCLUSION

The Court should deny Brookside's motion to dismiss Counts 1 through 4 and the class allegations of Plaintiffs' First Amended Complaint. If the Court finds that any of Plaintiffs' claims or allegations are inadequately pleaded, it should grant Plaintiffs leave to amend and cure those deficiencies pursuant to Rule 15(a)(2) and *Foman v. Davis*, 371 U.S. 178, 182 (1962).

Dated: July 25, 2022

Respectfully submitted,

s/ Jaba Tsitsuashvili

William M. Dawson
DAWSON LAW OFFICE
1736 Oxmoor Road, #101
Birmingham, AL 35209
Phone: (205) 795-3512
Email: bill@billdawsonlaw.com

Jaba Tsitsuashvili (DC Bar No. 1601246)*
Samuel B. Gedge (VA Bar No. 80387)*
Victoria Clark (TX Bar No. 24109731)*
Suranjan Sen (TN Bar No. 038830)*
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, VA 22203
Phone: (703) 682-9320
Fax: (703) 682-9321
Email: jtsitsuashvili@ij.org; sgedge@ij.org;
tclark@ij.org; ssen@ij.org

William R. Maurer (WA Bar No. 25451)*
INSTITUTE FOR JUSTICE
600 University Street, Suite 1730
Seattle, WA 98101
Phone: (206) 957-1300
Email: wmaurer@ij.org

*Admitted pro hac vice

**CERTIFICATE OF NON-FRIVOLOUS SUBMISSIONS**

I hereby certify that I have affirmatively sought to submit to the court only those documents, factual allegations, and arguments that are material to the issues to be resolved in the motion, that careful consideration has been given to the contents of all submissions to ensure that the submissions do not include vague language or an overly broad citation of evidence or misstatements of the law, and that all submissions are non-frivolous in nature.

**CERTIFICATE OF SERVICE**

I hereby certify that on July 25, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

James W. Porter II
R. Warren Kinney
PORTER, PORTER & HASSINGER, P.C.
880 Montclair Rd, Suite 175
Birmingham, AL 35213
jwporterii@pphlaw.net
wkinney@pphlaw.net
*Counsel for The Town of Brookside*

Jay Tidwell
TIDWELL LAW GROUP, LLC
2001 Park Place N, Suite 253
Birmingham, AL 35203
jay@tidwelllawgroup.com
*Counsel for Jett's Towing, Inc.*

Thomas Hale
HALE SIDES LLC
505 20th St. North, Suite 600
Birmingham, AL 35203
thale@halesides.com
*Counsel for Marcus Sellers,*
*Maresha Moses, and Anthony Ragsdale*

s/ Jaba Tsitsuashvili
*Counsel for Plaintiffs*

27