FILED
2023 Mar-23  PM 04:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **BRITTANY COLEMAN; *et al.*, on behalf of themselves and all others similarly situated,** | ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Case No.: 2:22-cv-423-AMM** |
| **THE TOWN OF BROOKSIDE, ALABAMA; *et al.*,** | ) ) ) | |
| **Defendants.** | ) | |

## ORDER

This case is before the court on motions to dismiss by two defendants, The Town of Brookside, Alabama ("the Town"), Doc. 39, and Jett's Towing, Inc. ("Jett's Towing"), Doc. 43. For the reasons stated below, the motions to dismiss are **DENIED**.

## I. BACKGROUND

These are the allegations in the First Amended (operative) Class Action Complaint relevant to the motions to dismiss:

The Town "is a small city" with "fewer than 1,300 residents." Doc. 32 ¶ 40. In 2017, the Town employed a "handful of part-time [police] officers" and "reported no serious crimes." *Id.* ¶¶ 42-43, 45. The Town's 2017 revenue from fines and forfeitures was $51,473. *Id.* ¶ 65.

In March 2018, the Town's City Council made one of its part-time police officers, Michael Jones, its chief of police and its "only full-time officer." *Id.* ¶¶ 43, 45. The Town "hired Chief Jones with a directive to build a new police force." *Id.* ¶ 86. That new police force would receive "[a]lmost all of the revenue increases [it] generated." *Id.* ¶ 76.

Chief Jones hired "nine full-time officers and several part-time officers," making the Town's new police force "five times larger [per capita] than the national average." *Id.* ¶ 48. In 2020, the new police force made 1,273 misdemeanor arrests (a "fourteenfold increase between 2018 and 2020"), ordered 789 vehicles towed (also a fourteenfold increase), and issued 3,024 traffic citations (a "near-eightfold increase"). *Id.* ¶¶ 53, 55, 138.

The Town's annual revenue from fines and forfeitures increased from $51,473 in 2017 to $610,307 in 2020 (which amounted to "49% of [the Town's] total annual revenue"). *Id.* ¶¶ 62, 65, 67. Put differently, in 2020, the Town "collected $487 in fines and forfeitures for every man, woman, and child in the [T]own." *Id.* ¶ 61. Of that $610,307 in revenue, $544,077 "went directly to the [Town's] police," which used the money to fund "training, conferences, computer and software purchases, vehicle maintenance and purchases" (including "expensive unmarked black SUVs" and a "mine-resistant vehicle" known "as the town tank"), "and salaries." *Id.* ¶¶ 165-67.

The increased revenue also went to "the town attorney, municipal judge, and municipal court." *Id.* ¶ 49. Between 2019 and 2021, Municipal Judge Wooten's annual salary grew from $8,800 to $20,000. *Id.* ¶ 188. "Between 2019 and 2021, the [T]own attorney's annual salary attributable to his prosecutorial duties more than doubled—from $8,200 to $18,000[,]" and his overall salary "grew . . . from $21,132 to $72,115." *Id.* ¶¶ 198-99. The Town attorney has explained that his and the municipal judge's increased salaries were due to the "increase in the number of cases having to be processed through the municipal court." *Id.* ¶ 200 (cleaned up). Those salaries are paid from a separate account that is funded by revenue from the municipal court, which revenue the Town attorney and municipal judge have "the power to maximize." *Id.* ¶¶ 193-94, 197.

According to Plaintiffs, the relationship between the Town's municipal court revenue and its funding of its police department and municipal court has created an "eat-what-you-kill" system of criminal justice. *Id.* ¶¶ 22, 165. Plaintiffs have alleged that one practice in particular—the Town's towing policy—is emblematic of the way the police department's funding structure incentivizes "baseless . . . traffic stops . . . and arrests." *Id.* ¶¶ 15-16, 120.

Since 2018, the Town has used only one towing company, Jett's Towing, to impound vehicles. *Id.* ¶¶ 95-98. The Town "and Jett's Towing do not have a contract for this towing service." *Id.* ¶ 100. When a Town police officer arrests the driver of

a vehicle, the officer orders Jett's Towing to impound the vehicle—"even when people are physically present or about to be present who could legally and safely drive th[at] vehicle[] away." *Id.* ¶¶ 123, 125. Under a Town ordinance, "[f]or every vehicle that [the Town's] police order seized and towed, the owner or driver must pay [the Town] $175 to get a piece of paper authorizing Jett's Towing to 'release' the vehicle." *Id.* ¶¶ 114-15. That $175 "mandatory impound fee" is imposed prior to and "regardless of the initiation or outcome of any criminal or other judicial proceedings"; "goes entirely to [the Town]" (and not Jett's Towing); "is not related to the cost of administering [the] towing and impounding system"; and is not "subject to review." *Id.* ¶¶ 107-13. "[T]he Town's . . . 'Vehicle Release Process' form . . . says that presenting proof of payment to the Town is a prerequisite for Jett's Towing's release of a vehicle." *Id.* ¶ 134.

"Jett's Towing refuses to release a car without proof that the owner or driver has paid [the] $175 'mandatory impound fee' to [the Town] for a 'release receipt.'" *Id.* ¶ 18. When the vehicle owner presents the release authorization to Jett's Towing, Jett's Towing charges the owner "its own fee of . . . $160, plus daily impound fees, to release [a] vehicle." *Id.* ¶¶ 117-18. The Town does not return the impound fee "even to innocent individuals." *Id.* ¶ 153.

For example, one of the Plaintiffs, Brittany Coleman, alleged that in April of 2020, a Town police officer pulled her over, told her that he smelled marijuana, put

her in handcuffs, searched her car for half an hour, found nothing, and charged her with marijuana possession. *Id*. ¶¶ 203-227. The officer told Ms. Coleman that even though she was not under arrest, he "considered her arrested 'on paper' and would therefore tow and impound her car—even though she passed her sobriety tests and there was no indication that she could not safely drive her car away." *Id.* ¶¶ 227-28. Ms. Coleman paid the Town $175 to get a release authorization and paid an additional $160 to Jett's Towing to get her car back. *Id.* ¶ 233. "[T]he marijuana charge [against Ms. Coleman] was dismissed for lack of evidence," which "dismissal was conditioned on [her] payment of at least $382 in court costs." *Id.* ¶¶ 238-39.

The allegations of Plaintiff Alexis Thomas are similar. Ms. Thomas alleged that a Town police officer pulled her over, told her that he smelled marijuana, arrested her, and ordered her vehicle towed by Jett's Towing. *Id.* ¶¶ 278-81, 291. Ms. Thomas's mother paid fees to both the Town and Jett's Towing to release her car. *Id.* ¶ 304. Later, the charges against Ms. Thomas were dismissed. *Id.* ¶¶ 309-10.

Plaintiff Brandon Jones alleged that in December of 2021, Town police officers "follow[ed] [him] for no reason," "ran the information on [his] car for . . . outstanding warrants," and pulled him over "[w]hen their search returned an outstanding warrant for the owner of the car." *Id.* ¶¶ 244, 248-50. During the stop, the officers learned "that [Mr. Jones] had a suspended driver's license." *Id.* ¶ 253. Mr. Jones was arrested. *Id.* ¶ 257. Mr. Jones's wife informed the officers that

relatives were coming to pick up the car, and the relatives arrived around the same time that Jett's Towing did, but the officers had the car towed. *Id.* ¶¶ 264-68. Mr. Jones's wife paid the Town the mandatory impound fee and paid Jett's Towing its additional fee. *Id.* ¶¶ 272-73. At the time of the filing of the operative complaint (June 17, 2022), Mr. Jones's citation for driving with a suspended license "remain[ed] pending in [the Town's] municipal court." *Id.* ¶ 274.

Plaintiff Chekeithia Grant alleged that in February of 2020, her daughter was pulled over in her car. *Id.* ¶¶ 277-78. When Ms. Grant arrived on the scene, where Town police officers were searching the car, she asked the officers where her daughter was. *Id.* ¶¶ 285-87. An officer then seized and searched Ms. Grant's purse and wallet "without consent or any basis to believe the purse contained contraband" and "threw her phone against the windshield of her car, breaking the phone screen." *Id.* ¶ 288. During the search, the officer "found . . . a small prescription bottle with what the officer maintained was a small amount of marijuana" and arrested Ms. Grant. *Id.* ¶¶ 289-90. Ms. Grant was also charged with "obstruction of government operations" because she "ask[ed] the officers what they had done with her daughter." *Id.* ¶ 303. Ms. Grant's car was towed by Jett's Towing and she paid the Town's impound fee and the fee to Jett's Towing to have the car released. *Id.* ¶¶ 291, 304. Later, the charges against Ms. Grant were dismissed. *Id.* ¶¶ 309-10.

A Town police officer has stated that "most of the [Town's] Police Department's tickets got dismissed because [the Department] patrolled and wrote tickets beyond its jurisdiction." *Id.* ¶ 236.

Other alleged examples of the Town's revenue-generating police practices include:

a. issuing hundreds of fabricated criminal citations under Alabama Code § 32-5-77, a left-lane driving law that does not provide for or allow the issuance of citations.

b. issuing citations and towing vehicles for lack of insurance despite the presence of paperwork or documentation showing that the vehicles were in fact insured.

c. unlawfully issuing hundreds of traffic citations on stretches of Interstate 22 beyond and outside the Town's jurisdiction.

d. stacking charges so that a single occurrence or violation results in a handful of (or even a dozen or more) charged violations, with pecuniary fines, fees, and court costs for each.

e. waiting surreptitiously and targeting the residents of a particular housing project by pulling them over and ticketing them on allegations, sometimes fabricated, of failing to use a turn signal when entering the neighborhood, usually in the evening as people are coming home from work.

f. waiting surreptitiously for people to exit the Dollar General[1] parking lot and pulling them over on pretextual allegations in order to search their cars without any basis, in hopes of finding chargeable offenses and reasons to tow their cars.

g. collecting cash bonds directly from arrestees in order to buy their freedom, sometimes with no documentation given to the arrestee of the amount paid.

---

[1] Dollar General is allegedly the only business in the Town. *See* Doc. 63 ¶ 51 in *Thomas v. Town of Brookside et al.*, Case No. 2:22-cv-157-AMM.

*Id.* ¶ 171.

In January of 2022, the Town made national news and Chief Jones resigned. *Id.* ¶¶ 313, 317. In February of 2022, the Sheriff of Jefferson County advised people: "'Don't go through Brookside.'" *Id.* ¶ 333. The Lieutenant Governor of Alabama "asked the Alabama Department of Examiners of Public Accounts to 'conduct a full audit of the City of Brookside, focusing on, but not limited to, their police department, municipal court, general and departmental funds[,]'" because "'[i]t appears there is potential mismanagement, fraud and systemic abuse by the [Town's] police department and municipal court system.'" *Id.* ¶ 314.

In March of 2022, a judge in the Circuit Court of Jefferson County "dismissed dozens of Brookside convictions on appeal from the Brookside Municipal Court" and stated that the court would heavily scrutinize the Town's remaining cases "'[d]ue to the lack of credibility and public trust of the Brookside Police Department." *Id.* ¶ 315.

"For several months following the public revelations of its revenue-driven policies, practices, and customs, [the Town's] municipal court was suspended . . . ." *Id.* ¶ 320. "When [the Town] resumed operating its municipal court in May 2022, Judge Wooten recused from pending cases[,] [b]ut he continues to hear new cases without any changes to salary or funding policies." *Id.* ¶ 324. "The new judge assigned to hear the pending cases from which Judge Wooten recused has not issued

blanket dismissals or indicated a change in town or municipal court policy." *Id.* ¶ 326.

On April 4, 2022, Plaintiffs filed the original complaint in this action. Doc. 1. The operative complaint is the First Amended Class Action Complaint. Doc. 32. Counts 1 through 4 are putative class claims. *Id.* at 44-66. The Town and Jett's Towing moved to dismiss those counts, which motions are before the court. Docs. 39, 43. Count 5 is asserted against Defendants Maresha Moses, Anthony Ragsdale, and Marcus Sellers—the officers who allegedly participated in the arrests of the named plaintiffs. Doc. 32 at 66-68. Those individual defendants filed a motion for summary judgment on Count 5, which motion was denied. Docs. 52, 67. The case was thereafter assigned to the undersigned. Doc. 70.

Count 1 is asserted against the Town and Jett's Towing on behalf of a putative class ("the Towing Class") of "[a]ll persons who, since March 1, 2018, have paid fees to either the Town of Brookside or Jett's Towing (or both) to secure the release of a vehicle towed on the orders of the Brookside Police Department following a traffic stop." Doc. 32 ¶¶ 24, 359 (cleaned up). Plaintiffs assert that the Town's "vehicle towing and impounding system" violates the Due Process Clause of the Fourteenth Amendment and 42 U.S.C. § 1983 ("Section 1983") because the Town's law enforcement has a "personal or institutional financial stake in enforcing" that system. *Id.* ¶¶ 358, 363. Plaintiffs further allege that "Jett's Towing is a knowing and

active participant in and beneficiary of" that unconstitutional scheme. *Id.* ¶ 368. Plaintiffs assert that they and the Towing Class were injured when their vehicles were "seized, towed, and impounded" and they were charged fees to secure the release of those vehicles. *Id.* ¶ 371. Plaintiffs seek class-wide declaratory and injunctive relief, including disgorgement of those fees, under Federal Rule of Civil Procedure 23(b)(2) and (b)(3). *Id.* ¶¶ 342, 372-73.

Count 2 is asserted against the Town on behalf of a putative class ("the Charging Class") of "[a]ll persons who have been charged with offenses in Brookside Municipal Court following traffic stops by the Brookside Police Department since March 1, 2018." *Id.* ¶¶ 26, 376 (cleaned up). Plaintiffs assert that the Town's "law enforcement and prosecution systems" grant participants in that system "a personal or institutional financial stake in the cases they bring or prosecute" and that charging people using that system violates the Due Process Clause of the Fourteenth Amendment and Section 1983. *Id.* ¶¶ 377-79. Plaintiffs seek class-wide declaratory and injunctive relief and damages under Rule 23(b)(2), (b)(3), and (c)(4). *Id.* ¶ 356, 386-87.

Count 3 is similar to Count 2, except that Count 3 challenges the Town's "municipal court adjudication policies" and asserts that its "judicial officers or municipal courts" have or appear to have a personal or institutional financial interest

in the proceedings brought before them in violation of the Due Process Clause of the Fourteenth Amendment and Section 1983. *Id.* ¶¶ 389, 392.

Count 4 is brought by Mr. Jones against the Town on behalf of a more narrowly-drawn putative class ("the Vehicle Retention Sub-Class") of "[a]ll persons who, since June 17, 2020, have paid fees to the Town of Brookside to secure the release of a vehicle towed on the orders of the Brookside Police Department following a traffic stop." *Id.* ¶¶ 25, 404 (cleaned up). Count 4 brings a due process challenge to the Town's practice of conditioning the return of an impounded vehicle on payment of a fee that is not related to the costs of impounding that vehicle. *Id.* ¶ 412. Count 4 seek class-wide declaratory and injunctive relief, including disgorgement and cancellation of any outstanding fees, under Rule 23(b)(2) and (b)(3). *Id.* ¶¶ 349, 415-16.

After the Town's motion to dismiss the class claims, the United States filed a statement of interest pursuant to 28 U.S.C. § 517. Doc. 56. According to the United States, Plaintiffs' claims implicate the federal government's interest in "ensuring equal access to justice," "addressing practices that punish people for their poverty," and "enforcing 34 U.S.C. § 12601, which authorizes the Attorney General to address patterns or practices of law enforcement conduct that deprive people of federal rights." Doc. 56 at 2-3. The United States asserted that the Town's alleged conduct is an "extreme" example of the constitutionally "impermissibl[e] conflict[]" of

11

interest that occurs when the funding of police officers and prosecutors is "dependent on revenues from fines, fees, and forfeitures" that they collect. *Id*. at 14.

## II. LEGAL STANDARD

A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint need not make "detailed factual allegations"; its purpose is only to "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up). To survive a motion to dismiss based on Rule 12(b)(6), a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* But "courts are not bound to accept as true a legal conclusion couched as a factual allegation," such as the "recitation of [an] element[] of a cause of action." *Id.* (cleaned up).

To test the complaint, the court discards any "conclusory allegations," takes the facts alleged as true, *McCullough v. Finley*, 907 F.3d 1324, 1333 (11th Cir. 2018), and "draw[s] all reasonable inferences in the plaintiff's favor," *Randall v. Scott*, 610 F.3d 701, 705 (11th Cir. 2010). These facts and inferences must amount to a "plausible" claim for relief, a standard that "requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

## III. ANALYSIS

Plaintiffs assert claims that implicate two requirements of the Due Process Clause of the Fourteenth Amendment: the impartiality requirement and the hearing requirement. *See, e.g.*, Doc. 32 ¶¶ 362, 365 (alleging that Town officials are financially interested in the outcome of proceedings); *id.* ¶¶ 107-10 (alleging that the Town charges mandatory impound fees "before" and "regardless of" any proceedings related to an arrest); Doc. 54 at 23 (asserting that the deprivation alleged in Count IV is completed "without any . . . procedural safeguards").

### A. The Impartiality Requirement of the Due Process Clause

The Fourteenth Amendment provides that no State shall "deprive any person of . . . property . . . without due process of law." U.S. Const. amend. XIV, § 1. A municipality may be liable for violating the Fourteenth Amendment under Section 1983. *Monell v. Dep't of Soc. Servs. of New York,* 436 U.S. 658, 694 (1978).

"[A] fair trial in a fair tribunal is a basic requirement of due process." *Withrow v. Larkin*, 421 U.S. 35, 46 (1975) (cleaned up). "Not only is a biased decisionmaker constitutionally unacceptable but our system of law has always endeavored to prevent even the probability of unfairness." *Id.* at 47 (cleaned up). "In pursuit of this end, various situations have been identified in which experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Id.* "Among these cases are those in which the

adjudicator has a pecuniary interest in the outcome . . . ." *Id.*; *see also Harper v. Pro. Prob. Servs. Inc.*, 976 F.3d 1236, 1242 (11th Cir. 2020) ("The Due Process Clause forbids adjudication by a judge who has a financial interest in the outcome of his decisions, provided that the interest—personal or otherwise—is substantial enough to give him a possible temptation to forsake his obligation of impartiality.") (cleaned up). Although judges are held to a stricter standard, constitutional scrutiny has also been applied to the pecuniary interest of prosecutors and police officers in enforcing the law. *See Brucker v. City of Doraville*, 38 F.4th 876, 886-87 (11th Cir. 2022).

The pecuniary or "financial interest" at issue may be "personal." *Id.* at 887. For example, a personal interest can arise when "the police officers' compensation is . . . tied to the citations they issue" or they "are at risk of termination" if they do not issue enough citations. *Id.* Or a personal interest can arise when a judge's salary correlates to the fines she levies—in those cases, the judge's "own financial interests" may present an unacceptable risk of bias. *Id.* at 882.

Alternatively, the financial interest at issue may be "institutional." *Id.* at 885. For example, an institutional interest can arise when a police department is funded based "on the amounts of penalties it collected," or when a large part of the "penalty funds" goes to the police department rather than being "spread out over [several] other departments." *Id.* at 887-88. Or an institutional interest can arise when a judge "ha[s] some control over the expenditure of the moneys that [a]re raised" from court

fines, *id.* at 883, such that his "executive responsibility over the City's finances . . . might compromise his impartiality" in his judicial decision-making, *id.* at 885.

The interest at issue may be analyzed on an individual (or departmental) basis or on a governmental-wide basis. *Id.* at 882. When an individual "is the sole decisionmaker in the matters coming before him, and he receives no direction from the rest of the [government] or its leadership," the appropriate subject of analysis is the individual's interest. *Id.* at 883. Conversely, when government "employees' conduct [is] part of one central scheme that cause[s] the constitutional violation," the appropriate subject of analysis is the governmental "entity, not . . . its individual employees." *Id.* at 882 (cleaned up).

Whether a pecuniary interest is constitutionally infirm is "a matter of degree," *id.* at 884 (cleaned up), and the specifics are important, *see id.* at 885 (holding that "a judge . . . whose employer disclaims any ability to fire him except for cause, who has only a passing knowledge of the City's budget, who has never been pressured in any way, and who does not formally report to anyone" does not suffer from a personal interest that presents an unconstitutional risk of partiality).

"[T]hose with substantial pecuniary interest in legal proceedings should not adjudicate these disputes." *Gibson v. Berryhill*, 411 U.S. 564, 579 (1973). On the other hand, the mere "fact that a judge works for a government, which gets a

significant portion of its revenues from fines and fees, is not enough to establish an unconstitutional risk of bias on the part of the judge." *Brucker*, 38 F.4th at 884.

Some pecuniary interests are "too remote and speculative" to compromise a person's decisionmaking. *Id.* at 886. For example, a federal district judge "sees no noticeable impact on her chambers from the fines she imposes" in criminal cases—those fines "are not set aside for judicial operations even on a national level, let alone" on a district-by-district basis. *Caliste v. Cantrell*, 937 F.3d 525, 532 (5th Cir. 2019). So any "benefits" from federal fines are too "diffuse" to raise due process concerns about federal judges. *Id.*

### B. The Hearing Requirement of the Due Process Clause

Apart from impartiality, the Due Process Clause also requires "some form of hearing"—*i.e.*, "the opportunity to present [one's] case"—before the government "finally deprive[s]" a person of her property. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 433 (1982) (emphasis omitted) (cleaned up). When the property deprivation is "tortious," such as when it is a "result of a random and unauthorized act by a state employee," "an independent tort action" may provide an opportunity to be heard sufficient to comply with due process. *Id.* at 435-36 (cleaned up); *see, e.g., Lindsey v. Storey*, 936 F.2d 554 (11th Cir. 1991) (due process claim challenging the continued retention of a seized car for nine months without a forfeiture

proceeding failed because the state provided a tort action for conversion of the car, so the plaintiff had an adequate opportunity to present her case).

Such unauthorized "executive acts" by government employees "typically arise from the ministerial or administrative activities of members of the executive branch" and "characteristically apply to a limited number of persons (and often to only one person)." *McKinney v. Pate*, 20 F.3d 1550, 1557 n.9 (11th Cir. 1994) (en banc).

Employees who commit such unauthorized actions are sometimes called "rogue" employees. *See, e.g., Simpson v. Brown Cnty.*, 860 F.3d 1001, 1007 (7th Cir. 2017); *S. Allegheny Pittsburgh Rest. Enters., LLC v. City of Pittsburgh*, 806 F. App'x 134, 141 (3d Cir. 2020); *Browder v. City of Albuquerque*, 787 F.3d 1076, 1079 n.1 (10th Cir. 2015) (Gorsuch, J.).

A different analysis applies to legislative acts, such as "laws and broad-ranging executive regulations." *McKinney*, 20 F.3d at 1557 n.9 & 1588 n.14. When a plaintiff alleges that "the [government's] system itself[,] . . . by operation of law," deprived her of property—*i.e.*, that the government's "established . . . procedure" lacked "proper procedural safeguards"—then subsequent "process . . . in the form of an independent tort action" is constitutionally inadequate. *Logan*, 455 U.S. at 436 (cleaned up); *see also Brooks v. George Cnty.*, 84 F.3d 157, 165 (5th Cir. 1996);

*Greenbriar Vill., L.L.C. v. City of Mountain Brook*, 212 F. Supp. 2d 1335, 1339 (N.D. Ala. 2002).

For example, when the government's established "trial court procedure" injects bias into the proceedings, the availability of subsequent proceedings does not "correct[]" the constitutional problem. *Ward v. Vill. of Monroeville*, 409 U.S. 57, 61 (1972). "Even appeal and a trial *de novo* will not cure a failure to provide a neutral and detached adjudicator." *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 618 (1993). "[D]ue process requires a neutral and detached judge in the first instance." *Id.* at 617 (cleaned up).

### C. Claims Against The Town in Counts 1 and 2

According to Plaintiffs, "Count 1 challenges Brookside's towing system" and "Count 2 pleads a similar due process challenge to Brookside's profit-fueled traffic ticketing system." Doc. 54 at 13. The Town asserted that Count 2 must be dismissed "[f]or the same reasons" that Count 1 must be dismissed. Doc. 39 at 25-26.

### 1. Count 1 - Towing

In Count 1, which is asserted on behalf of the Towing Class, Plaintiffs allege that the Town's police officers have a financial incentive to stop and arrest drivers because that allows them to tow vehicles, which generates an impound fee that goes toward funding the police department. Doc. 32 ¶¶ 365, 368. In Count 2, which is brought on behalf of the Charging Class, Plaintiffs allege that the Town's police

department and prosecutor's office have a financial incentive to charge and prosecute people. *Id.* ¶ 380. According to Plaintiffs, those allegations plead an unconstitutional financial interest on both a personal and an institutional level.

Plaintiffs assert that they have pleaded an unconstitutional personal interest of the Town's police officers because those officers are allegedly at risk of termination if they fail to generate enough arrests that enable cars to be towed and people to be prosecuted. Doc. 54 at 11. For example, Plaintiffs alleged that between 2018 and 2020, both the number of arrests and the number of vehicles towed increased fourteenfold, and the revenue generated by that activity funded the increase of the Town's full-time police officers from one in 2018 (Chief Jones) to nine in 2021. Moreover, the size of the Town's police force allegedly is not normal: it is now five times larger per capita than the national average, and according to Plaintiffs, "if revenue drops, the police force must shrink." Doc. 54 at 11.

According to the Town, those allegations are insufficient to plead that the officers harbored a personal financial interest because no allegation "t[ies] the number of citations issued" by a particular officer to that "officer's salary or the retention of his job." Doc. 39 at 22. The court agrees that Plaintiffs have not pleaded a personal interest on the part of each police officer, analyzed individually. Plaintiffs have not alleged, for example, that some officers made more money than others, or were actually terminated (or even actually threatened with termination), based on

the number of tows they generated or arrests they made. Plaintiffs have not alleged that a quota system existed.

But under the precedents discussed above, Plaintiffs' allegations are sufficient to plead a due process claim based on the institutional interest of the police department in generating impound fees and making arrests. The question is whether "the police department was financially dependent on the maintenance of a high level of penalties." *Brucker*, 38 F.4th at 888 (cleaned up). Put differently, whether the "possibility that the official would be swayed by the financial needs of his department" when enforcing the law was imminent or "remote." *Id.* at 887.

In *Brucker*, there was no "link between fine revenue and police staffing," and the defendant city did not "direct police operations to increase revenue." *Id.* at 881. So the plaintiff's claim regarding the police department relied solely on evidence that "11 to 25 percent of the funds going to th[e] [police] department consist[ed] of fines and fees" that had been collected over a five-year period. *Id.* at 888. The Eleventh Circuit held that that percentage figure was insufficient by itself to establish an unconstitutional institutional financial interest in generating fines and fees. *Id*.

Here, Plaintiffs' allegations are both more substantial, and different in kind, than the plaintiffs' evidence in *Brucker* (which was decided on summary judgment). Moreover, the claims in Count 1 are more tailored than the claims in *Brucker* because Count 1 challenges a new practice of collecting a certain type of fee. Plaintiffs have

asserted that the Town directed police operations to increase revenue, that the sharply increased revenue funded the Town's increased police staffing, and that the new revenue figures "dwarf" the figures "at issue in *Brucker*." Doc. 54 at 15-16.

Plaintiffs alleged that the Town police department caused 789 vehicles to be towed in 2020—about one vehicle for every two residents of the Town. Doc. 32 ¶¶ 40, 54. Plaintiffs further alleged that the Town imposes a $175 fee for each vehicle towed, and that that fee represents pure profit because the Town does not incur any costs associated with the towing. *Id.* ¶¶ 106, 410. Using those figures, the Town police department's towing practice alone (separate and apart from the fines and forfeitures that are the subject of Count 2) allegedly generated $138,075 in a single year. *See* Doc. 54 at 10.

Moreover, Plaintiffs assert that the Town's police tow cars under "dubious and unnecessary circumstances." *Id.* at 11. Plaintiffs offer Ms. Coleman's alleged experience—in which a police officer explained that she was arrested "on paper" and thus her car could be towed, even though she was not being removed from the scene and could have driven her car away—as just one example of how the Town's towing practice is allegedly incentivized by revenue rather than legitimate law enforcement needs.

## 2. Count 2 - Fines and Forfeitures

In *Brucker*, "[a]round half of [the city's] general fund [went] to the police department, and roughly 11 to 25 percent of that fund came from fines and fees over the last five recorded years." 38 F.4th at 888. Here, Plaintiffs allege that the police department operated on "a direct eat-what-you-kill . . . system" in which it received "$544,077 of the $610,307 in fines and forfeitures . . . [the Town] raised in 2020," Doc. 32 ¶ 165, and that that $610,307 "made up 49% of [the Town's] total annual revenue," *id*. ¶ 67.

The Town's motion does not engage Plaintiff's argument that those allegations are sufficient to state a claim of institutional bias. *See* Doc. 39 at 22; Doc. 59 at 3-4. The Town asserts that even if Plaintiffs sufficiently pleaded a constitutionally infirm risk that its police officers were swayed by the financial needs of their department, Plaintiffs' due process claim nevertheless fails because "tort law for conversion of property . . . provides . . . a post-deprivation remedy and obviates the need to file a procedural due process claim pursuant to § 1983." Doc. 39 at 23-24 (citing, *e.g.*, *McKinney*, 20 F.3d at 1557, 1562); *see also* Doc. 59 at 8. In passing and on reply, the Town also referred to a possibility of trial *de novo* in the Circuit Court of Jefferson County, or a motion for "return of property" under Alabama Rule of Criminal Procedure 3.13, but the Town did not explain how a person would be refunded the $175 impound fee using those processes. *See* Doc. 59 at 8. The Town's

argument about a conversion action and the availability of other potentially remedial process fails for two reasons.

*First*, Counts 1 and 2 challenge legislative acts, not executive acts (what Plaintiffs call "one-off" acts, Doc. 54 at 21-22), so *McKinney* and its progeny do not apply. Plaintiffs identified the applicable precedent: *Logan* and its progeny. Doc. 54 at 13. When "the state system itself . . . destroys a complainant's property interest, by operation of law," process "in the form of an independent tort action" is constitutionally inadequate. *Logan*, 455 U.S. at 436. For example, in *Ward*, the plaintiff challenged a systemic problem with the way a municipality operated its court—the "mayor who also had responsibilities for revenue production and law enforcement" sat as the judge—not a particular unauthorized action of the judge that violated the municipality's policy. 409 U.S. at 58. In such cases, the availability of "appeal and trial de novo" does not solve the constitutional problem. *Id.* at 61.

Counts 1 and 2 challenge "the [Town's] system itself" and its "established . . . procedures," *Logan*, 455 U.S. at 436; *see also Brown v. Vance*, 637 F.2d 272, 281, 284 (5th Cir. Jan. 1981),[2] not merely a particular unauthorized action by a specific Town employee. Doc. 54 at 24-25 (asserting that the claims challenge the Town's "systems," not individualized "interaction[s] with those systems"). More specifically, Plaintiffs challenge the Town's policy of enforcing Ordinance 519 (in

---

[2] *Brown* is binding precedent under *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981).

Count 1), and the law generally (in Count 2), with a police department that allegedly reaps substantial financial benefit from that enforcement. Doc. 54 at 13; Doc. 32 ¶¶ 360-363. Those allegations target the Town's rules, not a particular application of them. *See McKinney*, 20 F.3d at 1557 n.9 (distinguishing a challenge to a "rule itself," which is a legislative act, from a challenge to a particular "application of the rule," which is an executive act); *id*. at 1588 n.14.

*McKinney* and its progeny are application challenges; many of them are challenges to the termination of a particular state employee's employment. *See id.* at 1553 (plaintiff "allege[d] that he was deprived of [his] employment interest by an arbitrary and capricious non-legislative government action"); *Cotton v. Jackson*, 216 F.3d 1328, 1330 (11th Cir. 2000) (plaintiff alleged that a state employee "effectively ruined his reputation by labeling him as a sexual harasser and by terminating his employment"—*i.e.*, that a rogue executive action harmed him); *Laskar v. Peterson*, 771 F.3d 1291 (11th Cir. 2014) (employment termination case); *Case v. Eslinger*, 555 F.3d 1317, 1330 (11th Cir. 2009) (analyzing a particular instance "of continued retention of legally seized property"). The Eleventh Circuit explicitly warned against applying *McKinney* to cases that challenge the rules themselves. *McKinney*, 20 F.3d at 1557 n.9 & 1558 n.14. So the Town's reliance on *McKinney* and related cases is misplaced.

*Second*, even if *McKinney* and its progeny applied (instead of *Logan* and *Ward*), they foreclose a due process claim only when an "adequate . . . remedial procedure" exists, which is one that "could have fully compensated the [plaintiff] for the property loss he suffered." 20 F.3d at 1564 (cleaned up). In the precedent the Town discussed, the cure that subsequent process offered was obvious. The state employment termination decision could have been appealed. *See, e.g., id.* at 1563. Vehicles are commonly the subject of the tort of replevin or conversion. *See, e.g., Lindsey*, 936 F.2d at 561 (citing *Norred v. Dispain*, 166 S.E.2d 38 (Ga. Ct. App. 1969)). With regard to Count 1, the Town did not explain how a person who allegedly paid a $175 fee to retrieve her car could appeal that fee, or how she could satisfy the elements of a conversion action. A plaintiff asserting an action for conversion must establish "a wrongful taking or a wrongful detention or interference" of "specific personal property." *Ex parte Anderson*, 867 So. 2d 1125, 1129 (Ala. 2003) (cleaned up). It is not obvious how paying a $175 fee allegedly procured through a constitutionally objectionable process would meet those elements, and unlike the court in *Lindsey*, 936 F.2d at 561, the Town did not cite an example of a conversion action involving a challenge similar to Plaintiffs'. Accordingly, at this early stage of the proceedings, the Town failed to establish that under the facts alleged, adequate remedial procedure exists.

In an argument why Plaintiffs' claims are inappropriate for class treatment, the Town asserted that its "officers' bias, *i.e.* their subjective intent, has absolutely no bearing on the reasonableness of any individual's traffic stop, arrest, or tow of her vehicle, which is governed by the Fourth Amendment." Doc. 39 at 11. In a footnote, the Town argued that the Fourth Amendment, not the Fourteenth Amendment, governs Plaintiff's claims. *Id.* at 11 n.4. And on reply, the Town asserted that the Fourth Amendment, not the Fourteenth Amendment, "define[s] the process that is due for seizures of . . . property in criminal cases," Doc. 59 at 8-9 (cleaned up), and that "[a]ny procedural flaws that might have been present during the seizures of the Plaintiffs' person or property as part of those criminal charges do not negate the objective reasonableness of those same seizures under the Fourth Amendment." *Id.* at 11. According to the Town, even "the most extreme or egregious" financial bias at "all three" levels of law enforcement—from the police department, to the prosecutor's office, to the judge—is not actionable under the Fourteenth Amendment because the sole question is whether, under the Fourth Amendment, "objectively reasonable grounds to perform a stop, search, arrest, seizure and/or adjudication" existed with regard to any particular class member. *Id.* at 11-12.

The court ordinarily does not consider arguments made only in footnotes or for the first time on reply. On that basis alone, the Town's motion to dismiss Count

1 on the ground that it relies on the wrong constitutional amendment fails. But even were the court to consider the Town's Fourth Amendment argument, the court would reject it.

Plaintiffs assert that it is "a matter of century-old, undisputed doctrine" that the Fourteenth Amendment is "the specific constitutional provision covering claims for institutionally or personally interested law enforcement or judicial decisionmaking." Doc. 54 at 25 (citing *Tumey v. Ohio*, 273 U.S. 510 (1927)). According to Plaintiffs, their claims "do not turn on the individual circumstances in which any Plaintiff or putative class member has been stopped, towed, ticketed, charged, prosecuted, or convicted," but on "whether Brookside's systems are biased and whether every class member was subjected to Brookside's systems." *Id.* at 24-25 (citing *Tumey*, 273 U.S. at 532 ("It is certainly not fair to **each defendant** brought before the mayor for the careful and judicial consideration of his guilt or innocence that the **prospect** of such a prospective loss by the mayor should weigh against his acquittal.") (emphasis added by Plaintiffs)). The court agrees.

The Town's Fourth Amendment argument starts from an erroneous premise. According to the Town, the Fourth Amendment is concerned with whether an officer's behavior was "objectively justifiable," whereas the Fourteenth Amendment is concerned with whether the officer was biased as a matter of "subjective intent." Doc. 39 at 11-12 (cleaned up). But subjective bias is not the standard for the

impartiality requirement of the Due Process Clause. A court "need find no instance of actual . . . bias to hold [a] fee system constitutionally infirm" under the Due Process Clause. *Brown*, 637 F.2d at 282. "The test is whether a fee system presents a possible temptation," not whether there is "proof of actual . . . prejudice or of a direct pecuniary interest in the outcome of particular cases." *Id.* (cleaned up). The claims in Count 1 challenge the existence of a fee system, not the subjective intent of the individuals who allegedly enforced it. *See id.* at 284 ("The *Tumey-Ward* test . . . is levelled at the system, not the individual . . . .").

The Town cited *United States v. Spivey*, 861 F.3d 1207 (11th Cir. 2017), but that case "present[ed] the question whether deception by law enforcement necessarily renders a suspect's consent to a search of a home involuntary" for purposes of a motion to suppress. *Id.* at 1210. That is very different from the question the Town presented, which is whether the Fourth Amendment "necessarily subsume[s]" "procedural due process protections" related to law enforcement. Doc. 59 at 11 (cleaned up).

The Town asserts that if Due Process jurisprudence applies, it would render the Fourth Amendment irrelevant and "would further just ignore . . . criminal charges." Doc. 59 at 10-11. The argument is an echo of the opening salvo of the Town's motion: "In Alabama, possession of marijuana is a crime." Doc. 39 at 3. It is as if the Town believes it is defending a *habeas* challenge seeking to overturn

marijuana convictions. That is not remotely this case. Plaintiffs are seeking to dismantle the financial incentive system for law enforcement that the Town allegedly erected beginning in March 2018—a system that allegedly caused the Town to be investigated by the Alabama Attorney General's office. None of the Town's authorities apply the Fourth Amendment to that type of claim, and none supports the rule that the Town proposed, under which it would not offend Due Process for a municipality to operate a financially-biased police department, prosecutor's office, and judiciary so long as certain individual searches and seizures might be "objective[ly] reasonable[]." Doc. 59 at 11-12.

Plaintiffs' allegations about the Town's police department are sufficient to state a claim in Counts 1 and 2. Accordingly, the court need not analyze whether the allegations in Count 2 about the Town's prosecutor also raise Due Process concerns, nor whether Plaintiffs have alleged that the City was operating under the type of "central scheme" that could allow consideration of bias on the part of "the whole [Town] government," even if the financial incentives to the Town's police department, prosecutor's office, and judge, considered individually, fell below the constitutional threshold for a Due Process violation. *See Brucker*, 38 F.4th at 882 (cleaned up).

### D. Count 4

According to Plaintiffs, Count 4 challenges the Town's "impound fee system" because the procedure by which it is administered "risks erroneous deprivations of crucial property (cars and cash) without any opportunity to be heard or any countervailing government interest." Doc. 54 at 9. Plaintiffs assert that three features of the Town's impound fee system violate the Due Process Clause: the fee "(1) is not related to the cost of administering Brookside's car towing system, for which the town incurs no costs; (2) is unmoored from the initiation or outcome of criminal or other judicial proceedings; and (3) redounds entirely to the profit of Brookside's police department, which imposes and keeps 100% of the fee without any guardrails against abuse because the fee is never subject to review by any neutral arbiter." Doc. 54 at 22 (cleaned up).

Other than the arguments rejected for the reasons discussed *supra* pp. 22-29, the Town did not assert any reason why Count 4 must be dismissed. *See* Doc. 39 at 30-31. Accordingly, the motion to dismiss Count 4 is **DENIED**.

### E. Count 3

According to Plaintiffs, "Count 3 alleges that Brookside's municipal judge has, or appears to have, institutional and personal financial interests in convicting and fining . . . traffic defendants[.]" Doc. 54 at 17. Plaintiffs alleged that several features of the Town's municipal court system and the way the Town's judge is paid

give the judge an institutional and personal financial interest in the cases he decides. *See id.* at 18-19. In particular, Plaintiffs assert that "between 2019 and 2021, as Brookside's revenues grew, so did the municipal judge's annual salary, by 127%," and so did the amount he was paid per court appearance. *Id.* at 19.

The Town asserted two reasons why Count 3 must be dismissed. *First*, the Town asserted that under *McKinney*, the availability of an appeal is all the process that is due. Doc. 39 at 27. As explained *supra* pp. 22-24, *McKinney* does not apply to cases involving judges with financial incentives, so the availability of appeal does not cure the alleged constitutional problem.

*Second*, the Town asserted that Count 3 must be dismissed because "the Brookside Municipal Court is not a department of the Town . . . , but part of the judiciary of the State of Alabama, and [the State] cannot be a political subdivision subject to suit pursuant to § 1983." Doc. 39 at 28. A municipality may be liable under Section 1983 only for its own actions, not that of others. *Monell*, 436 U.S. at 683, 694. According to the Town, it "has no authority to control the workings of the Brookside Municipal Court because the Alabama Supreme Court—not the municipality where a court sits—exercises supervision and control over municipal courts." Doc. 39 at 29. To support dismissal, the Town cited a Ninth Circuit case for the proposition that "a municipality cannot be liable for judicial conduct it lacks the power to require, control, or remedy." *Id.* (cleaned up).

In response, Plaintiffs asserted that Count 3 challenges the Town's alleged policy of providing "financial rewards" to its judge based on "increased prosecution." Doc. 54 at 19. According to Plaintiffs, the salient question is "whether the Brookside municipal court is a municipal actor," not whether the court is "under the control of the state." *Id.* at 20. On reply, the Town did not respond to those arguments. *See* Doc. 59.

The Town is wrong that Count 3 challenges conduct attributable to the State and not the Town. Plaintiffs alleged that the Town controls the pay of its municipal judge. Doc. 32 ¶ 193 ("Brookside's municipal judge has his salary fixed by the Brookside City Council, and that salary is paid by the Town of Brookside.") (cleaned up). And Count 3 challenges the Town's alleged decision to link its judge's pay to increased prosecution, not judicial conduct that could possibly be supervised by the State. *Id.* ¶¶ 391, 393-94 (alleging that Count 3 is based on the "design[]" of the "municipal court system," which allegedly "create[s] an institutional [financial] incentive . . . for the Town to charge, convict, and fine defendants," "regardless of whether [judicial officers] actually . . . violate their obligations to be disinterested" when adjudicating particular cases); *see also id.* ¶¶ 194-200. The potential for supervision by the Alabama Supreme Court over judicial conduct is not relevant to the claims in Count 3, which challenge legislative action.

**F. The Town's Argument That Class Allegations Must Be Stricken**

The Town asserted that because the Fourth Amendment would require individualized assessments of probable cause, Plaintiffs cannot satisfy the prerequisites in Rule 23 for class actions. Doc. 39 at 7-17. In a footnote, the Town asserted also "that a court may determine at the pleading stage whether a plaintiff can satisfy Rule 23's class certification requirements," and that the class allegations could be stricken under Rule 12(f) and Rule 23(d). *Id.* at 9 n.3 (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982) ("Sometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim, and sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question.")).

Plaintiffs responded that the Town "cite[d] no case where a claim was held to be properly pleaded but class allegations were dismissed as inadequately pleaded before the class certification stage." Doc. 54 at 23. According to Plaintiffs, there is a "general rule against resolving the adequacy of class allegations at the pleading stage" rather than the certification stage. *Id.* at 24 (citing *Hughes v. Greenetrack, Inc.*, No. 7:09-CV-2335-RDP, 2010 WL 11470616, at *1-2 (N.D. Ala. Apr. 16, 2010)).

Regarding the Town's argument about an individualized Fourth Amendment inquiry, Plaintiffs asserted that "Counts 1 through 4, properly construed, do not turn on the individual circumstances in which any Plaintiff or putative class member has been stopped, towed, ticketed, charged, prosecuted, or convicted," but on "whether Brookside's systems" create a constitutionally unacceptable risk of bias "and whether every class member was subjected to Brookside's systems." *Id.* at 25; *see also Brown*, 637 F.2d at 284.

On reply, the Town expanded its Fourth Amendment argument and asserted that monetary damages would be unavailable on a class-wide basis. Doc. 59 at 13-14. The Town did not engage Plaintiffs' assertion about the general rule against deciding certification questions at the pleading stage except to observe that such a decision "would not be unprecedented." *See* Doc. 59 at 10.

For the reasons discussed *supra* pp. 26-29, the court rejected the Town's argument that the Fourth Amendment governs Plaintiffs' class claims. Accordingly, at this early stage, the court rejects the Town's argument that the Fourth Amendment also makes this case is inappropriate for class-wide adjudication. The Town has not established that this case is the exceptional one in which Plaintiffs should not be allowed discovery related to a putative class. "[T]he strong policy among the federal courts is to 'allow discovery relevant to determining whether the requirements of Rule 23(a) are satisfied and whether the action is maintainable under one of the

categories listed in Rule 23(b).'" *Hughes*, 2010 WL 11470616, at *2 (quoting 5 James Wm. Moore et al., *Moore's Federal Practice* ¶ 23.85 (2010)). "A preemptive assessment as to whether Rule 23(a) thresholds and Rule 23(b) requirements are met, without the benefit of targeted discovery and in a contentious case such as this, would clearly be an abuse of this court's discretion." *Id.*; *see also Rensel v. Centra Tech, Inc.*, 2 F.4th 1359, 1364-68 (11th Cir. 2021) (holding that a district court abused its discretion when it prematurely decided the certification issue before allowing discovery).

### G. Claims Against Jett's Towing

Plaintiffs alleged that Jett's Towing: (a) "is a knowing and active participant in and beneficiary of Brookside's towing policies, practices, and customs"; (b) "is the designated and approved Brookside impound lot" and is "empower[ed] . . . to not only charge the company's own towing, impound, and storage fees, but also to charge and collect 'additional town fees'"; and (c) "stands at the ready near police cars to tow vehicles, and . . . refuses to release them until Brookside collects its own predatory fees." Doc. 32 ¶ 368; *see also* Doc. 55 at 6 (asserting that Plaintiffs' claims against Jett's Towing "rest[] on . . . [its] knowing, active, and crucial participation" in the Town's towing policy). Plaintiffs further allege that "the Town's . . . 'Vehicle Release Process' form . . . says that presenting proof of payment to the Town is a prerequisite for Jett's Towing's release of a vehicle." Doc. 32 ¶ 134. Plaintiffs assert

claims against Jett's Towing under the Due Process Clause of the Fourteenth Amendment. *Id*. at 56-57.

"The Fourteenth Amendment, by its own language, applies solely to state action." *Charles v. Johnson*, 18 F.4th 686, 693 (11th Cir. 2021). "The state action requirement is an element of a § 1983 claim that the plaintiff must prove in order to prevail." *Id.* at 694. "Faithful adherence to the 'state action' requirement of the Fourteenth Amendment requires careful attention to the gravamen of the plaintiff's complaint." *Blum v. Yaretsky*, 457 U.S. 991, 1003 (1982). "Only in rare circumstances can a private party be viewed as a 'state actor' for section 1983 purposes." *Harvey v. Harvey*, 949 F.2d 1127, 1130 (11th Cir. 1992). "The fundamental inquiry is whether the [defendant] is a governmental actor to whom the prohibitions of the Constitution apply." *S.F. Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 542 (1987). "[L]iability attaches only to those wrongdoers who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it." *Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 191 (1988) (cleaned up).

The Supreme Court has identified three circumstances in which a private party becomes a state actor. *Charles*, 18 F.4th at 694. The first (sometimes called the State compulsion test) is when "the State has coerced or at least significantly encouraged the action [of the private party] alleged to violate the Constitution." *Id*. The second

is when "the private parties performed a public function that was traditionally the exclusive prerogative of the State ('public function test')," *id.*, such that "the public character" of a defendant's function "requires that [the defendant] be treated as a public institution subject to the command[s] of the" Constitution, *Evans v. Newton*, 382 U.S. 296, 302 (1966). The third is when "the State ha[s] so far insinuated itself into a position of interdependence with the private parties that it was a joint participant in the enterprise ('nexus/joint action test')." *Charles*, 18 F.4th at 694.

Jett's Towing moved to dismiss on two grounds: (1) that it "is not a governmental agency," and (2) that Plaintiffs' allegations about Jett's Towing involvement in the Town's towing practices are too vague to plausibly assert that Jett's Towing conspired with a governmental agency to engage in conduct that violated the Fourteenth Amendment. Doc. 43 at 4-5. Jett's Towing further denied that it "collect[s] fees for Brookside" and asserted that its own fees were reasonable. *Id.* at 6.

In their response, Plaintiffs disclaimed a theory of conspiracy liability and asserted that private companies can be state actors even without conspiring with the government so long as "their conduct satisfies any one of three standards" in *Charles*. Doc. 55 at 8-9, 17. According to Plaintiffs, the "key aspect" of Jett's Towing participation in unconstitutional state action is that Jett's Towing "condition[s] the release of every car on proof of the driver's prior payment to

Brookside of the town's $175 mandatory impound fee." *Id*. at 7; *see also id.* at 11-12, 14-16.

Plaintiffs' focus on Jett's Towing's alleged role in helping the Town to collect a fee distinguishes this case from other towing-company precedent, which typically analyze whether a towing company "was a state actor when it initially towed and stored the vehicle at the behest of [law enforcement]" in the context of a challenge to the adequacy of pre- or post-deprivation hearings. *See, e.g., Smith v. Insley's Inc.*, 499 F.3d 875, 880 (8th Cir. 2007); *Beyer v. Vill. of Ashwaubenon*, 444 F. App'x 99, 101 (7th Cir. 2011); *Robertson v. Breakthrough Towing, LLC*, No. 19-10266, 2022 WL 4292314, at *7 & nn.6-8 (E.D. Mich. Sept. 16, 2022) (collecting cases); *see also* Doc. 55 at 9 n.3 (citing a string of tow-company cases including *Smith*). Granted, Plaintiffs emphasized their allegations that Jett's Towing profits from towing and impounding cars at the behest of the Town's police officers, but Plaintiffs did not contend that profitably towing cars at the government's behest is state action that violates the Due Process Clause. *See, e.g.,* Doc. 55 at 12 (identifying the "constitutional violation[]" as "the system's prioritization of generating and maximizing revenue and profit for the [T]own and the company") (cleaned up).

Jett's Towing was afforded an opportunity but did not file a reply.

Plaintiffs' allegations are sufficient to plead that the Town "has coerced or at least significantly encouraged the action [of the private party] alleged to violate the

Constitution." *Charles*, 18 F.4th at 694. Under the State coercion or compulsion test, "it makes no difference . . . whether the [unconstitutional] act by the private party is compelled by a statutory provision or by a custom having the force of law—in either case it is the [government] that has commanded the result by its law." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 171 (1970). For example, in *Adickes*, the Supreme Court held that a private company who operated a restaurant could be liable under Section 1983 when it discriminated on the basis of race pursuant to a "state-enforced custom." *Id.* Here, Plaintiffs have alleged that before releasing a vehicle, Jett's Towing demands proof of payment of the Town's allegedly unconstitutional impound fee pursuant to the Town's "'Vehicle Release Process' form." Doc. 32 ¶ 134. That allegation is sufficient to plead that the conduct alleged is enforced under the Town's authority, *i.e.*, that Jett's Towing "carr[ies] a badge of authority of [the Town] and represent[s] it in some capacity" when demanding that proof. *Nat'l Collegiate Athletic Ass'n*, 488 U.S. at 191 (cleaned up).

The result here is in accord with precedent holding that a private entity is a state actor when it helps a government entity to collect a fee. *Compare Jarvis v. Vill. Gun Shop, Inc.*, 805 F.3d 1, 9, 12-13 (1st Cir. 2015) (holding that a private storage company that impounded property at the behest of police was not a state actor because the police did not share in the impound charges collected by the company and the law did not "require[] or compel[]" the company "to provide its services to

the police"), *with Brown v. Transurban USA, Inc.*, 144 F. Supp. 3d 809, 836 (E.D. Va. 2015) (holding that a private company "acts under color of state law when collecting unpaid tolls and associated administrative fees, penalties, and costs"). Plaintiffs' challenge is to Jett's Towing's role in assisting the Town to collect a fee, so those precedents are more helpful to the state-action analysis than the precedents the parties cited about towing.

Because Plaintiffs' allegations are sufficient to plead that Jett's Towing's conduct was state action under the State coercion test, the court need not analyze whether those allegations are also sufficient under other tests. Accordingly, Jett's Towing's motion to dismiss is **DENIED**.

### H. Shotgun Complaint Issues

Defendants asserted that the complaint must be dismissed because it suffers from shotgun pleading problems. Doc. 39 at 5-6; Doc. 43 at 3-4. The court disagrees. As the motions to dismiss and the above analysis illustrate, the complaint makes reasonably clear which allegations support which claims and which claims are asserted against which defendants. While the complaint is long (438 paragraphs), it does not appear to be unreasonably long or complicated in the context of a putative class action. *See In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1258 (11th Cir. 2021) (analyzing a "559-page consolidated class action complaint against Equifax" that "included 96 named plaintiffs who brought a host of statutory

and common law claims under federal and state law"). Accordingly, the court will not dismiss or order repleader on the ground that the complaint is an impermissible shotgun pleading.

## IV. CONCLUSION

For the foregoing reasons, the motions to dismiss are **DENIED**.

**DONE** and **ORDERED** this 23rd day of March, 2023.

_____

**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE